## In re ADLER, COLEMAN CLEARING CORP., Debtor.

**David A. Jackson, Donald D. Doty, John L. Nappi, Thomas Crouch, David Laskey, A.J. Marks, Jr., Charlotte Marks, Alfred Marks, Alfred J. Marks, Jr., Appellants,**

v.

**Edwin B. Mishkin, as Trustee of Adler, Coleman Clearing Corp., Appellee.**

Nos. 00 CIV 4216 (VM), 00 CIV 4217 (VM).

United States District Court, S.D. New York.

June 11, 2001.

414

Jed Horwitt, Stephen M. Kindseth, Zeisler & Zeisler, Bridgeport, CT, for appellants.

Mitchell A. Lowenthal, Cleary, Gottlieb, Steen & Hamilton, New York City, for appellee.

Kenneth J. Caputo, Wash. D.C., for Securities Investor Protection Corporation.

### DECISION AND AMENDED ORDER

MARRERO, District Judge.

### TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 416

I. *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417

A. THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417
B. THE ILLEGAL SHORT SELLING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418
C. THE NET CAPITAL COMPLIANCE RULE AND HANOVER'S
 RESPONSE TO ILLEGAL SHORT SELLING . . . . . . . . . . . . . . . . . . . . . . . . . . . 419

D. HANOVER'S FINAL WEEK ...........................................421
E. THE CLOSING OF HANOVER AND ADLER................................422
F. PRIOR PROCEEDINGS ..............................................423

## II. *STANDARD OF REVIEW* 423

## III. *DISCUSSION* 424

A. THE PARTIAL SUMMARY JUDGMENT MOTION.............................424
 1. Appellants' Claims and the Bankruptcy Court's Rulings.......424
 2. Contract Formation..........................................428
 3. The Blue Chip Buys..........................................430
 a. Cash in the Accounts ...................................430
 b. Trade Date..............................................432
 c. Effects of Hanover's Fraud..............................433
B. CANCELLATION OF TRADES PURSUANT TO PROVISIONS OF
 CONTRACTS ......................................................435
C. AVOIDING THE TRADES AS FRAUDULENT TRANSFERS PURSUANT
 TO THE BANKRUPTCY CODE .........................................438
 1. Avoidance Pursuant to 11 U.S.C. § 548(a)(1)(A)..............439
 a. Hanover's Intent to Hinder, Delay or Defraud ...........439
 b. Domination or Control of the Debtor.....................441
 (i) Transferee's Intent..............................443
 (ii) Position to Control .............................447
 (iii) Disposition of Debtor's Property ................448
 c. Appellants' Responsibility .............................451
 (i) Appellants' Theory and the Bankruptcy Court's Ruling.............451
 (ii) Agency Principles ...............................453
 (iii) Hanover's Integrated Scheme .....................457
 (iv) Appellants' Innocence ...........................462
 2. Avoidance Pursuant to 11 U.S.C. § 548(a)(1)(B)..............464
 a. Reasonably Equivalent Value ............................465
 (i) Date of Valuation ...............................466
 (ii) The Potential Buy–In Value ......................467
 b. Adler's Insolvency......................................469
 3. Defense of Value Given Pursuant to § 548(c) ...............470
 4. Defense of Settlement Payments or Margin Payments Pursuant to § 546(e).....471
 a. The Parties' Arguments..................................472
 b. The Bankruptcy Court's Rulings .........................474
 c. Applicability of the Defense...........................474
 (i) Settlement Payments .............................475
 (ii) Margin Payments ................................483
 (iii) The Holistic Statutory Framework ...............484
D. AVOIDING THE TRADES PURSUANT TO § 544(b) AND NEW YORK
 DEBTOR AND CREDITOR LAW ........................................485
E. RESCISSION OF CONTRACTS UNDER NON–BANKRUPTCY LAWS..........486
 1. Common Law Fraud ...........................................486
 a. Hanover's Misrepresentations...........................486
 b. The Bankruptcy Court's Rulings and Factual Basis .......487
 c. Appellants' Responsibility .............................489
 d. Reasonable Reliance.....................................489
 e. Adler's Claimed Guarantee ..............................491
F. RESCISSION OF TRADES AS ILLEGAL CONTRACTS ......................492
 1. Illegality Under Securities Laws ...........................492
 2. Exceptions for Innocent Parties ............................494

## IV. *CONCLUSION AND ORDER* 496

## INTRODUCTION

Innocence has many faces, and perhaps embodies as many notions of the word's meaning as the number of self-proclaimed innocents from time immemorial who have invoked the blessings of its absolution. Central to the appeal before the Court is a consideration of innocence: the limits of the concept, how far it validly expands and whose conduct it embraces—beyond the hyperbole to which the term often gives rise. In their opening argument, Appellants declare: "For the first time in American Jurisprudence, a court has held innocent customers liable for the frauds perpetrated by a market-maker simply because it was also their executing broker." Appellants' Brief, dated July 14, 2000 ("Appellants' Brief"), at 5.

In the same vein, repeatedly throughout their lengthy briefs here, as well as before the bankruptcy court, Appellants pronounce their blamelessness. Vigorously and indignantly, they portray themselves as "innocent public investors" whose only role in the events here at issue was their mistaken choice of unethical or dishonest brokers with whom they dealt at arms length and in good faith and for whose frauds and other misdeeds Appellants contend they should not be held responsible. Appellants' Reply Brief, dated November 17, 2000 ("Appellants' Reply"), at 1-2. By their account, Appellants are faultless victims of the bankruptcy Trustee's zealous pursuit of the proceeds of certain allegedly tainted securities transactions that are the subject of this appeal. Appellants seek to retain the benefits of bargains they struck with their corrupt brokers in connection with those trades, for this purpose invoking the shelter and safeguards of the Securities Investors Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78 aaa-lll. *See* Appellants' Reply at 1, 3.

In this context, Appellants' remonstrances put in play here the definition and proper bounds of the notion of innocence. In its ordinary sense, innocence denotes an absence of a particular state of mind— for example, a lack of culpable knowledge or intent— which in turn generally derives from an absence of causal involvement by a person in the harms or undue gains associated with a given wrongful act. This lack of knowing participation serves as the innocent's defensive shield, justifying his claim to be screened or absolved of responsibility for the consequences of the underlying deed.

As unfolds below, however, and as is frequently the case even in connection with the most passionate incantations of the term, there is often more to innocence than meets the eye. Profoundly held convictions of one's own clean hands at times play tricks of the mind, blurring objectivity, concealing from comprehension or view the person's actual role in unavowed causes and effects, and impeding discernment of shades of involvement and responsibility not immediately apparent to the naked or subjective eye. And, beyond a person's own actions, whether the given conduct is individually or externally controlled, circumstances may prevail under which the law, in disregard of the innocent's protestations, and indeed at times even conceding whatever validity due them, may still impose liability, not on account of anything the person may have done or omitted to do, but, for reasons of equity or policy, by imputing to the apparent bystander the misconduct of a sufficiently related wrongdoer. By these means, the law recognizes that even innocent association with scoundrels has its limitations, and its costs. Occasions arise when the villain chooses to exploit the relationship and betray the trust, and then the supposed "innocent" may be obligated

to pay a price. The operation of these principles drives much of what is at issue on this appeal.

## I. FACTS [1]

### A. THE PARTIES AND THEIR TRANSACTIONS

Hanover Sterling & Company ("Hanover") was an introducing broker-dealer, located principally in New York City. Its main business was underwriting certain initial public offerings ("IPO's") of securities. Hanover would act as the market-maker for these securities (the "House Stocks"). As such, it held itself out as ready to buy House Stocks (for which it set a "bid" price) and sell House Stocks (for which it set an "ask" price). In particular, whenever a Hanover customer bought or sold House Stocks, Hanover acted as a "middle man" in the purchase or sale of those securities. Hanover was registered with the Securities Exchange Commission ("SEC") and was a member of the National Association of Securities Dealers ("NASD") and the Securities Investors Protection Corporation ("SIPC").

Adler, Coleman Clearing Corporation ("Adler"), the subject of the bankruptcy court liquidation proceeding from which this appeal arises, was a securities clearing house broker-dealer which "cleared" or "settled" executed trades on behalf of other brokerage firms. Hanover was among 42 introducing firms that Adler serviced. Adler was also registered with the SEC, and was a member of SIPC, NASD, as well as the New York Stock Exchange

("NYSE") and the National Securities Clearing Corporation ("NSCC").

Pursuant to an agreement with Hanover dated August 22, 1994 (the "Clearing Agreement"), Adler undertook to clear trades for Hanover. This contract obligated Adler to: (a) clear and settle trades at Hanover's instructions; (b) prepare and mail trade confirmations to Hanover's customers; (c) settle contracts and securities transactions between Hanover and other broker-dealers (the "Street" transactions), and between Hanover and the customers it introduced to Adler; (d) perform cashiering functions for Hanover's customers' accounts; and (e) maintain copies of the documentation relating to the accounts of Hanover's customers. In clearing and settling trades, it was Adler's responsibility to ensure that securities and cash were transferred to and from the appropriate Hanover and customer accounts and that this information was properly recorded and reported to Hanover and the customers. Consequently, while Hanover had primary direct dealings with its customers, it was Adler that held the customers' cash and securities.

In addition to servicing customer accounts, Adler cleared and settled trades for Hanover's own proprietary accounts. The securities from both Hanover's proprietary and customer accounts were held at Adler's Depositary Trust Company account, while cash for these accounts was held in other Adler bank accounts. When Hanover executed trades on behalf of its customers with the Street, Adler cleared the transactions through the NSCC, which

---

1. The facts recited here are taken from the factual recitation of the bankruptcy court set forth in the decision (herein the "Decision") which is the subject of this appeal. The Decision is reported in *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 247 B.R. 51* (Bankr.S.D.N.Y.1999), citations to the text and holdings of which are referred to herein

as the *"Decision"*. The definitions and terminology used in this Opinion are adopted from those employed by the bankruptcy court in the Decision. Except where quoted or as otherwise specifically indicated, the factual summary detailed below derives from the facts section reported at pages 65–72 of the *Decision.*

would match buy and sell orders between Adler and the other brokerage houses involved.

When Adler instituted liquidation proceedings under the circumstances described below, over 15,000 customers filed claims, several hundred of which were denied for various reasons by the court appointed trustee, Edwin B. Mishkin (the "Trustee"). Among those denied are claims of several hundred customers that arose from transactions which occurred during the period February 17 through February 24, 1995, Hanover's last five days in business (the "Final Week"). The eight [2] Appellants in this appeal were among approximately 133 claimants (the "Claimants") who took the Trustee's denials of their claims to trial.[3] Their claims for cash and securities arise out of sales of House Stocks (the "Challenged Sales") and related purchases of certain Blue Chip [4] securities (the "Challenged Blue Chip

Buys") these customers ordered Hanover to execute during the Final Week [5] (collectively the "Challenged Trades").

In connection with certain of these transactions, the proceeds of the Challenged Sales were to be applied to pay for Appellants' Blue Chip Buys. With regard to transactions that occurred up to February 23, 1995 Adler sent trade confirmations to the customers effectuating the transactions. No such confirmations were sent with respect to the Challenged Trades that occurred on February 24 because, as described below, Adler retrieved the confirmations before they were transmitted to the customers.

## B. THE ILLEGAL SHORT SELLING

Beginning around January 20, 1995, a group of broker-dealers (the "Short Sellers") engaged in a pattern of short selling House Stocks in order to depress the market price of the securities.[6] While short

2. As filed with this Court, the appeal named nine Appellants. They were David A. Jackson; Rabbi Mark Kunis; Alfred J. Marks, Jr.; Thomas C. Crouch; Donald T. Doty; William Giarusso; David P. Laskey; Michael Polselli; and John T. Nappi. *See* Appellants' Brief at 26–33. At the oral argument the Court conducted on the matter, Appellants counsel informed the Court that Mr. Polselli had reach a settlement with the Trustee and was no longer a party to this appeal. *See* Transcript of Oral Argument on April 10, 2001 at 2.

3. The remaining Claimants did not pursue their claims on this appeal. *See* Trustee's and SIPC's Opposition Brief, dated September 29, 2000 ("Trustee's Brief"), at 2–3. Throughout this Opinion the Court refers to Claimants in a manner consistent with the bankruptcy court's references insofar as the Decision pertains to all Claimants. Where the context requires reference to Appellants separately from Claimants the Opinion will so differentiate.

4. Securities other than House Stocks.

5. One point of contention between the parties to this appeal is whether Appellants were

"favored customers." *See* Appellant's Brief at 25–26; Trustee's Brief at 13. The issue might be semantic in part. The Trustee defines "favored customer" as a customer in whose account Challenged Trades were booked, while Appellants' definition rests on whether a customer was an insider in Hanover's business or a relative of insiders. Trustee's Brief at xiv; Appellants' Brief at 26. The bankruptcy court did not treat this question as material to a resolution of the issues before it, stating that whether or not a Claimant was a "favored customer" did not determine liability for Hanover's fraud. *See Decision*, 247 B.R. at 134. Rather, the court regarded that determination as resting on whether the Claimant was seeking to enforce Challenged Trades. *See id.* The court also noted, as further discussed below, that whether or not a customer was particularly favored or a beneficiary of Hanover's actions did not matter in connection with the Trustee's theory of constructive fraud. *See id.*

6. Short selling involves the sale of stock that the seller actually does not own, but has arranged with a broker to borrow. The seller pays a fee while it borrows the stock and

selling, by definition, involves trading stock the seller does not own, the Short Sellers here had not arranged to borrow the House Stocks they purportedly sold and the securities were not publicly available. These sales were illegal because they violated NASD rules, as well as federal law, including § 10(b) of the 1934 Securities and Exchange Act, 15 U.S.C. § 78j(b). This illegal short selling took place between January 20, 1995 and March 20, 1995 (the "Short Selling Period"). In addition to this illegal activity, the Short Sellers depressed the price of the House Stocks by planting negative information about Hanover and some of the House Stocks with Dan Dorfman, a financial reporter for television station CNBC. Mr. Dorfman transmitted a negative assessment of the stocks in his January 20, 1995 broadcast and reported that Hanover was under investigation by the SEC. Moreover, the Short Sellers spread rumors that Hanover was going to fail by reason of the short-selling scheme.

## C. THE NET CAPITAL COMPLIANCE RULE AND HANOVER'S RESPONSE TO ILLEGAL SHORT SELLING

To understand the effect of the illegal short selling on Hanover, as well as Hanover's response to these activities, a description of the SEC's net capital rule is necessary. Both Adler and Hanover were required to comply with the SEC's net capital rule which obligates broker-dealers to maintain a certain level of net capital intended to protect investors. Net capital is calculated by subtracting from a broker-dealer's total capital "the aggregate of certain non-allowable assets, operational charges and 'haircuts'." *Decision*, 247 B.R. at 68. "Haircuts" represent charges against net capital to assess the real market value in a broker-dealer's proprietary accounts and to account for the risk level of the broker and the concentration of stock in its proprietary account for which it is the market-maker. *See id.* If a market-maker retains too much of its own stock among its assets, its net capital may be devalued because the dealer could not easily liquidate its position without lowering the price of the stock. The amount of liquid capital that the broker-dealer needs to maintain depends on the type of business it conducts.

Every month, Adler and Hanover were required to report their financial information in a Financial and Operational Combined Uniform Single Report (the "FOCUS Report") which contained a monthly calculation of net capital. Net capital must be calculated on a monthly basis, and more frequently if a broker-dealer approaches non-compliance. If a company reaches non-compliance, it must file a report notifying the appropriate self-regulatory organization: NASD for Hanover and NYSE for Adler.

As of December 31, 1994, prior to the Short Selling Period, Hanover's net capital was reported at $3,478,665.00 over its $297,798.00 net capital requirement. However, this surplus plummeted to $162,000.00 by the end of January 1995. This steep decline was a product of the illegal activities of the Short Sellers, who

eventually is called upon to "cover" the short sale by returning the equivalent amount of stock to the broker. *See United States v. Russo*, 74 F.3d 1383, 1388 (2d Cir.1996). The seller hopes that the price of the stock drops between the date of sale and the date he must pay for the borrowed stock, in which case his profit is the difference between the two amounts. At the time of the events at issue here, short sales were subject to regulations requiring the seller to advance margin equal to 50% of the value of the securities sold short. *See Russo*, 74 F.3d at 1388.

caused a depression in the price of the House Stocks, as well as a rise in the volume of House Stocks in Hanover's proprietary accounts, and prompted corresponding increases in Hanover "haircuts".

Hanover was compelled to respond to the downward pressures on House Stock prices for two important reasons: (1) Hanover's customers, including Hanover officers, brokers, and relatives, owned large amounts of House Stocks and (2) Hanover's net capital was supported by large quantities of House Stocks in its own proprietary accounts. In response to the illegal short selling, Hanover could have either lowered the price of the House Stocks or supported those prices by purchasing the House Stocks the Short Sellers were offering at the prices Hanover posted. Hanover, as market-maker for the House Stocks, was empowered to lower their prices, thereby discouraging the Short Sellers who could profit only by buying high and selling low. This strategy, however, would have resulted in losses to Hanover's customers and to Hanover itself through its proprietary accounts, thereby further threatening Hanover's net capital.

Hanover chose to respond by purchasing the Short Seller's House Stocks at inflated prices. However, Hanover could not sustain these purchases indefinitely because a higher concentration of House Stocks in its own accounts would mean increased haircuts, which in turn would mean lower net capital. Thus, Hanover felt pressured to find the means to sell House Stocks to customers or to the Street at Hanover's quoted prices.

By February 13, 1995, Hanover could no longer find customers to purchase the House Stocks in its proprietary accounts. Nonetheless, it continued buying such securities at the inflated prices it quoted. To avoid the negative effect of these acquisitions on its net capital, Hanover had to offset these purchases with corresponding sales. It chose to do so by recording fictitious "buys" of House Stocks in customer accounts. By these means, Hanover avoided further charges to net capital, allowing it to "deceive Adler and the regulators into believing that it was in net capital compliance." *Decision,* 247 B.R. at 69. Hanover posted $3.3 million worth of these fake "buys" between February 13 and 16, 1995 involving 31 customer accounts[7]. At the same time, Hanover booked a further $9.8 million in "buys" that were later cancelled. The bankruptcy court also found these cancelled trades to be fake, and that "Hanover effected them to further its deceptive and illegal actions." *Id.*

Even counting these deceptive transactions and using Hanover's posted prices, the bankruptcy court found that Hanover was still at least $2 million out of net capital compliance by February 16, 1995. If the fake and cancelled buys were removed from the calculation, Hanover's net capital deficiency on February 16 amounted to approximately $6 million. Hanover

7. The Bankruptcy Court found that these "buys" were fake on the following grounds: (1) no one ever paid for them; (2) customers representing 75% of the "buys" by dollar value denied that they ordered them and no customers acknowledged ordering them; (3) Hanover booked 70% of those "buys" by dollar value in closed accounts, dormant accounts and accounts with no assets and/or no activity while Hanover cleared through Adler; (4) the remaining "buys" were at unprece- dented levels in the accounts where Hanover booked them; (5) the average "buy" in those accounts was almost four times the average House Stock purchase by Hanover customers prior to the Final Week; and (6) Hanover masked a portion of the fake buys by booking $2.7 million of fake sales in customer accounts credited with fake buys to make it appear that there was sufficient cash in those accounts. *See id.* at 69–70 (citations omitted).

neither reported its violation of the net capital rule to Adler (as was required by the Clearing Agreement) nor to NASD, and the bankruptcy court found that neither party was otherwise aware of Hanover's true financial condition.[8] On this basis, the bankruptcy court concluded that had NASD known of Hanover's capital deficiency, it would have closed Hanover on February 16, 1995.

## D. HANOVER'S FINAL WEEK

During the Final Week, Hanover continued to purchase House Stocks and recorded $59.2 million worth of House Stock "buys" in its customers' accounts. Of this amount, Hanover cancelled $7.7 million of the purchases before they closed. The bankruptcy court found $45.1 million of these "buys" were fake (the "Fake Buys").[9]

In order to conceal the Fake Buys from Adler, Hanover took steps both to make it appear that the particular accounts contained enough money for the purchases and also to ensure that the customers were not informed of the "buys", so as to prevent the customers from complaining to Adler. To these ends, Hanover booked illegal short sales (the "Fake Short Sales") in some customer accounts. Though these customers did not own, borrow, or intend to borrow the securities, Hanover booked sales of predominately Blue Chip securities in their accounts. These sales made it appear that the accounts held $ 15.1 million in cash, "proceeds" that theoretically could be used to purchase House Stocks. To ensure that the customers did not find out about this activity and possibly complain to Adler, Hanover submitted phony customer address changes to Adler. That way, when Adler sent confirmations of the trades, the statements would never reach the actual customers. Additional fraudulent activity Hanover engaged in during this period included booking trades into accounts that customers had directed to be closed or into accounts opened without customer authorization, as well as entering additional fake buys into Hanover's proprietary accounts.

During the Final Week, only 9% of Hanover's 5900 customers were able to sell their House Stocks, while many more attempted unsuccessfully to do so and complained that Hanover refused to execute their sales orders. Hanover, however, booked a total of $31.5 million worth of

---

**8.** Appellants contend that Adler did, in fact, know of Hanover's financial peril and fraudulent activities. *See* Appellants' Brief at 20. However, as discussed below, the bankruptcy court's factual findings reject this assertion. *See Decision,* 247 B.R. at 70.

**9.** The court cited the following reasons in support of its finding: (1) customers explicitly denied making 90% ($40.4 million) of the Fake Buys, and no customer acknowledged any of the transactions as a real purchase; (2) at least two Hanover brokers whose accounts were booked with Fake Buys denied that they effected those trades; (3) Hanover brokers took the Fifth Amendment when they were questioned about those trades; (4) $10.8 million worth of those "buys" were recorded with Hanover brokers who were not working at Hanover when the buys allegedly took place in their customers' accounts; (5) over 77% of the dollar value of the "buys" occurred in accounts that never before had any trading activity cleared by Adler, and the average "buy" in those accounts was more than ten times the average House Stock buy in all Hanover accounts prior to the Final Week; (6) the "buys" booked in 42 of the accounts, or over 22% of the dollar value ($10.1 million) were at least five times higher than other buys or sells in those accounts; (7) the purchase volume of House Stocks during the Final Week was greater than any other five-day period in Hanover's trading history with Adler; (8) the accounts in which Hanover recorded the Fake Buys contained in aggregate approximately $300,000 in cash and securities; and (9) Hanover made several attempts to conceal the Fake Buys from Adler. *See id.* at 70–71 (citations omitted).

cash credits representing House Stock sales into its customers' accounts, including the small number of customers who were actually able to communicate sell orders. The bankruptcy court found that some Claimants admitted that they did not authorize the House Stock sales and/or Blue Chip Buys and that others submitted documents to the Trustee containing admissions that they were unaware that Hanover had booked the Challenged Trades in their accounts. The court concluded that others, presumably including Appellants, submitted sufficient documentation supporting their contention that they authorized the Challenged Trades.[10]

During the Final Week, Hanover purchased $18.7 million [11] in Blue Chip securities on behalf of the Claimants, including Appellants. Of these purchases, 80% occurred in the last 90 minutes [12] before Hanover closed permanently on February 24, 1995. The bankruptcy court described this activity during the Final Week as "unprecedented." *Decision*, 247 B.R. at 79. According to the bankruptcy court, the accounts chosen by Hanover to purchase Blue Chip securities were not picked at random. Rather, "Hanover booked those Blue Chip buys in accounts where the 'proceeds' of the House Stock 'sales'

exceeded $100,000." *Id.* Hanover brokers, realizing the company's fate, attempted to protect these customers' investments by converting cash in their accounts to securities. *See id.* SIPA differentiates between claims for cash and claims for securities, protecting the former up to $100,000.00, but the latter up to $500,000.00. *See* 15 U.S.C. § 78fff–3(a). By converting cash to securities, Hanover maximized these customers' potential claims "in the inevitable liquidation proceeding." *Decision*, 247 B.R. at 79.

Most of the Blue Chip securities purchased by Hanover for its customers were purchased at significantly higher levels than at any previous time in Hanover's existence. According to the bankruptcy court, almost all (94%) of the Blue Chip Buys were concentrated in eight securities.[13] Many of these securities had never been purchased by the customers through their Hanover accounts, and purchases of the remaining 6% of Blue Chip securities by Hanover customers prior to the Final Week totaled only $194,553.00.

## E. THE CLOSING OF HANOVER AND ADLER

At approximately 11:00 a.m. on February 24, 1995, NASD closed Hanover. Two

---

**10.** The bankruptcy court's summary of the evidence supporting Appellants' authorization of the Challenged Trades is set forth at pages 80–82 of the Decision. *See id.*, 247 B.R. at 80–82. While the court found circumstantial evidence contradicting the Claimants' assertions, it made credibility determinations in Claimants' favor, particularly in light of their sworn testimony that they give advance authorization for the Challenged Trades. *See id.*

**11.** The bankruptcy court cites two different figures for the total amount of the Blue Chip Buys during the Final Week. On page 72 of the *Decision* the amount is given as $18.7 million while on page 106 the amount indicated is $13.3 million. *See Decision*, 247 B.R. at 72, 106. The source cited for the higher

figure is the Declaration of John P. Norris, the Trustee's expert, while the lower number is traced to Trustee Exhibit 770. *See id.*

**12.** The bankruptcy court cites the duration of Hanover's operations on February 24 as 90 minutes on page 72 of the *Decision* and as 40 minutes on page 81. *See Decision*, 247 B.R. at 72, 81. *id.* This Court concludes that the 90 minutes reference was the one intended because on page 73 the *Decision* indicates that Hanover was closed by its regulators at approximately 11:00 a.m. on February 24, 1995. *See id.* at 72–73; 81.

**13.** These Blue Chips were Apple, Dell, Ford, Cisco Systems, IBM, AT & T, Birmingham Steel and Microsoft. *See id.*

days later, on February 26, Adler was forced to close under orders from NYSE.

## F. *PRIOR PROCEEDINGS*

On February 27, 1995 (the "Filing Date"), SIPC commenced a SIPA liquidation proceeding against Adler in this Court under 15 U.S.C. § 78eee(b). Judge Loretta A. Preska found that Adler's customers required protection under SIPA and entered an order pursuant to SIPA § 5(b) appointing the Trustee for the liquidation of Adler and removing the case to the bankruptcy court. The proceedings in bankruptcy court, over which Judge James L. Garrity presided, culminated in the granting of a partial motion for summary judgment in favor of the Trustee with regard to 65 Claimants, including Appellants, who asserted claims based on certain trades that Hanover purported to execute on February 24, 1995. *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 218 B.R. 13 (Bankr.S.D.N.Y. 1998) (herein, *"Ensminger II"*).[14] A trial before Judge Garrity followed between March 13 and March 20, 1998 with respect to claims pertaining to the remaining Challenged Trades. After the trial, Judge Garrity upheld the Trustee's denial of the claims of some of the Claimants because they failed to establish that they authorized Hanover to execute their Challenged Sales or because they did not have sufficient funds in their accounts to pay for the Blue Chip Buys. In any event, the Court sustained the denial of claims as against all Claimants on the grounds that (1) under the Clearance Agreement the Trustee could cancel the Challenged Trades and (2) pursuant to applicable SIPC Rules, the Trustee could avoid the Challenged Trades as fraudulent transfers and/or rescind them as illegal contracts. The bankruptcy court's rulings, which granted the relief the Trustee sought, gave rise to this appeal.

## II. *STANDARD OF REVIEW*

■ On an appeal to the District Court from a bankruptcy court's final order or judgment the bankruptcy court's conclusions of law are reviewed de novo. *See In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir.1999); *National Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2nd Cir.1996).

■ The bankruptcy court's findings of facts, however, are reviewed for clear error. The applicable standard is set forth in Fed. R. Bankr. ¶ 8013, which provides: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witness." A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, (1948); *Metzen v. United States*, 19 F.3d 795, 797 (2d Cir. 1994).

■ The Supreme Court has articulated guidance for proper application of the clearly erroneous standard. "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City N.C.*, 470 U.S.

14. As discussed below, the Trustee's motion for partial summary judgment pertained only to the Challenged Trades that occurred on February 24, 1995, as to which Adler did not send confirmations to the customers. Judge Garrity issued his ruling on that motion on March 13, 1998, just prior to the commencement of the trial.

564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Factual findings must be upheld if "plausible in light of the record viewed in its entirety." *Id.* Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* In elaborating on the standard, the Supreme Court recognized the practicalities and limitations of appellate review of factual determinations. "Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources." *Id.* at 574, 105 S.Ct. 1504.

Appellants state that the only factual issues relevant to this appeal are: (1) the value Appellants gave to Adler in exchange for the transfers sought to be avoided; (2) Adler's intent to effectuate buy-ins of the short positions of the Illegal Short Sellers; and (3) Adler's knowledge of Hanover's fraudulent trading practices and inability to pay for its purchases of House Stock. *See* Appellants' Brief at 4. Appellants, however, assert error of both fact and law in the bankruptcy court's rulings in regards to thirteen specific issues they claim are presented on this appeal. *See id.* at 2–

3. The factual issues and errors Appellants raise are considered separately in the discussion below. Upon a full review of the record, this Court finds no clear errors in the bankruptcy court's findings of fact. Accordingly, the court adopts the foregoing recitation as setting forth the facts pertinent to the Court's treatment of the legal issues Appellants cite.

## III. DISCUSSION

### A. THE PARTIAL SUMMARY JUDGMENT MOTION

#### 1. Appellants' Claims and the Bankruptcy Court's Rulings

Appellants take issue with the bankruptcy court's granting the Trustee's motion for partial summary judgment and subsequently declining to alter its decision so as to deny the motion. The Trustee's motion related to his disallowance of claims arising out of Appellants' February 24, 1995 Trades that Adler refused to confirm. Judge Garrity held that Claimants were not entitled to customer claims for cash or securities under SIPC Rules §§ 300.501 through 300.503 (the "Series 500 Rules"), 17 C.F.R. §§ 300.501–503 (2001).[15] This

**15.** The Series 500 Rules determine whether a customer has a claim for cash or a claim for securities under SIPA. Rules were adopted by the SEC in 1988. Under SIPA, SIPC Rules as promulgated by the SEC are considered legislative rather than interpretive and have the full force and effect of law. *See* 15 U.S.C. § 78ccc; *see also* H.R.Rep. No. 95–746, 95th Cong., 1st Sess. 25 (1977). SIPC Rule 300.501 provides in relevant part that:

(a) Where a SIPC member ("Debtor") held securities in an account for a customer, the customer has a "claim for cash" with respect to any authorized securities sale:
(1) If the Debtor has sent written confirmation to the customer that the securities in question have been sold for or purchased from the customer's account; or

(2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account. 17 C.F.R. § 300.501. Rule 300.502 provides in relevant part that:

(a) Where the Debtor held cash in an account for a customer, the customer has a "claim for securities" with respect to any authorized securities purchase:
(1) If the Debtor has sent written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account; or
(2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.

ruling was based on the bankruptcy court's finding that Adler had retrieved and cancelled the confirmations of the transactions before Claimants received them, and that, under applicable New York law, the cancellation of the confirmations prevented the February 24 Trades from becoming the subject of completed or executory contracts with Adler.[16] *See Decision,* 247 B.R. at 75; *Ensminger II,* 218 B.R. at 19. The court held that trade confirmation is tantamount to acceptance of an offer. It construed New York's Statute of Frauds, § 8–319(a) of the New York Uniform Commercial Code (the "N.Y.U.C.C."), to require that a securities customer must have received written confirmation of a trade before a contract enforceable against the broker can form. *See* N.Y.U.C.C. § 8–319(a) (McKinney 1990); *Decision,* 247 B.R. at 75, 78.[17] Thus, pursuant to Adler's

Customer Agreements, whether or not executed by the customers, Adler could create a contractual obligation enforceable against it by the customer only upon Adler's transmittal of a written confirmation to the customer. *See id.; Ensminger II,* 218 B.R. at 24.

In ruling upon post-trial motions, the bankruptcy court denied Claimants' request pursuant to Fed.R.Civ.P. 54(b) to revise the court's earlier decision and to deny the partial summary judgment granted to the Trustee. Finding that Claimants' arguments had raised no issue sufficient to compel modification of its conclusions, the bankruptcy court reaffirmed its *Ensminger II* ruling. *See Decision,* 247 B.R. at 74–75.

On appeal before this Court, Appellants renew their challenge to the bankruptcy

---

17 C.F.R. § 300.502. Rule 300.503 provides in relevant part that "[n]othing in these series 500 rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law". 17 C.F.R. § 300.503.

**16.** This issue pertains only to the February 24 Trades and not to the balance of the Challenged Trades because Adler produced and sent written confirmations for all trades that Hanover effected on or prior to February 23, 1995. *See Decision,* 247 B.R. at 74. The Trustee challenged the validity of those earlier transactions, as well as the February 24 Trades themselves, on separate grounds described below.

**17.** Section 8–319 is contained in New York's version of the Uniform Commercial Code. That section, entitled "Statute of Frauds", provides, in pertinent part:

A contract for the sale of securities is not enforceable by way of action or defense unless
(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker

sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price....

*Id.* In 1997, the New York State Legislature amended article 8 of the Uniform Commercial Code to streamline the rules applicable to securities transactions. *See* McKinney's Session Laws of New York L.1997, ch. 566 at 2532 (passed September 10, 1997). This amendment essentially rendered the Statute of Frauds inapplicable to securities trade. In signing the bill, Governor Pataki noted that the amended statute recognizes current practices of the securities industry under which book entry delivery of stocks occurs without the physical movement of stock certificates. *See id.* at 1950. The effect of these amendments to Article 8, enacted after the Challenged Trades here were completed, lends further support to Judge Garrity's conclusion that under the text of the New York Statute of Frauds then in effect, absent Adler's written trade confirmations, Appellants' purported House Stock Sales did not give rise to enforceable securities contracts. Had prior law been understood to recognize book entry alone to suffice to satisfy the Statute of Frauds, as Appellants argue, the 1997 amendments to Article 8 would have been unnecessary.

court's summary judgment decision. First, Appellants contend that their February 24 Trades at issue are governed by the SIPC Series 500 Rules, which offer two alternative means by which a customer may establish entitlement to the protection and benefits of SIPA and SIPC Rules: either receipt of written confirmation of their trades *or* sufficient evidence that the relevant securities have become the subject of a "completed or executory contract" for purchase or sale. *See* 17 C.F.R. § 300.502(a)(2). Appellants assert that (1) for SIPA purposes a contract for the sale or purchase of securities forms on the trade date when the customer places an order and the broker executes the transaction and logs it in its computer records and other books and (2) such book entry evidence is sufficient to consummate a securities contract, thereby rendering proof of the delivery of a written confirmation to the customer unnecessary. Appellants maintain that the bankruptcy court erred in rejecting their arguments and by ruling instead that no contract had formed between Appellants and Adler because Adler had cancelled its written confirmations before the trades settled.

Second, Appellants argue that the bankruptcy court misconstrued paragraph 8(a) of Adler's Standard Form Customer Agreement and misapplied § 8–319 of the N.Y.U.C.C. Appellants contend that the bankruptcy court effectively· established a condition precedent to the formation of a securities contract by requiring customer receipt of a written confirmation and absence of timely objection as a basis for the existence of an enforceable agreement.

Paragraph 8(a) of Adler's Customer Agreement provides that

[t]he confirmation of the receipt or execution of an order shall be conclusive and binding upon the undersigned [customer] if the undersigned does not object thereto in writing within five business days after Adler Coleman has sent the confirmation to the undersigned by mail or otherwise.

*See* Customer Agreement ¶ 8(a) (Trustee Ex. 66); *see also Decision,* 247 B.R. at 76; *Ensminger II,* 218 B.R. at 24–25. In the bankruptcy court's interpretation of this paragraph, Adler was not required to clear and settle any trade until the customer both received a written confirmation and failed to object in a timely manner. *See Decision,* 247 B.R. at 76. This construction of paragraph 8(a) of the Customer Agreement served as the basis for the court's holding that Appellants' February 24 Trades did not comply with the requirements of N.Y.U.C.C. § 8–319(a).

Appellants hold that § 8–319(a) contains the requisite elements to enforce a securities contract in New York and that the provision contains no reference to a requirement of actual receipt of the writing by the party seeking the enforcement. They read the statute to require merely that such writing exist, and that here the various transmissions of trade orders from Hanover to Adler and their recording on Adler's computer records and booking in the customers' accounts constitute sufficient evidence of the existence of the customers' contracts without the necessity of delivery by Adler of the written confirmations.

Appellants further argue that even if no contract with Adler formed, the bankruptcy court also erred by holding that only a contract between a customer and a debtor satisfies the Series 500 Rules. In Appellants' view, the Series 500 Rules do not specify that the contract must be with a "debtor". Accordingly, here, where Adler was a clearing broker, the Rules could be satisfied by the customers' securities contracts with Hanover, the introducing broker, and by Hanover's related agreements

with Adler, as clearing house, of which Appellants claim to be third party beneficiaries. Appellants' argument therefore posits that the "completed or executory contract" language of the series 500 Rules requires only that "a" contract exist, without specifying that such contract must be with the debtor. *See* 17 C.F.R. §§ 300.501–502. Appellants allege that the bankruptcy court's ruling effectively reads the word "debtor" into the Series 500 Rules.

Finally, Appellants assert procedural errors in the bankruptcy court's rulings. They contend that the court improvidently granted summary judgment to the Trustee by ignoring issues of fact that Claimants' responses presented and by resolving ambiguities against the non-movants. Specifically, Appellants point out that the Trustee's cross motion for partial judgment rested solely on two arguments: that (1) Adler had decided not to clear and settle and affirmatively to cancel the February 24 Trades and (2) the trades were unenforceable under the New York Statute Frauds because § 8–319(a) required the Claimants, in order to establish the existence of enforceable contracts, to possess written confirmations of the transactions. Nonetheless, according to Appellants, the bankruptcy court, while acknowledging that the evidence demonstrated that Adler had not cancelled the trades, ruled on the basis of its interpretation of paragraph 8(a) of the Customer Agreement that no contracts actually formed for Adler to cancel.

Appellants claim that because the Trustee had not raised this "no-contract-formed" issue in his motion, the bankruptcy court could not sua sponte rely on it as the basis for its decision, in doing so denying the Appellants of an opportunity to respond to the court's interpretation of paragraph 8(a). *See* Appellants' Brief at 44–45; *Decision,* 247 B.R. at 74–75; *Ensminger II,* 218 B.R. at 27. In contesting Judge Garrity's determination that under paragraph 8(a) of the Customer Agreement Adler did not intend to be bound by the Customer Agreement, Appellants argue the court erroneously made findings of fact with regard to these issues by drawing inferences against, rather than in favor of Appellants as non-movants. *See* Appellants' Brief at 46.

On this appeal, the Trustee and SIPC do not address Appellants' challenge to that portion of the bankruptcy court's decision granting partial summary judgment. *See* Trustee's Brief at 25. In their view, questions as to whether contracts formed with respect to these trades for which Adler never sent confirmations, and whether or not Appellants failed to establish claims for the Blue Chips even if the Challenged Sales were held valid, are "academic" because the issues are not fully dispositive of this entire matter, whereas the various other grounds based on fraud asserted by the Trustee would comprehensively defeat Appellants' claims to all of the Challenged Trades. *See id.* at 25–26.

Regarding these issues, the bankruptcy court's Decision methodically considers and disposes of each of Appellants' arguments in extensive detail and by persuasive reasoning. Although the Trustee has declined to square the issue on this appeal, and the Court concurs that the matter is not entirely dispositive of this proceeding, the Court believes it is nonetheless appropriate to respond to Appellants' challenge to this aspect of the bankruptcy court's ruling. For the reasons Judge Garrity articulates, this Court concludes that the bankruptcy court properly granted the Trustee's partial motion for summary judgment.

## 2. *Contract Formation*

■ Appellants cite no authority persuasively supporting their contention that in the context of securities transactions subject to N.Y.U.C.C. § 319, delivery of a writing confirming the trade and creating the contract is not required. To the extent applicable principles exist in New York case law, *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952), upon which the bankruptcy court relied, is more closely analogous than the cases from other areas of the law Appellants adduce. *Schwartz* held, in relevant part, that in the absence of delivery of an appropriately executed contract to the party seeking enforcement, the mere existence of a signed writing is insufficient to evidence formation of a contract when the parties manifest an intent to be bound only upon the delivery of the written document. *See also Durable v. Twin County Grocers*, 839 F.Supp. 257, 260 (S.D.N.Y.1993) ("[w]here a writing sent by the party to be bound to the other specifically indicates that an additional agreed-upon writing is contemplated prior to entry into a binding contract, this indication of intent should be honored.") (citing *Arcadian Phosphates v. Arcadian Corp.*, 884 F.2d 69, 72–73 (2d Cir. 1989)); *accord Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1985).

The evidence here supports the bankruptcy court's determination that in the Customer Agreement or through their course of dealings the parties expressed an intent to be bound only upon Adler's transmission of written trade confirmations to the customers. By virtue of the three-way relationship that existed here, the trade confirmation, as Judge Garrity noted, was the only communication that ever occurred between Adler and the Claimants. *See Ensminger II*, 218 B.R. at 25. Absent Adler's ability to determine contract for-mation through transmission of the written confirmations, Hanover would have been in the position to form securities contracts for its customers binding upon Adler by unilaterally entering the trades into Adler's books, without Adler having any ability to protect itself against transactions that were not in its interest, contrary to the provisions of the Clearing Agreement. *See* Clearing Agreement ¶ 3b (Trustee's Ex. 771). To recognize such unilateral book-entries by themselves as sufficient to form contracts enforceable against Adler would effectively permit Adler to be entrapped into obligations it never intended. *See Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 497–99 (S.D.N.Y.1987).

Appellants rely heavily on *Murray v. McGraw (In re Bell & Beckwith)*, 821 F.2d 333 (6th Cir.1987) for the proposition that a securities customer's rights and obligations, and therefore a customer claim under SIPA, become fixed on the trade date, and that the bankruptcy court's holding to the contrary is inconsistent with that case and the Series 500 Rules. This Court disagrees. As more fully described below, the broker relationships, type of trades and underlying fraud prevailing in the case at bar are all distinguishable from the fact pattern the *Bell & Beckwith* court addressed before the Series 500 Rules were promulgated. *See* discussion *infra* Part III.A.3.a.

■ Second, the bankruptcy court rejected Appellants' argument that the Rules require only that the securities in question be the subject of "a" completed or executory contract, rather than only a contract with the debtor. The Series 500 Rules and SIPA, as the court observed, address claims against a debtor and its fund of customer property. *See Decision*, 247 B.R. at 77.

Rule 300.502(a)(2) provides that "where *the Debtor held cash in an account for a customer*" the customer has a "claim for securities", whether or not a written confirmation has been sent, if the securities in question satisfy three conditions: they must have become the subject of (1) a completed or executory contract; (2) for sale or purchase of securities; (3) from "*the account*". 17 C.F.R. § 300.502(a) (emphasis added); *see also In re A.R. Baron Co., Inc.*, 226 B.R. 790, 796 (Bankr. S.D.N.Y.1998) (where the debtor did not issue a written confirmation of sale and there was no evidence of a completed or executory contract for the sale of securities, the claimant was not entitled to preferred SIPA customer status). Regarding the requirement that the securities contract must be for "sale or purchase" of particular securities, the broker which satisfies that criterion in this case is Adler, as clearing house. As Appellants concede, for SIPA purposes customers introduced to a clearing broker are deemed customers of the clearing broker, and not of the introducing broker. *See* Appellants' Brief at 11; *see also Arford v. Miller Trustee for Stratton Oakmont, Inc.*, 239 B.R. 698, 701–02 (S.D.N.Y.1999), *aff'd*, 210 F.3d 420 (2d Cir.2000).

It is thus Adler's Customer Agreement and the transaction documents generated for each specific securities sale or purchase that constitute the basis for a relevant contract. "The account" from which the relevant securities must become the subject of a contract can only be the same account which the lead paragraph of the Rule specifies is held by "the Debtor" for a customer. Like the bankruptcy court, this Court fails to see how a customer could have an enforceable preferred SIPA claim against a debtor, payable out of a pool of funds available to pay all of the debtor's eligible creditors, absent an enforceable obligation against that debtor. *See Decision*, 247 B.R. at 77.

■ The Court finds unconvincing Appellants' assertion that the Clearing Agreement constituted a contract qualifying for these purposes and applying to Appellants as third-party beneficiaries. The Clearing Agreement does not constitute a "contract for sale for or purchase *from the account*". 17 C.F.R. § 300.502(a)(2) (2001) (emphasis added). The Clearing Agreement is a contract between Hanover as introducing broker and Adler as clearing broker that governs the parties' respective rights and obligations. It does not purport affirmatively to define the terms of any particular customer's trade or the conditions relating to Adler's establishment and servicing of the individual customers' accounts. Appellants cite no provision of that agreement that could reasonably be construed to satisfy the language of the Rule. Moreover, the provision of Rule 300.502(a) that the debtor hold "cash in an account for a customer", 17 C.F.R. § 300.502(a), suggests as well that the qualifying contract must be one that governs the conditions of the disposition of that cash and its relation to the purchase or sale of securities from the account—— as for example the sufficiency of such cash to warrant execution of the particular trade.[18]

The Court also finds no merit in Appellants' proposition that irrevocable contracts between them and Adler could form

---

18. Under paragraph 4(b) of the Customer Agreement, customers purchasing securities were required to have "previously uncommitted, immediately available funds in an amount sufficient to pay the purchase price" of the securities they were purchasing. *See* Customer Agreement ¶ 4(b). This provision bears upon the bankruptcy court's determination that Appellants could not make out a claim for the Blue Chip securities because they did not have sufficient funds in their accounts.

automatically by virtue of Hanover's direct access to Adler's computer system, merely through the unilateral actions of Hanover, serving as their agent, in booking trades and recording them into Appellants' accounts at Adler, even when the transactions are indisputably fraudulent. Such a construction of the Rules would, as previously mentioned, entrap the broker into liability for obligations to which it did not intend to be bound. *See Tribune*, 670 F.Supp. at 497. It would also render clearinghouses powerless to protect against their introducing brokers' fraud and place them at the mercy of the introducing firm.

Finally, the Court finds that the bankruptcy court adequately addressed the issues raised by Appellants' procedural challenges. Judge Garrity noted that, as filed, the Trustee's motion for summary judgment clearly raised the issue of when Adler created enforceable contracts with the Claimants; that during the arguments on the Trustee's motions the Claimants protested the manner in which the Trustee had introduced the "no-contract-formed" argument, but that no Claimants sought leave to submit any additional evidence or arguments in response to it, either at the hearing or while the motion was under deliberation by the court. *See Decision*, 247 B.R. at 75. On this basis, Judge Garrity concluded that the Claimants were not prejudiced because they had ample opportunity to file legal and factual support in opposing the "no-contract-formed" theory but failed to do so. *See id.* This Court finds that Appellants have advanced no sufficient grounds to warrant disturbing the bankruptcy court's determinations in this regard.

### 3. The Blue Chip Buys

Appellants contest the bankruptcy court's ruling that they failed to establish a claim for securities under the Series 500 Rules on the ground that Appellants lacked "immediately available" funds in their accounts sufficient to pay the purchase price of the Blue Chip securities. Appellants contend the court erred because (1) the required cash was in their accounts and (2) the Series 500 Rules do not require immediately available cash. *See* Appellants' Brief at 46.

The bankruptcy court found no dispute that (1) Adler maintained Hanover's proprietary account and cleared and settled Hanover's trades, whether Hanover acted as buyer or seller; (2) Hanover purported to purchase all of the House Stocks associated with the Challenged Trades; and (3) Adler's books and records showed that Adler, in executing the purchase or sale orders Hanover transmitted, (a) debited the House Stocks out of the Claimants' accounts and into Hanover's proprietary account and (b) debited the cash corresponding to the purchase price out of Hanover's proprietary account and into Claimants' accounts. *See Decision*, 247 B.R. at 82.

### a. Cash in the Accounts

The Trustee sought to disallow the Claimants' claims for the Blue Chips because Claimants did not establish that they had sufficient funds in their accounts to pay for the securities. He maintained that, under Hanover's fraudulent scheme, the cash expected to be generated by the Challenged Sales upon settlement of the trades would be applied to pay for the securities. *See Decision*, 247 B.R. at 82. As such, there was no real cash in the Claimants' accounts because the trades never settled and the proceeds yielded by the Challenged Sales of House Stock, even at the inflated prices manipulated by Hanover, were not enough to cover the cost of the Blue Chips.

The bankruptcy court found that the record did not support the Claimants' argument. Rather, the court determined that cash proceeds of a sale of securities are not available until settlement date. *See Decision,* 247 B.R. at 84. The court concluded that although some Claimants made out a prima facie case that they held preferred SIPA customer "claims for cash" in the form of the proceeds from the Challenged Sales, they could not sustain a valid "claim for securities" in the form of the Blue Chips because the trades never settled, and because a "claim for cash" is not the equivalent of "cash" in the customer's account held by the debtor within the meaning of SIPC Rule 300.502. *Id.* at 85.

On this appeal, Appellants, again relying on *Bell & Beckwith,* maintain that a customer's sale of stock through a broker-debtor who holds possession of the stock constitutes a completed or executory contract when the account is credited, whether or not the clearing broker actually confirms it. *See* Appellants' Brief at 48. According to Appellants, the cash credit Adler posted into their accounts without delivery of actual cash was sufficient to satisfy the "cash in the account" requirement of the Series 500 Rules even if no cash was immediately available to be withdrawn, and notwithstanding the provision of the standard form Customer Agreement which required the cash necessary to purchase securities to have been "previously uncommitted, immediately available funds in an amount sufficient to pay the purchase price". Customer Agreement, ¶ 4(b). Appellants note that only 162 of the 5660 Customer Agreements Adler possessed were signed by the customers, none of them by Appellants, and contend that it was Adler's course of business dealings to waive this provision.

In Appellants' view, recognizing cash credit entries into their accounts on the trade date as being equivalent to actual "cash in the account" preserves for customers the legitimate expectations of their bargains and would leave Appellants here "unaffected by Hanover's and Adler's collapse." Appellants' Brief at 50 (citing *Bell & Beckwith,* 821 F.2d at 339).

The bankruptcy court, rejecting the waiver argument, concluded that waiver constitutes an "intentional relinquishment of a known right." *Decision,* at 247 B.R. at 83 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The court further found that Claimants had adduced no evidence in writing or course of dealings establishing that Adler had knowingly or intentionally waived any provision of its Customer Agreements. The court also reiterated for this purpose its earlier holding that securities contracts cannot form merely by the introducing broker's unilateral book entries of debits and credits into the customers' accounts, but, under New York law, require confirmation by the clearing broker to be enforceable.

Finally, the bankruptcy court rejected Claimants' argument that there was sufficient cash in their accounts. It found that the evidence on the record, including the testimony of Claimants' expert, established that the cash proceeds of a sale of securities are not available until settlement date and that "none of the Challenged Trades booked in the usual way settled." *Decision,* 247 B.R. at 84. According to the court, the experts agreed that "Adler's accounting records merely show pending transactions and that the booking of a transaction does not mean that the transaction had settled." *Id.*

■ This Court sees no clear error in this aspect of the bankruptcy court's factual findings and is persuaded that the bank-

ruptcy court's legal determinations are supported by applicable law. The predicate for a valid "claim for securities" under Rule 300.502(a) is "cash" held by the debtor in the customer's account. *See* 17 C.F.R. § 300.502(a). In the plain meaning of the word, "cash" requires actual funds promptly available. The dictionary defines the term as "money that a person actually has, including money on deposit; ready money." *Webster's New Universal Unabridged Dictionary,* p. 280 (2d ed.1979); *See also Black's Law Dictionary,* p. 216 (6th ed.1990) ("money or the equivalent; usually ready money"). The concept suggests a current asset, as opposed to an expectation or claim to receive a specific sum of money in the future that may be the subject of contingencies. This right to an amount due, a correlative of debt, defines a "credit". *Black's Law Dictionary,* p. 367 (6th ed.1990).

### b. *Trade Date*

■ Appellants cite *Bell &amp; Beckwith* extensively for the proposition that their sale of securities to Hanover was complete on trade date, entitling them as of that point to the legitimate expectations of their bargains. The case is distinguishable, and Appellants place unwarranted reliance on it. Because the SIPC Series 500 Rules are said to have codified the holding of *Bell and Beckwith* (*see In re Investors Ctr., Inc.,* 129 B.R. 339, 351 (Bankr.E.D.N.Y.1991)), ample consideration of the case here is warranted. First, *Bell &amp; Beckwith* involved a one-sided, two-party trade entailing only an order by the customer directly to its broker-debtor to sell securities. 821 F.2d at 334. The securities in question were already in the broker's account and registered in its name, so that the trade was subject to immediate execution by the broker. *See id.* On the date the customer placed the order, the broker sold a portion of the stocks to other brokers and arranged to purchase the remaining shares for its own account. *See id.* All of the transactions were reflected on trade tickets and reported to the customer the same day, with the settlement date indicated to be one week later. *See id.* The Sixth Circuit, reversing contrary determinations by the bankruptcy court and the district court, held that on trade date the customer had a claim for cash, rather than one for securities. *See id.* at 340.

The *Bell &amp; Beckwith* situation is markedly different from the multi-dimensional transaction in the case at bar. There the customer dealt directly with the broker which executed the trade; no intermediary broker acted on behalf of the customer to enter the trade on the clearing broker's account. *See id.* at 334. The broker purchased and sold customer securities of which it already had received delivery, so that no aspect of the transaction remained unperformed other than settlement. *See id.*

Moreover, upon completion of the trade, the sales were reflected on trade tickets and reported to the customer on the same day. *See id.* In other words, to the extent confirmation of the trade represented an essential element to form a binding contract as between the primary broker and the customer, thereby committing the parties to the transaction, the circuit court suggests that step had occurred. Accordingly, the circuit court's holding is premised on the existence of fully performed and enforceable obligations on the trade date. Finally, in holding that trades ordered by customers of a debtor before filing date should be treated vis-a-vis those customers as if subsequently completed by the debtor, the *Bell &amp; Beckwith* court impliedly assumed that the debtor-broker would be able satisfactorily to complete the transactions in relation to other bro-

kers with which the customers dealt. *See id.* at 339. That assumption may be valid where the other brokers are solvent and capable of fulfilling obligations to the debtor. The proposition is questionable where, as here, the purchasing broker, which ordinarily would be required to cover by buying stock elsewhere (*see id.* at 338) was not only insolvent at the time but had purposely defrauded its clearing house broker-debtor.

By contrast, in the instant case, the Challenged Trades contemplated not only Appellants' sale of House Stocks to Hanover and simultaneous purchase of the Blue Chips from third parties in the relevant markets, but also a tri-lateral relationship. These interconnections involved a clearing broker-debtor, implicating Adler's performance obligations to the clearing agency of which it was a participant, and the introducing broker which unilaterally posted the trades directly into the Appellants' accounts, purportedly automatically creating Appellants' claim against Adler. The additional steps and parties involved in this more complex transaction and process implicated contractual obligations and corresponding performances toward the formation of binding securities contracts and consummation of the transactions that, as the bankruptcy court concluded, were not all in place on the trade date. This process required that the clearing broker send trade confirmations to the customers and· did not contemplate that the cash necessary to effectuate delivery of the Blue Chip securities would be in the customers' accounts until settlement date. *See Matthysse v. Securities Processing Servs., Inc.,* 444 F.Supp. 1009, 1020 (S.D.N.Y. 1977) (holding that under applicable provisions of the N.Y.U.C.C., to satisfy delivery and complete a trade of securities in a three-party transaction required both book entry and receipt of confirmation by the customer).

### c. *Effects of Hanover's Fraud*

An equally significant difference, in this Court's view, is the additional dimension that distinguishes and drives so much of the appeal before the Court: Hanover's far-reaching fraud. There was nothing in the *Bell & Beckwith* trades remotely resembling the fraudulent and criminal misconduct which actuated and accompanied the trades here at issue. It is the legitimate expectations of the bargains of those concededly fraudulent transactions of which Appellants seek to avail themselves.

This element makes a critical and compelling difference in this case. In the transactions Appellants seek to enforce as arms-length, good faith bargains, Appellants purportedly sold their shares of House Stocks to Hanover. Appellants' brokers at Hanover knew, however, as the bankruptcy court determined (*see Decision,* 247 B.R. at 98) that Hanover was insolvent at the time; that the prices it agreed to "pay" for its purchase of Appellants' House Stocks were fraudulently inflated by Hanover's manipulation; and that Hanover had no funds in its proprietary account at Adler with which to pay Appellants for those purchases. Nonetheless, Hanover, having independent access to its Adler customers' accounts through a direct computer link, booked the entries of the disputed "cash" credits into Appellants' accounts and corresponding debits into Hanover's own proprietary account, reflecting the transfer or delivery of the phantom "cash" here in contention.

The only way this credit could have materialized into real cash would have required Adler, itself then at the point of financial collapse, to advance the funds in the form of loans to finance Hanover's fraudulent purchases. These monies would support loans that Hanover, then in

its final gasp during its chaotic closing moments, knew would never be paid. *See id.*

These loans and credits were fraudulently posted into Appellants' accounts by their brokers with no intent or ability on Hanover's part to repay them, and were effectuated unilaterally by external, automatic book entries in the records of the clearing broker which was being defrauded. It is thus Adler's purported obligation to make good on Hanover's misconduct that Appellants seek to convert into "cash" in their accounts at Adler within the meaning of the SIPA Rules. This notion of "cash", they contend, is sufficient to give them a binding claim enforceable against Adler entitling them to delivery of the Blue Chips.

Under Appellants' conception, this "cash" was enough to pay for the Blue Chips. They take exception with the bankruptcy court's ruling that paragraph 4(b) of the Customer Agreement required customers purchasing securities to have in the account "immediately available funds in an amount sufficient to pay the purchase price." Customer Agreement ¶ 4(b). Appellants' argue that they had some cash represented by the proceeds from their sale of House Stocks to Hanover and that even if not enough to cover the full price of the Blue Chips, the cash was sufficient for Rule 300.502(a)(2) purposes. This argument ignores that the Rule assumes the existence of a complete or executory contract with respect to the particular trade from the customer's account at Adler, and that in this case, by reason of paragraph 4(b), absent sufficient funds in the account to pay for the Blue Chips' purchase price, Appellants could not possess such a completed contract.

Also overlooked in Appellants' elided view of the transactions is that the purchase of Appellants' House Stocks was simultaneously entered into their accounts by the same brokers at manipulated, artificially high prices which far exceeded the proceeds that could be expected to be derived from the fair market value of Appellants' House Stocks. Under this version of the transactions, by Appellants own account, Appellants gain the full benefit of their "legitimate bargain", as though the trades were entirely untouched by their brokers' frauds, and Appellants are left fully "unaffected by Hanover's and Adler's collapse." Appellants' Brief at 50. But in this construction of events, while Appellants come out whole, Adler and its thousands of other customers and creditors who were not specifically chosen by Hanover as beneficiaries of its fraud, are left holding the proverbial bag.

This Court believes that neither SIPA nor the SIPC Rules promulgated to carry out its protections, nor anything in *Bell & Beckwith*, countenance a legal alchemy by which fraudulent credits posted into customers' accounts from the sale of securities that the bankruptcy court found were "practically worthless" (*Decision,* 247 B.R. at 106) could be transformed into instant cash. In turn, to carry Appellants' theory to its conclusion, the purported "cash" from this conversion would immediately materialize into binding purchase contracts for delivery of brand name securities whose market worth far exceeded the fair value of the proceeds in Appellants' accounts. This operation would demand that during the transfiguration of credit into cash, the manifest improprieties in the methods the Appellants' broker-agents employed, by which the supposed "cash" materialized into the customers accounts in the first place, be overlooked, while at the same time maintaining that the entire trade be blessed as strictly arms-length, good faith and innocent.

Hanover's extensive fraud has overarching significance and implications for

the transactions that culminated in the Challenged Trades that included the February 24, 1995 Blue Chip Buys. Contrary to Appellants' perceptions of these events, Hanover's deeds cannot be ignored in assessing whether Appellants are entitled to enforce the Challenged Trades. While it is true that one of SIPA's primary objectives is to protect individual customers from financial hardship, the legislation also embodies parallel and complementary aims intended

> to insulate the economy from disruption which can follow the failure of major financial institutions; *and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.*

H.R. Rep. 91–1218, at 4 (1970) (emphasis added); *see also* H.R.Rep. No. 91–1613, at 1 (1970), U.S.Code Cong. & Admin.News 1970, pp. 5254, 5255; *SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975).

The SIPC 500 Rules, promulgated in 1988, two years after *Bell & Beckwith* was decided, reflect these ends. They safeguard securities customers' legitimate claims to cash and securities held by the debtor in their accounts prior to filing date, and also manifest a design to deny protection to transactions tainted by fraud. SIPC Rule 300.503(a) excludes such fraudulent claims.[19] *See* 17 C.F.R. § 300.503.

**B. *CANCELLATION OF TRADES PURSUANT TO PROVISIONS OF CONTRACTS***

■ The bankruptcy court sustained the Trustee's contention that he was enti-

tled to invoke contractual rights flowing from paragraph 3(b) of the Clearing Agreement as grounds for cancelling the Challenged Trades. That provision states that Adler may, if it has reasonable grounds to believe such action is necessary to protect its interests,

> refuse to open an account for a specific customer, close an account already opened; refuse to confirm a transaction; cancel a confirmation of a transaction; refuse delivery or receipt of any cash, securities or other property; refuse to clear any transaction executed by [the introducing firm]; or refuse to execute any transaction for an Introduced Account (notwithstanding its acceptance by the Introducing Firm pursuant to Paragraph 5(d)). [Adler] shall use its best efforts to notify [the introducing firm] of any such action in advance thereof if it is able to do so without jeopardizing its economic interest....

Clearing Agreement, ¶ 3(b). The Customer Agreement contains a similar provision defining Adler's rights as against customers. *See* Customer Agreement, ¶ 5(b).

Appellants argue, parallel to their views regarding the formation of securities contracts for SIPA purposes, that SIPA and the SIPC Series 500 Rules govern the establishment of customer claims and contain the exclusive remedies to address the Trustee's claims. In essence, Appellants assert that federal law preempts the application of Adler's contractual rights here. In support of this federal law supremacy theory, Appellants cite *Investors Ctr.*, 129 B.R. 339, and *Bell & Beckwith*, 821 F.2d 333.

---

**19.** Rule 300.503(a) provides that:
Nothing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to

avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law.
17 C.F.R. § 300.503.

The trustee in *Investors Ctr.* sought to deny customers' claims under the Series 500 Rules on the grounds that the clearinghouse broker-debtor, having already sent to the customers confirmations of the securities sales they sought to enforce, subsequently purported to reverse the transactions by sending cancellation notices, as instructed by the debtor, when the debtor realized that it had no funds to pay for the purchases. Appellants stress that the Series 500 Rules were designed to provide a bright line test to determine when a customer has established a claim for cash or for securities, and that the bright line is satisfied, consistent with *Bell & Beckwith,* on the trade date when the purchase or sale is completed. Appellants also assert that the relevant language of the Clearing Agreement grants the Trustee the right to cancel a confirmation of a trade, and not the underlying executed or completed transaction.

The authorities upon which Appellants' argument relies do not endorse the expansive preemption theory Appellants assert. By implication, under Appellants' proposition, federal law would not only establish exclusive rules governing the formation of a securities contract, but would similarly override any express contractual rights pertaining to the cancellation of contracts that the parties may have negotiated to protect their interests from precisely the type of wrongful acts evidenced here. This Court does not read that purpose in SIPA or the SIPC Rules. In fact, the Series 500 Rules contemplate the application of contract law principles. SIPC Rule 300.502(2) explicitly does so by providing that whether or not the broker has sent written confirmations the customer has a "claim for securities" if the securities in question "have become the subject of a completed or executory contract." 17 C.F.R. § 300.502(a)(2); *see Baron,* 226 B.R. at 796; *Ensminger II,* 218 B.R. at 26.

In *Bell & Beckwith,* 821 F.2d at 338, the Sixth Circuit noted that it was concerned with "a transaction that was interrupted by the operation of federal law," specifically a bankruptcy filing under SIPA. Such transactions, the court concluded, "must ultimately be defined as a matter of federal law, because SIPA alters the rights of the parties in a way not contemplated by the U.C.C." *Id.* However, the "dispositive issue" the court there identified entailed specifically whether "this contract should be characterized as 'wholly executory'". *Id.* at 336. There is no indication in the circuit court's opinion that the trades in question were assailable under the terms of any other contractual commitments between the parties. *Bell & Beckwith* thus presupposes the existence of a contract otherwise valid that had already come into force and whose completion was interrupted by the bankruptcy filing. As regards such contracts, *Bell & Beckwith* stands for the proposition that under federal securities law, trade date rather than settlement date "fixes the rights of the parties" to a transaction interrupted by a SIPA filing. *Id.* at 338.

Consequently, as discussed above, the case did not deal with the prerequisites for the *formation* of a contract, the elements of which presumably would still be governed by contract principles defined by applicable law. By the same token, because the case assumes the existence of a contract whose enforcement was not contested on other grounds, the court did not consider the circumstances under which, absent confirmations that would have satisfied Rule 300.502(a)(1), *cancellation* of a securities contract may be permissible on an independent basis in accordance with the relevant terms defining the parties' rights and obligations relating to such a contract.

The second case upon which Appellants rest their preemption theory indirectly references this issue, and suggests an outcome which does not support Appellants' contentions. The court in *Investors Ctr.* held that the debtor's purported cancellation of the trades did not deprive the customers of their claims for cash from their sales of stock because, under SIPC's Rule 300.501(a)(1), the customers already had been sent a "written confirmation" of their sales, whose finality could not be erased by the later notice. 129 B.R. at 349–50. At the moment of transmission, that first confirmation fixed the customers' rights by operation of SIPA, regardless of the parties' other underlying contractual rights and obligations. *See id.* at 350. The court, however, assumed that such other contractual rights did exist, potentially also giving the customers a claim for breach of contract against the broker based on the attempted cancellation of the trades. *See id.* at 351.

In other words, to the extent the SIPC Rules provided for customers' rights to claims for cash to become binding upon trade confirmation, the Rules superseded the parties' other contractual relations to the contrary. Relevant to the issue at hand, the court acknowledged that had the customers not been entitled to the protection of Rule 300.501(a)(1) by reason of the written confirmations sent to them, the provision of Rule 300.501(a)(2) defining the alternative basis for a claim for cash— the securities in question having become the subject of a completed and executory contract— would have operated to deny the customers' claims. *See id.* at 350. In that event *"the cancellation notice might have been fatal to the claims of these customers." Id.* (emphasis added).

In the case at hand, because Adler sent no confirmation notices to effectuate the February 24 Trades Appellants seek to enforce, Appellants, unlike the customers in *Investors Ctr.,* must rely on the alternative "completed or executory contract" prong under Rule 300.501(a)(2) in order to establish their claim for securities. The bankruptcy court disagreed with Appellants' contention that by operation of SIPA, as applied in *Bell & Beckwith,* Appellants had completed irrevocable contracts on the trade date, concluding instead that because Adler had not sent confirmations with respect to the transactions, delivery of which was required to satisfy New York's Statute of Frauds, N.Y.U.C.C. § 8–319(c), a condition necessary to the formation of an enforceable contract in New York had not been met.

Because a predicate of Rule 300.501(a)(2) is not only the existence of a contract, but also a contract that is either completed or executory, a necessary condition could not be satisfied if the contract is precluded from becoming completed or executory by some intervening action, such as cancellation effectuated on some independent basis in accordance with the parties' underlying contractual relationship and expressed intent, or even, as the *Investors Ctr.* court recognized, as a breach by either party.

Appellants concede that paragraph 3(b) of the Clearing Agreement authorized Adler to cancel a confirmation of or refuse to confirm a trade. Insofar as under state law confirmation was an essential element of the parties' contract, Adler's retrieval of the confirmations could be read either as consistent with a decision to prevent the formation of contracts or subsequently to cancel the trades that otherwise could have ensued to settlement so as to create executed or executory contracts. Like the customers in *Investors Ctr.* whose trades were not executed, these customers may hold a claim for breach of contract, though not an enforceable SIPA claim. *See Inves-*

*tors Ctr.,* 129 B.R. at 353; *see also Baron,* 226 B.R. at 796; *Barton v. SIPC,* 182 B.R. 981, 985 (Bankr.D.N.J.1995); *SIPC v. Oberweis Sec., Inc.,* 135 B.R. 842, 846 (Bankr. N.D.Ill.1991).

The point that emerges from this analysis is that, absent the sending out of securities trade confirmations pursuant to Rule 300.502(a)(1), SIPC Rule 300.502(a)(2), by requiring evidence of an enforceable contract, would not operate, as Appellants' hypothesis would suggest, effectively to vitiate the entire bundle of contractual rights and obligations set forth in the parties' underlying agreements that deal with contractual prerequisites such as the principles governing formation, enforcement and cancellation of the agreement. To construe the provision as mechanically as Appellants suggest would read Rule 300.502(a)(2) out of existence, to the same extent and for comparable reasons that the *Investors Ctr.* court observed that an analogous construction of Rule 300.501(a)(1) in that case would have interpreted that provision out of the statute. *See id.* at 350.

Appellants' theory would produce consequence that SIPA could not have contemplated. By insisting that through mechanical book entries made unilaterally by a customer's agent on the clearing broker's books, even if patently fraudulent, contracts technically formed creating irrevocable obligations for the broker, a securities customer could deprive the defrauded broker, prior to the contract's becoming executory or completed, the negotiated right to invoke permissible safeguards, such as cancellation. The broker thereby may be denied the ability to defend itself from precisely the actions or conditions that the parties contemplated the agreement would protect against, and that the customer may seek to ignore or evade.

For the foregoing reasons, this Court finds no error in the bankruptcy court's

ruling that to the extent the Trustee has reasonable grounds to cancel the Challenged Trades pursuant to paragraph 3(b) of the Clearing Agreement, he is entitled to do so.

## C. *AVOIDING THE TRADES AS FRAUDULENT TRANSFERS PURSUANT TO THE BANKRUPTCY CODE*

The Court turns to the Trustee's argument, sustained by bankruptcy court, that even if Appellants held binding contracts with respect to the Challenged Trades, those transactions were tainted with the massive frauds perpetrated by Hanover and its brokers against Adler and its creditors. On this basis, the Trustee maintains that the bankruptcy court properly determined that the Trustee could cancel the confirmations of the trades and/or avoid the contracts and underlying transactions as fraudulent transfers or illegal agreements under various federal and state laws.

In fact, Hanover's fraudulent conduct at issue was so pervasive, and so permeated the events, the parties' relations and the transactions at hand that, as Judge Garrity recognized, the underlying frauds cannot be disassociated from the basic issue of whether the Challenged Trades formed valid contracts. *See Decision,* 247 B.R. at 84, 97. Thus, for example, it was Adler's realization on February 24, 1995 of the full scope of Hanover's fraud that motivated Adler's decision that same day to retrieve the confirmations of the February 24 Trades before they were transmitted to the Claimants. Adler's cancellation of the confirmations in turn constituted the basis for the bankruptcy court's determinations that no contract between Adler and Appellants formed and that the Trustee, in protecting Adler's interests under the Clearing Agreement, was entitled under that

Agreement to cancel the Challenged trades altogether.

The bankruptcy court found sufficient grounds to sustain the Trustee's avoidance of the Challenged Trades insofar as the transactions purported conveyance by Adler of any cash or securities to Appellants' accounts, and as to any obligation incurred by Adler to deliver any such property. The court disallowed the trades as actual fraudulent transfers under § 548(a)(1)(A) of the Bankruptcy Code (herein the "Code"), as well as constructively fraudulent trades under § 548(a)(1)(B), and granted the Trustee recovery pursuant to § 550.[20]

1. *Avoidance Pursuant TO 11 U.S.C. § 548(a)(1)(A)*

Under § 548(a)(1)(A) a trustee

may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor... if the debtor voluntarily or involuntarily... made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made or such obligation was incurred, [ ] indebted.

11 U.S.C. § 548(a)(1)(A).

In determining whether the Trustee could prevail in his claim to avoid the Challenged Trades pursuant to § 548(a)(1)(A), the bankruptcy court applied a three-part test reflecting the elements the Trustee had to establish. Those requirements were that (1) Hanover, rather than Adler as debtor, actually intended to hinder, delay or defraud Adler's credi-

tors or the SIPC; (2) Hanover's fraudulent intent could be imputed to Adler because Hanover dominated or controlled Adler's disposition of its property; and (3) Hanover's fraudulent acts could also be charged to the Claimants as principals and ultimate beneficiaries of the trades conducted by Hanover as their agent.

Examining the totality of the circumstances to infer whether the fraudulent intent existed here, the bankruptcy court found that the Trustee was entitled to judgment under § 548(a)(1)(A) avoiding the transactions and restoring to the debtor's estate the property fraudulently transferred. *See Decision,* 247 B.R. at 86; *see also Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 218 B.R. 689, 704–05 (Bankr.S.D.N.Y.1998) ("*Ensminger I* ") (denying Claimants' motion to dismiss the Trustee's complaint and ruling that the Trustee's allegations were sufficient to state a claim for avoidance pursuant to § 548).

Appellants dispute each of the bankruptcy court's conclusions. They contend that as innocent customers they cannot be held vicariously liable for the fraudulent and illegal acts of their brokers under any of the agency law principles Judge Garrity applied, and charge error in the court's holding that Hanover dominated or controlled the disposition of Adler's property.

a. *Hanover's Intent to Hinder, Delay or Defraud*

The nature, purpose and full magnitude of the fraud perpetrated by the Hanover brokers in this case can be best understood in the light of the position Hanover

---

**20.** Under § 550(a), to the extent a transfer is avoided under various provisions of the Code, including § 548,

> the trustee may recover, for the benefit of the estate, the property transferred, or, if the Court so orders, the value of such prop-

erty, from—(1) the initial transferee of the transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

found itself in by mid-February 1995, as the facts emerge from the voluminous evidence the bankruptcy court admitted and credited. As detailed above, Hanover, its officers and brokers, as well as relatives, friends and selected favored customers were all heavily invested in House Stocks. Because Hanover was the dominant market-maker for the House Stocks and used the value of House Stocks in its proprietary accounts to support its net capital requirements, the market prices Hanover quoted for these securities took on special importance to Hanover and its officers. See Decision, 247 B.R. at 68–69. In late January 1995, the posted prices for the House Stocks came under severe attack by the activities of the Illegal Short Sellers.

In response to the short selling, Hanover, rather than lowering the prices it offered for the House Stocks and thereby discouraging the Short Sellers' onslaught, supported the prices by purchasing for its own account, at Hanover's posted prices, all of the House Stocks the Short Sellers put up for sale. See id. at 69. Hanover's large purchases of House Stocks for its proprietary accounts had adverse implications. It forced Hanover to take charges against net capital in order to remain in compliance with the SEC's net-capital rule and avoid the risk of being closed down by Hanover's regulators or by Adler. See id. at 68.

Faced with the prospect of net capital deficits, with the high volume of House Stocks the Short Sellers were offering and with an insufficient demand for those securities among its customers and other buyers at Hanover's high prices, Hanover devised the fraudulent scheme underlying the transactions that the Trustee sought to avoid. Hanover fabricated purchases of House Stocks and booked them into the accounts of real and fictitious customers to create the appearance that its fake acquisitions of House Stocks were matched by corresponding sales of the securities at the stated prices. See id. The bankruptcy court found that Hanover's purpose in booking these purchases was "to deceive Adler and the regulators into believing that it was in net capital compliance." Id. at 69.

The bankruptcy court also found extensive evidence establishing that during the Final Week Hanover's principal brokers sold House Stocks and purchased Blue Chips for their own accounts and for their families, friends, and favored customers to ensure that when Hanover's inevitable collapse occurred, they would hold preferred SIPA claims. See id. at 86–90. Aware of the nature and limitations of SIPA protections extended to customers of failed securities firms,[21] the brokers posted entries of Blue Chip purchases by Hanover on the basis of whether the expected proceeds from the customers' House Stocks sales, when applied against the cost of the Blue Chip Buys, would exceed $100,000.00, so that any cash position remaining in the account would be reduced below that threshold amount. See id. According to the evidence the bankruptcy court considered and credited, some of the Claimants were told by their Hanover brokers that they needed to shift their holdings, presumably from House Stocks to Blue Chips, in order to maximize the extent of their protection under SIPA, and some of the

21. In a SIPA liquidation proceeding, SIPC advances funds to the trustee, limited to $500,000.00 per customer, of which no more than $100,000.00 may be based on a customer claim for cash, as opposed to securities, in order to enable the trustee to satisfy customer claims that fall within these limits. SIPC becomes subrogated to customer claims paid to the extent of such advances. See 15 U.S.C. §§ 78fff–3(a), 78fff–2(c)(1), and 78lll(11); Ensminger I, 218 B.R. 689 at 695–96.

brokers themselves, following Hanover's closing, admitted that their actions were motivated by a purpose to vest their customers with preferred SIPA claims. *See id.* at 87.

In addition, Judge Garrity found that following Hanover's failure, a number of its brokers joined other brokerage houses, from which they solicited business from some of their former Hanover customers. *See id.* at 89. Among the former customers contacted were four of the eight Appellants here. *See id.* at n. 55.[22] When questioned about their involvement in these transactions, Hanover's principals and brokers refused to testify and invoked their Fifth Amendment privilege against self-incrimination. *See id.* at 89.

On the basis of these factual findings of Hanover's unlawful conduct, and other undisputed evidence of Hanover's massive market manipulation, the bankruptcy court concluded that Hanover and its brokers clearly intended to hinder, delay and defraud Adler and its creditors, including SIPC.[23] *See id.* at 90 ("[N]o one disputes that while Hanover's brokers' immediate purpose was to deceive Adler, they plainly intended for Adler's creditors, including SIPC, to be the ultimate victims of their fraud.").

During the bankruptcy court proceeding, the Claimants conceded that Hanover's conduct was fraudulent. *See Decision,* 247 B.R. at 90, 95. On this appeal, Appellants have not challenged the bankruptcy court's conclusion on this point. In fact, they acknowledge that Hanover's brokers had engaged in fraud. *See* Appellants' Brief at 59. They argue only that to the extent Hanover committed fraud it did not do so as Appellants' agent. *See* Appellants' Brief at 53–58. This Court thus accepts the bankruptcy court's factual recitations and findings with regard to Hanover's fraud and other unlawful actions. Appellants take issue, however, with the bankruptcy court's conclusions of law relating to attribution of Hanover's fraud to Adler and in turn by operation of agency principles, to Appellants.

### b. *Domination or Control of the Debtor*

The bankruptcy court, applying a common law principle, determined that Hanover's actual fraudulent intent may be ascribed to Adler on the basis of the court's

---

**22.** According to the Trustee, all of the Appellants were serviced by two Hanover brokers, John Lembo and Joseph DiBella. *See* Trustee's Brief at 13. Both Lembo and DiBella were indicted for securities fraud in connection with their market manipulation of House Stock prices while at Hanover. *See Decision,* 247 B.R. at 89 n. 57. Judge Garrity noted that DiBella pleaded guilty. *See id.* Lembo subsequently did as well, a fact of which this Court may take judicial notice. *See Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir.2000). Lowell Schatzer, Hanover's titular head, refused to testify and absconded, allowing a $50 million default judgment to be entered against him. *See id.* at 89 n. 56. In related rulings Judge Garrity admitted evidence of the Hanover brokers' invocation of the Fifth Amendment and of their other frauds. *See Mishkin v. Ensminger (In re Adler, Coleman Clearing*

*Corp.),* No. 95–08203, 1998 WL 160036 (Bankr.S.D.N.Y. April 3, 1998); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* No. 95–08203, 1998 WL 182808 (Bankr.S.D.N.Y. April 17, 1998).

**23.** SIPC qualifies under § 548(a)(1)(A) as an "entity to which the debtor…became… after the date that such transfer was made or such obligation was incurred, indebted" because in the event Appellants were to prevail and the Challenged Trades were sustained, SIPC would be obligated to pay for them up to the amounts of its statutory limits. It then would be subrogated to Appellants' claims against the Adler estate. *See Decision,* 247 B.R. at 90 (citing *Ensminger I,* 218 B.R. at 695–96 and SIPA, 15 U.S.C. §§ 78fff–2(c)(1) and 78fff–3(a)).

conclusion that Hanover dominated or controlled Adler's disposition of its (Adler's) property. *See Pirrone v. Toboroff (In re Vaniman Int'l, Inc.)*, 22 B.R. 166, 182–85 (Bankr.E.D.N.Y.1982); *Langan v. First Trust and Deposit Co.*, 293 N.Y. 604, 59 N.E.2d 424 (1944); *see also* 5 *Lawrence P. King, Collier on Bankruptcy* ¶ 548.04[1], at 548–24 (15th ed. Rev.2000) (hereinafter *"Collier"*) ("[W]hen the transferee or obligee is in a position to dominate or control the debtor's disposition of his property, however, his intent to hinder, delay, or defraud creditors may be imputed to the debtor so as to render the transfer fraudulent within section 548(a)(1)(A) regardless of the actual purpose of the debtor transferor.").

In support of its domination or control determination, the court relied, first, on the fact of the electronic connections between Hanover and Adler through a direct computer link installed by Adler when Hanover joined its roster of introducing brokers in October 1994. *See Decision,* 247 B.R. at 90. This system provided Hanover direct access to its customers' accounts at Adler, and physically enabled it to manage what purchases and sales were booked to its customers, and to have exclusive knowledge of which trades were legitimate.

As described by Judge Garrity, Hanover brokers obtained orders from their customers and wrote uptrade tickets containing information that Hanover's trading desk entered into its computer and automatically transmitted to Adler for clearing and settlement. *See id.* With regard to transactions involving House Stocks, the entry of the trading ticket information was automatic. *See id.* The process for entries on Adler's books as to securities other than the House Stocks depended on the exchange on which the security was listed. For shares registered on the New York or

the American Stock Exchanges, Hanover's trading desk obtained the market price from Adler's trading desk and then Adler proceeded to execute the transaction as Hanover instructed. *See id.* at 91. For unlisted Blue Chips traded in over-the-counter markets, Hanover itself obtained the price and then posted and executed the trade through its computers into the customers accounts at Adler. These trades were booked into the customers' accounts on the evening of the day when they occurred and appeared in Adler's computer system by the following morning. *See id.*

Thus, Judge Garrity concluded that "at a mechanical level, Hanover controlled what Adler knew about its customers' trading." *Id.* Moreover, "Adler did not select the Hanover trades which were entered on its books and did not monitor the trades on a real-time basis.... Unless Adler took affirmative steps otherwise, the trades Hanover unilaterally input automatically settled." *Id.* By these means, Hanover managed not only to perpetrate the massive frauds evidenced here, but to conceal from Hanover the full scope of its unlawful activities and true financial condition.

The Trustee argued, and the bankruptcy court concurred, that Hanover's domination or control of Adler was inherent in the electronic clearing process so described, and that it was the automatic posting of securities purchases and sales in Adler's trading system, books and records that enabled Hanover during the Final Week to control the process that culminated in the entries of the disputed cash credits and Blue Chip securities purchases into Appellants' accounts. *See id.* Accordingly, the bankruptcy court ruled that, although the fraudulent intent to which § 548(a)(1)(A) refers is that of the debtor, the intent of a transferee of the debtor's property may be imputed when the transferee is in a posi-

tion to dominate or control the debtor's disposition of its property. *See id.* (citing *Ensminger I,* 218 B.R. at 704; 5 *Collier* ¶ 548.04[1] ).

Appellants challenge the bankruptcy court's application of the intent imputation doctrine on several grounds. They contend that the exception is narrowly limited to cases in which the transferee's domination or control over the debtor's management of its business decisions is complete, as when the debtor is essentially the transferee's alter ego, a wholly-owned entity or a controlled corporate subsidiary. *See* Appellants' Brief at 65–67. In support of this argument, Appellants cite precedents where the doctrine was applied. These cases involve control of a debtor by transferee principals, large shareholders, executive officers, directors and insiders or by another corporation, whose dominance of the debtor, by virtue of their relationship, is so extensive that the separate identity of the transferor debtor may be disregarded and the debtor may be deemed as transacting the business of the controlling person or entity rather than its own. *See Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979); *In re Cushman Bakery,* 526 F.2d 23, 31 (1st Cir.1975); *In re Southern Land Title Corp.,* 474 F.2d 1033, 1038–39 (5th Cir.1973); *Armstrong v. United Bank of Bismarck (In re Bob's Sea Ray Boats* ), 144 B.R. 451, 459 (Bankr.D.N.D.1992); *Freeling v. Nielson (In re F & C Services, Inc.),* 44 B.R. 863, 868 (Bankr.S.D.Fla. 1984); *Vaniman Int'l,* 22 B.R. 166.

Appellants maintain on appeal that there is no evidence that Hanover was Adler's insider or alter ego, or that the two firms formed parts of a single entity sufficient to establish Hanover's control. They stress that Adler made business decisions entirely independently of Hanover through separate directors, officers, shareholders and employees. *See* Appellants' Brief at 66.

Moreover, Appellants assert that Adler, acting for its own advantage, entered into the Clearing Agreement independently, accepted Hanover's trades for clearance and settlement, monitored those trades and retained the right unilaterally to end its computer links with Hanover, but chose not to terminate its relationship with Hanover despite its knowledge of Hanover's financial condition and fraudulent practices. *See id.* Appellants further argue that under the domination or control doctrine the fraudulent intent is imputed to the debtor from the dominating or controlling transferee, and that in this case the relevant transferees were Appellants, rather than Hanover. Finally, Appellants assert that a mere contractual right to cause an entirely independent debtor to transfer property does not give rise to domination or control for the purposes of the rule. *See id.* at 66–67.

■ The central consideration under § 548(a)(1)(A) is not what form of ownership or institutional links govern the relationship between the transferee and the debtor. Rather, examining the standard formulation of the principle, the relevant inquiry more narrowly reduces to three elements. First is that the controlling *transferee* possesses the requisite intent to hinder, delay or defraud the debtor's creditors. Second, the transferee "must be in a position to dominate or control". And third, the pertinent domination and control relates to "the debtor's disposition of his property". *See* 5 *Collier* ¶ 548.04[1], at 548–24.

(i) *Transferee's Intent*

■ Appellants claim error in the bankruptcy court's application of the domination or control doctrine as it related to the relevant transferees and beneficiaries of the obligations the Trustee seeks to avoid, and through whom the fraudulent

intent must derive. Appellants assert that they, and not Hanover, were the transferees. Accordingly, they maintain that because there is no evidence demonstrating that Appellants had any intent to hinder, delay or defraud Adler or its creditors, the doctrine is inapplicable in this case. This issue raises a fundamental disagreement between the parties and the bankruptcy court.

The bankruptcy court's analysis of the domination or control doctrine proceeds on the premise that the pertinent transferee in this case is Hanover, although the court does not specify which "property" of Adler's Hanover as transferee was in a position to dominate or control— for example, whether it was Adler's own funds which Adler advanced as loans to Hanover, or customer property Adler held in its accounts, or both. The court refers only to Hanover's domination or control over Adler by virtue of Hanover's ability to effectuate trades independently of Adler and to book them automatically into the customers' accounts. *See Decision,* 247 B.R. at 90–94.

Nonetheless, the bankruptcy court endeavors to respond to Appellants' argument by adding a third element to the requirements mentioned above that the Trustee must establish in order to prevail on his avoidance claim under § 548(a)(1)(A): that Claimants, as the ultimate beneficiaries of the trades sought to be avoided, are responsible under applicable law for Hanover's fraudulent acts. *See id.* at 86. The court then, applying agency law principles, concluded that in booking the Challenged Trades on their behalf Hanover acted as the Claimants' agent and within the scope of the authorized agency. *See id.* at 95–101. As a consequence, to satisfy the third prong of the § 548(a)(1)(A) test it articulated, the court

attributed Hanover's fraudulent intent to the Claimants. *See id.*

On appeal, the Trustee takes issue with this aspect of the bankruptcy court's ruling. Contending that while Appellants' responsibility is germane to the Trustee's common law defenses, it is superfluous to the application of § 548(a)(1)(A). *See* Trustee's Brief at 39.

This Court finds some confusion and circularity in the parties' arguments concerning this issue, as well as an ambiguity in the bankruptcy court's corresponding determination. The plain language of § 548(a)(1)(A) itself contains no reference to any requisite intent on the part of a transferee, to this extent supporting the Trustee's position. The provision explicitly mentions three parties as having operative roles in the application of the trustee's avoidance powers: (1) the trustee, who is authorized to avoid a covered transfer of an interest in property or an obligation incurred by the debtor; (2) the debtor, who, while possessing the requisite actual intent to defraud, hinder or delay, transfers the property or incurs the obligation; and (3) the entity or creditor to which the debtor was or became indebted by reason of the transfer or obligation. *See* 11 U.S.C. § 548(a)(1)(A).

There is no reference at all in the text to any requirement implicating the debtor's transferee. The only inquiry concerning actual intent that matters is that of the *debtor*: whether the debtor causing the transfer or incurring the obligation intended to hinder, delay or defraud its creditor. *See, e.g., Rubin Bros. Footwear, Inc. v. Chemical Bank (In re Rubin Bros. Footwear Inc.),* 119 B.R. 416, 423 (Bankr. S.D.N.Y.1990) ("For the purposes of [§ 548(a)(1)(A) ], plaintiff must show fraudulent intent on the part of the transferor, rather than on the part of the transferee."); *McColley v. Rosenberg (In re Can-*

*dor Diamond Corp.),* 76 B.R. 342, 349 n. 4 (Bankr.S.D.N.Y.1987) (referring to transferee's intent as irrelevant).

The circularity enters the picture here because where, as in this case, the debtor itself is presumed not to have possessed the actual intent to defraud, the requirement of the statute cannot be satisfied unless the fraudulent intent devolves upon the debtor through imputation of the misconduct of another person. The whole purpose of the domination or control doctrine so exhaustively treated by the parties and the bankruptcy court is to address precisely this situation. Under the domination or control rule, the requisite intent derives from a *transferee* who is in the position to dominate or control the debtor's disposition of his property, a circumstance that § 548(a)(1)(A) anticipates by its provision that the fraudulent conveyance by the debtor may be voluntary or *involuntary.* In the typical case, the controlling transferee stands either to gain directly or to confer benefits upon others by securing possession of the property and keeping it out of the reach of creditors.

The conceptual thicket in which the parties here become entangled arises because, for the purposes of applying the domination or control exception, they lose sight of who is the appropriate transferee given the multiple relationships and transactions particular to this case. In fact, largely on account of the assumption underlying the third criterion the bankruptcy court identified as necessary to satisfy the requirements of § 548(a)(1)(A)— imputation of fraudulent intent to Appellants— the parties' arguments actually shift the focus of the transferee inquiry from Hanover, as the perpetrator of the fraud, to Appellants, as its purported beneficiaries. As stated above, the bankruptcy court, for the purposes of the second element of the test it applied to satisfy § 548(a)(1)(A)— Hano-

ver's domination or control of Adler's disposition of its property— properly assumed that Hanover was the transferee. The premise underlying the court's third criterion, however, is that Appellants, as they themselves contend, are the transferees because, absent Adler's cancellation of the Challenged Trades, they would stand to gain delivery of the Blue Chips through their Adler accounts.

This difficulty arises largely by reason of the trilateral relationship that existed here among Appellants, Hanover as their introducing broker, and Adler as Hanover's clearing house, as well as two-step trades involving a sale of House Stocks and simultaneous purchase of Blue Chips. These circumstances present some unique variables that alter the position of the respective parties as transferor or transferee depending upon the progression of clearing and settlement of the different aspects of the securities trades through the multiple stages of the process.

As described by the bankruptcy court, though not expressly stated in the portion of the analysis concerning Hanover's domination or control of Adler, in the three-way relationship which bound the parties, Hanover maintained the primary contacts with the customer. Adler held the customers' cash and securities. *See Decision,* 247 B.R. at 67. Adler's clearing services for Hanover were rendered on a fully disclosed basis: the customers Hanover introduced knew that Adler held their property in their accounts and received trade confirmations and account statements directly from Adler. *See id.*

Hanover also maintained various proprietary or trading accounts with Adler, which held the securities and cash belonging to Hanover and its customers in Adler's bank accounts. *See id.* Thus, Adler cleared and settled all transactions between Hanover's proprietary accounts

and Hanover's customer's within Adler's own internal system. Under this arrangement, as the bankruptcy court found, "no transaction among Hanover customers or between a Hanover customer and the Street took place without Hanover's proprietary accounts acting as the 'middle man'." *Id.* at 68. To cite an example used by the bankruptcy court, if Hanover customer A were selling House Stocks and Hanover customer B was the ultimate buyer of those House Stocks, Hanover itself, through its proprietary accounts, would purchase the stock from A and sell it to B. *See id.*

This description of the process may shed light on the dispute at hand relating to the appropriate transferee. For when Hanover acquired large quantities of House Stocks from its customers without assets in its proprietary accounts sufficient to pay for them, such as it did during the Final Week, and Adler in turn—unaware of Hanover's true financial condition, which Hanover concealed from Adler—cleared and settled those trades, Adler was compelled to transfer funds of its own as loan advances into Hanover's proprietary accounts. Adler thus was made to incur obligations to pay for Hanover's purchases. In other words, before the customers could sell their House Stocks to Hanover and expect credits to their accounts corresponding to the proceeds of those sales, Hanover had to be in a financial position to purchase. For Hanover to purchase House Stocks from customers in such transactions, Hanover stood in another respect as the "middle man" to which Judge Garrity referred. *See id.*

Hanover was first a transferee of property of Adler's or held in Adler's estate that was conveyed into Hanover's proprietary account, from which the assets were subsequently transferred to the accounts of the customers in the form of cash, cred-

its or securities. At that later point, the customers theoretically became Hanover's transferees, although presumably the property they received, because Hanover was insolvent, actually derived from Adler's assets. With regard to the particular trades here at issue, Adler credited cash to Appellants' accounts, which was drawn from the balances in Hanover's proprietary accounts already maintained by Adler's loan transfers, and became obligated to deliver the Blue Chips to Appellants upon settlement. As regards this later stage of the transaction, were it executed, the customers would become Adler's transferees.

In their arguments before the bankruptcy court, the Claimants acknowledged this arrangement. They argued that Adler kept Hanover in business for several weeks by financing Hanover's House Stock purchases. *See Decision,* 247 B.R. at 84. According to Judge Garrity, the Claimants contended that "Adler paid for the Challenged Trades by increasing Hanover's outstanding debit to it by debiting Hanover's then-negative proprietary account, and delivering the cash to the Claimants by making credits to their accounts." *Id.*

This argument underscores the point this Court considers crucial to the resolution of the issue at hand. First, under the arrangements of the trades in question and the tripartite relationship that existed among the parties, and as a consequence of the events set in motion by Hanover in connection with the Challenged Trades of the Final Week, Adler was the initial transferor of its property to Hanover and incurred obligations occasioned by the actions of Hanover as transferee of that property in the first instance.

Second, even if later in the sequence of the transaction Appellants as customers became transferees and beneficiaries of the trades entitled to delivery either of the

proceeds of their sales or of the Blue Chips, for the purposes of the fraudulent intent requirement of § 548(a)(1)(A), their subsequent status as secondary transferees would be irrelevant. What matters in this connection is solely what is subsumed in the bankruptcy court's conclusions: that at the moment Hanover purportedly exercised domination or control over Adler's property in connection with Hanover's House Stocks purchases from Appellants, it caused a transfer of Adler property as well as the incurrence of obligations by Adler at Hanover's behest initially for Hanover's account. Hanover thus became the first transferee.

Third, Hanover, for its own accounts as well as to advance the interests of its officers and brokers and their friends, relatives and favored customers, sought to reap substantial benefits and promote Hanover's own ends by causing Adler to transfer funds and/or record credits from Hanover's fraudulent trades into the particular customers' accounts. That was the whole point of the scheme. Consequently, this Court finds that for the purposes of the domination or control principle, the bankruptcy court correctly treated Hanover as the transferee.

(ii) *Position to Control*

As emerges from the cases, the conceptual foundation for the domination or control doctrine may rest on several principles that justify the imputation of the transferee's fraudulent intent to the debtor. First, in the typical case the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of ownership, executive office or other insider role. *See, e.g., Bob's Sea Ray Boats,* 144 B.R. at 459 ("This situation normally arises... where the transferee is the Debtor's sole or dominant sharehold-

er.... The cases are careful to point out that vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee.") (citations omitted); *F & C Servs.,* 44 B.R. 863; *Vaniman Int'l,* 22 B.R. 166; *Langan,* 293 N.Y. 604, 59 N.E.2d 424; 5 *Collier* ¶ 548.04[2][b], at 548–27–28 and cases cited therein.

The unique status the controlling person holds creates the basis for the exercise of authority that then forms the predicate for the attribution of intent. That position establishes an overlapping of prerogatives that enables that person to assume identity as an alter ego. In some instances the controlling person is empowered to engage in the business affairs of both the transferor and transferee and to effectuate property transfers from one to the other, and in other cases to designate himself or another party as transferee. In these circumstances, some connecting link exists between the transferor-debtor and the controlling transferee. One and the same person or entity usually stands at both ends of the transaction, effectively rendering one party as but an extension of the other. The shared affiliate then serves as the conduit by which the fraud is both committed and concurrently transmitted to the controlled debtor.

In other words, by virtue of the common relationship to both sides of the disposition, the wrongful intent embodied in the controlling transferee may be presumed to flow on to the debtor-transferor as the property passes, for all practical purposes, from one hand to the other of the same person, ending with the intended transferee. The property disposition is effectuated in a manner that is other than strictly arms length, either with the knowledge, consent or acquiescence of the debtor. The controlled person or entity, from its subordinate position, lacks the indepen-

dent means to reverse the exercise of dominion over it. Accordingly, the domination is thus a product of the relationship and does not inhere in the controlling person's fraudulent intent itself, or derive from the actions or means employed to cause a disposition of the debtor's property. *See, e.g., F & C Serv.* 44 B.R. at 868.

A second theory, not explicitly articulated in the cases, may be grounded on application of agency principles. The controlling person, standing in the position of either principal or agent on either side of the transaction, may be presumed to act with actual or apparent authority to effectuate the disposition of the relevant property from the debtor on behalf of and for the benefit of the transferee.

Third, in some cases the controlling person is considered to stand in a fiduciary capacity or hold a position of trust in the transferor entity. *See Limperis v. Kolacny,* 36 B.R. 626, 631 (Bankr.N.D.Ill.1984). Fourth, the rule imputes the fraudulent intent in order to recognize and discourage the misuse of the corporate form and insider status as instruments to commit fraud by means of transferring property between affiliated entities. *See F & C Serv.,* 44 B.R. at 868 (citing *United States v. Benjamin,* 328 F.2d 854, 863 (2d Cir. 1964)); *In re Himoff Enters., Ltd.,* 22 CBC 36, 52 (Bankr.S.D.N.Y.1979). So framed, the doctrine may be regarded as analogous to or an extension of the rules that treat evidence of a transfer of debtor's property between close family relations or other agents or insiders of the debtor as a badge of fraud. *See 5 Collier* ¶ 548.04[2][b], at 548–27–28.

Whatever its conceptual underpinnings, at the heart of the doctrine is a culpable act committed by the debtor, actively or passively, for the purpose of keeping particular assets out of the reach of creditors. Insofar as the imputation rule applies to intentional acts. it serves various behavioral and financial purposes: to deter and penalize the debtor for harmful conduct, to prevent unjust enrichment to the debtor or the chosen transferee, and to make the injured creditors whole to the extent of the improper transfer. As considered below this Court concludes that extending the rule to the circumstances of this case satisfied none of the principled grounds justifying the doctrine.

### (iii) *Disposition of Debtor's Property*

The bankruptcy court found that through the mechanical means at its disposal, Hanover was able to effectuate transfers of Adler's property and to create obligations on Adler's part flowing to particular customers. That Appellants here seek to reap the benefits of those transactions attests to the reality of Hanover's access to Adler's property, and to its ability, at least "at a mechanical level" to affect its disposition. *Decision,* 247 B.R. at 90.

Nonetheless, this Court is not persuaded that the domination or control doctrine applies to the unique circumstances this case presents. Nor has it seen sufficient precedent or authority to support the bankruptcy court's determination. The bankruptcy court reasoned that nothing in the cases which have invoked the rule suggests that the controlling person must be an insider able to exercise total control over the debtor. By the same token, nothing in the case law is sufficiently analogous to indicate clearly that the doctrine is apposite in this case.

Here, none of the doctrinal circumstances that justify imputation of fraudulent intent to the debtor prevails. Adler and Hanover were independent, unaffiliated companies. Their open legal relationship set forth in the Clearing Agreement was arms-length, and their interests potentially hostile. The parties shared no con-

tinuous institutional channel through which the transference of fraudulent intent simultaneous with a disposition of property could be effected. Nor could Hanover have been regarded as Adler's authorized agent in effectuating the property transfers at issue. In fact, as is central to the Trustee's theory, Hanover served as Appellants' agent in booking the Challenged Traders and deceiving Adler, and could not simultaneously have acted as Adler's principal directing Adler knowingly to defraud itself.

None of the circumstances the bankruptcy court relies upon in applying the domination or control principle accords aptly with the conceptual framework underlying the doctrine. Extending the rule here leaves the fit somewhat tortured, showing the markings of a procrustean stretch. The mechanical access that computer connections afforded Hanover to execute securities trades and corresponding transfers of Adler's property do not create the authoritative link in one and the same person to both sides of the transaction by which fraudulent intent may be conveyed in the process of effectuating a property transfer. Those connections enabled nothing more than unilateral acts on Hanover's part that, to the extent they were designed specifically to defraud Adler, could not have been performed with any aura of authority.

Neither does the circumstance that Hanover brokers took steps to conceal their purpose from Adler constitute a measure of control. Semblance and secrecy is the way of all theft. If false appearances created by the wrongdoer served as the standard, every common thief could be deemed to be in a position to control the disposition of the victim's property. In the case of bankruptcies involving banks and securities brokers that have hundreds of thousands of customers, every client presumably could be regarded as being in a position to dominate or control the debtor merely by making withdrawals from his accounts upon receiving pre-petition bad news. In fact, in the application of the domination or control doctrine, by reason of the overlapping relationship inherent in the position of the controlling person and the debtor, maintaining strict secrecy of the transfer as between the transferor and the transferee is virtually impossible. Moreover, to the extent the debtor claims to have been unaware of the fraudulent conveyances, as Adler does here, the purpose of deterring, penalizing and preventing unjust enrichment of the debtor's known transferee would not be served in relation to the conduct of the debtor.

Neither the Trustee nor the bankruptcy court cites controlling or even plausible precedent on point to support extension of the domination or control rule to circumstances comparable to those raised by this appeal. In concluding its analysis of the applicability of § 548(a)(1)(A), the bankruptcy court does cite a case involving a scheme almost identical to the one Hanover devised, under a fact-pattern of misconduct not nearly as extreme as that evident here, where the transactions at issue were found to be fraudulent transfers and invalidated under § 548(a)(1)(A). *See SEC v. S.J. Salmon & Co.,* 72 Civ. 560, slip. op. (S.D.N.Y. Aug. 8, 1973) ("Salmon I"); *SEC v. S.J. Salmon & Co.,* 72 Civ. 560, slip. op. (S.D.N.Y. Feb. 5, 1974) ("Salmon II").

Salmon, the debtor in those cases, was a broker-dealer which, like Hanover, was the underwriter and principal market maker for certain house stocks which constituted the debtor's primary assets for net capital purposes. Under examination by the market regulator because it faced a large net capital deficiency, Salmon knew that "the liquidation of its business was both inevitable and imminent and that the quoted values of [its house stocks] would dip

sharply with its withdrawal as a market maker for those securities." *Salmon I*, at 9–10. The regulators concluded, and so informed Salmon's principals, that there was only a minimal market for the house stocks at any market value, that the firm's capital position was illiquid, and that the firm was in violation of the regulators' net capital rules.

In another striking resemblance to the events reenacted by Hanover, on the last day Salmon was open for business, it purported to purchase for the firm's own proprietary account certain securities from selected customers at the prices it had been quoting as a market-maker. Salmon recorded cash credit balances on the customers' accounts in executing those trades. On the same day, Salmon also purported to cancel certain sales of its house stocks to customers. The purpose of the transaction was to invest Salmon's favored customers with a cash claim that, in Salmon's liquidation proceedings, would qualify for preferred status for payment by SIPC.

On this record, the *Salmon* court concluded that there was "no room for doubting that the...transactions were intended by the debtor to place favored customers in a position so that instead of finding themselves possessed of securities that would shortly be severely depressed in value, they would appear to have cash credit balances at preliquidation prices and thus be entitled to the protection afforded

by SIPA." *Id.* at 14. The court therefore determined that Salmon's design was a deliberate attempt to defraud SIPC, and that the trades could be avoided by the bankruptcy trustee as having been made with actual intent to hinder, delay or defraud existing or future creditors within the meaning of § 67(d)(2) of the former Bankruptcy Act.[24]

In *Salmon*, the debtor exhibited actual intent to defraud its creditors, whereas here, because Adler itself did not intend to defraud its creditors, Adler's transfers to Hanover or to Appellants cannot be found to be actual fraudulent conveyances unless Hanover's intent is imputed to Adler. On this point, the bankruptcy court, relying on the domination or control principle to ascribe the necessary intent, noted that the distinction based on the existence of an intervening clearing broker as debtor in this case should not matter to the outcome.

This Court, however, is not persuaded that sufficiently clear, settled precedent exists to support such an extension of the domination or control doctrine here. In fact, in one case where the domination or control principle was sought to be expanded to a narrow financial relationship between otherwise independent parties based on a property interest secured by mortgages, the First Circuit affirmed a reversal of the bankruptcy court's ruling that the doctrine applied. *See In re Cushman Bakery*, 526 F.2d 23 (1st Cir.1975).[25]

---

24. Section 67(d)(2) of the Bankruptcy Act of 1898 is the predecessor of § 548(a)(1)(A) of the 1978 Bankruptcy Code. *See Ensminger I*, 218 B.R. at 707; 5 *Collier* ¶ 548.LH[1], at 548–89.

25. In *Cushman Bakery* the debtor corporation, experiencing severe financial difficulties and without other sources of credit to stay in business, obtained a loan from its longtime supplier at terms very favorable to the lender. The loan was secured by second mortgages on the debtor's real and personal property used

for its plants. The First Circuit found that while the terms of the loan may have been disproportionately favorable to the creditor, it nonetheless was an arm's length transaction negotiated by independently controlled and nonaffiliated entities. It held that evidence that the debtor was strapped for cash and that the supplier had stopped shipments before the security agreement was consummated was insufficient to satisfy the domination or control rule. The Circuit Court also found insufficient evidence of fraudulent intent on the part

This Court does not construe the domination or control doctrine to permit the exercise of a given limited power employed for wrongful or unlawful purposes, in and of itself, to equate to domination or control over the disposition of another's property sufficient for the purposes of the rule. Accordingly, the Court cannot sustain the bankruptcy court's application of the Trustee's avoidance mechanism under § 548(a)(1)(A), insofar as it rests upon the courts' findings that Hanover dominated or controlled Adler's disposition of its property and that by imputation of Hanover's intent, Adler therefore intended to hinder, delay or defraud Adler's creditors or SIPC. The Court is also of the view that a further finding that Appellants are responsible for Hanover's fraudulent acts is unnecessary to satisfy the requirements of § 548(a)(1)(A).

c. *Appellants' Responsibility*

Though the Court is of the view that the Trustee, for the purposes of avoiding the Challenged Trades pursuant to § 548(a)(1)(A), is not required to prove that Appellants may be held liable for Hanover's fraudulent acts, the Court nonetheless deems consideration of Appellants' responsibility appropriate at this point. First, upon review of the evidence and the parties' arguments regarding this issue, the Court is satisfied that in the event such a requirement were determined to be an element of the applicable test under § 548(a)(1)(A), the record here is sufficient to meet the standard, and the bankruptcy court's factual findings and conclusions of law in this regard are sustainable.

 Second, Appellants continue to insist strenuously upon their innocence in defense to the bankruptcy court's determi-

nation that they be held responsible for Hanover's frauds. The short answer to Appellants' objections has already been furnished above: insofar as Appellants' theory rests on their status as transferees, for the purposes of avoidance pursuant to § 548 the transferee's good faith or lack of it does not matter. *See* 5 *Collier* ¶ 548.04[1], at 548–23. The longer response, elaborated below, is that under applicable agency law principles, Appellants can be charged with Hanover's frauds to the degree Hanover served as their authorized agent in executing the Challenged Trades. The rules apply at least to the extent of entitling the Trustee to rescind the Challenged Trades, to recover for Adler's estate the property fraudulently transferred to Appellants' accounts, and/or to defeat Appellants' efforts to enforce obligations Adler incurred on account of Hanover's fraud committed on Appellants' behalf. Third, while the issue of Appellants' responsibility for their agent's fraud may not be relevant to the Trustee's avoidance claim pursuant to § 548(a)(1)(A), that fraudulent intent is relevant to the additional challenges pressed by the Trustee to invalidate the Challenged Trades under common law fraud and contract principles, a matter examined below. *See* discussion *infra* Part III.E.1.

(i) *Appellants' Theory and the Bankruptcy Court's Ruling*

In contesting the bankruptcy court's ruling holding them responsible for Hanover's fraud, Appellants advance several points. First, concerning the bankruptcy court's conclusions of law, Appellants take issue with Judge Garrity's determination that Hanover's fraudulent misrepresentations

of either the debtor or the transferee creditor at the time the agreement was reached. *See*

*id.*

to Adler regarding the price Hanover was willing and able to pay for the House Stocks it purchased from Appellants, as well as the entries of Fake Buys and Fake Short Sales in Adler's books, could not be divorced from Hanover's purchase of Appellants' House Stocks. They thus dispute the ruling that Hanover's fraudulent acts were committed within the scope of its agency on behalf of Appellants.[26] *See* Appellants' Brief at 53; *Decision*, 247 B.R. at 96.

Under Appellants' theory, because Appellants did not and could not control actions Hanover took as market-maker/dealer, at the time Hanover made its fraudulent misrepresentations to Adler about the inflated price of the House Stocks and engaged in related misconduct, Hanover functioned not as broker/agent for Appellants, but as market-maker and dealer/principal trading for its own account. Thus, Appellants argue, the scope of authority they granted, as well as the representations Hanover made acting as their agent, extended solely to placing and executing the orders to sell their House Stocks at the quoted market price and, pertaining to the Blue Chips, to purchase them at market price.

By their formulation, the agency Appellants granted Hanover falls within the bounds of the ordinary broker-customer relationship that is generally limited to the completion of the transaction. *See Robinson v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D.Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir.1972). On this basis, Appellants assert that Hanover's representations to Adler on their behalf had nothing to do with Hanover's ability to pay for the trades it executed as Appellants' agent and "contained no false-

hood or deception." Appellants' Brief at 53.

Next, they contend that, as a matter of general policy, making innocent securities customers vicariously liable for their brokers' fraudulent market manipulations simply because the brokers executed their trades could expose customers to actions for open-ended recovery by any defrauded investor who would sue not only the dealer but any customers who benefitted incidentally from the fraud's effect on the market value of their stocks. *See id.* at 52.

The bankruptcy court found no merit in Appellants' effort to distinguish Hanover's role as securities market maker/principal trading for its own account and as broker/agent acting on behalf of Appellants. The court determined that on a given transaction, a broker can act simultaneously in a dual capacity, as dealer/principal buying and selling for its own account and also as broker executing its customers' transactions. *See Decision*, 247 B.R. at 96 (citing *Ensminger I*, 218 B.R. at 705); *see also In re Merrill Lynch Sec. Litig.*, 911 F.Supp. 754, 760 (D.N.J.1995), *rev'd on other grounds*, 135 F.3d 266 (3d Cir.1998). On this basis, Judge Garrity concluded: "Indeed, if the Claimants did not authorize Hanover, as their agent, to agree to the prices that Hanover, as buyer, offered to pay for their House Stocks, there could not be any securities transactions at all, and the Claimants would have no claim herein." *Id.*

This Court concurs with Judge Garrity's reasoning and adopts his conclusion on this point. Under New York's Statute of Frauds in effect at the time of the transactions here in question, absent incorporation of a price on the written and signed

---

**26.** The bankruptcy court found evidence that certain Claimants had satisfied their burden of demonstrating that they authorized their Challenged Trades. *See Decision*, 247 B.R. at 82.

terms of a securities trade, a valid contract enforceable against Adler could not have formed. *See* N.Y.U.C.C. § 8–319; *Ensminger II,* 218 B.R. at 23. Accordingly, Hanover could not have fully executed the Challenged Trades Appellants concede they authorized Hanover to carry out on their behalf without an agreement reflecting the sale price Appellants would accept and Hanover would pay for Appellants' House Stocks. Incident to carrying out the agency is the power to effectuate the transaction as contemplated. In other words, when Hanover executed the orders Appellants authorized and transmitted them to Adler, the services Hanover performed at Appellants' behest and as their agent necessarily encompassed the authority to agree upon a price and to communicate it and other trade ticket information to Adler. *See Decision,* 247 B.R. at 96.

However, as the bankruptcy court found undisputed here, during the Final Week, other than the market Hanover itself created, there was no open market for the House Stocks at the manipulated and artificial prices Hanover quoted to Appellants and other customers for its purchases of House Stocks. Hanover's price inflation included fictitious purchases and sales that were intended to defraud Adler and its creditors. *See id.* at 97. Despite Hanover's knowledge that its quoted prices were fictitious, the Hanover brokers, acting as Appellants' agents, proceeded to enter the trades into Appellants' accounts at Adler. In so doing they were conscious also that Hanover did not have the ability to pay Adler for the proceeds of the sales that Hanover was debiting out of its proprietary account and crediting into Appellants' accounts, but intending that ultimately Adler would be obligated to make good on the transactions since Hanover could not. *See id.* Appellants cannot assert entitlement to the full value of their House Stocks Sales, and to the application

of those proceeds to the Blue Chips securities whose delivery they demand into their accounts, while denying Hanover's authority as their agent to effectuate the transactions on the very terms that would have yielded the particular value Appellants seek to enforce. A significant portion of that value is attributable to Hanover's unlawful price manipulation.

#### (ii) *Agency Principles*

Under basic precepts of agency law, Appellants may be charged with the knowledge and/or fraudulent intent of Hanover acting as their broker within the scope of its authority to execute the Challenge Trades on Appellants' behalf, even absent Appellants' knowledge of the fraud or lack of their own fraudulent intent. *See Curtis, Collins & Holbrook v. United States,* 262 U.S. 215, 223, 43 S.Ct. 570, 67 L.Ed. 956 (1923) ("The general rule is that a principal is charged with the knowledge of the agent acquired by the agent in the course of the principal's business."); *see also* Restatement (Second) of Agency §§ 259, 263, 272, 298 (1958).

These rules find particular application where the principal seeks to enforce a transaction so as to avail himself of the fruits of the agent's fraud, even if the fraud committed falls outside the scope of the agent's authority. *See Fineberg v. Stone (In re Brainard Hotel Co.),* 75 F.2d 481, 482 (2d Cir.1935); *Harriss v. Tams,* 258 N.Y. 229, 179 N.E. 476, 479 (1932) ("[T]his court has held that principals, who after offer to rescind, retain or demand the fruits of a contract obtained by unauthorized representations of an agent 'stand in the same position as if they had made the representation or authorized it to be made.'") (citations omitted); *Angerosa v. White Co.,* 248 A.D. 425, 290 N.Y.S. 204 (4th Dep't 1936), *aff'd,* 275 N.Y. 524, 11

N.E.2d 325 (1937) ("A principal who gives his agent authority to solicit a sale and accepts the fruits of his efforts will be held responsible for the fraudulent as well as the fair means by which the contract was obtained, if such instrumentalities are in line with the accomplishment of the object of the agency."); *see also* Restatement (Second) of Agency § 263 ("Unless he has changed his position, a principal whose servant or other agent has fraudulently acquired property for him, holds it subject to the interest of the defrauded person.") [27]

▇ The knowledge of the agent acting within the agency power entrusted may be imputed to the principal, and the principal's liability is affected by the agent's knowledge for the purposes of enabling a defrauded party to rescind a transaction procured through an agent's fraud, even if the principal did not authorize the agent's fraud. *See Russell v. Prudential Ins. Co.*, 176 N.Y. 178, 68 N.E. 252, 255 (1903) ("The rule is, that knowledge of the agent is the knowledge of the principal."); *Harriss*, 179 N.E. at 479; *see also Brainard Hotel*, 75 F.2d at 482 ("In depositing the money [the defrauding employee] acted as the hotel's agent, and the hotel had notice of the theft because he knew it himself."); *Willcox v. Goess*, 92 F.2d 8, 11 (2d Cir. 1937) ("[I]f the principal must avail himself of a transaction entered into by the agent on his behalf, the guilty agent's knowledge will be imputed to him."); *Cathay Pacific Airways, Ltd. v. Fly And See Travel, Inc.*, 3 F.Supp.2d 443, 445 (S.D.N.Y.1998) ("Under New York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge."); *Angerosa*, 248 A.D. 425, 290 N.Y.S. 204; *Reynolds v. Snow*, 10 A.D.2d 101, 197 N.Y.S.2d 590, 598 (1st Dept.1960), *aff'd*, 8 N.Y.2d 899, 204 N.Y.S.2d 146, 168 N.E.2d 822 (1960); *Abrams v. Forman*, 22 A.D.2d 824, 255 N.Y.S.2d 62 (2d Dept.1964); *Zanoni v. 855 Holding Co.*, 96 A.D.2d 860, 465 N.Y.S.2d 763 (2d Dept.1983), *aff'd* 62 N.Y.2d 963, 479 N.Y.S.2d 341, 468 N.E.2d 296 (1984); Restatement (Second) of Agency ¶ 272 cmt.[28]

---

**27.** The Restatement elaborates the principle of § 263 with two illustrations that are particularly apt to the issues now before this Court.

1. A, agent for P, steals Chattels from T, sells them, and places the proceeds in his principal's account. P is subject to liability to T for the proceeds.

2. A, having no power to bind P to the transaction, borrows from T, purporting to borrow on P's account. He places the money so borrowed on P's account from which he had previously embezzled, and draws upon this account to pay workman employed by P. P is subject to liability to T, since this money has been used for his benefit.

Restatement (Second) of Agency § 263, illus., 1 and 2.

**28.** The rule these cases stand for is reflected in several provisions of the Restatement (Second) of Agency. "The principal is affected by the agent's knowledge whenever the knowledge is of importance in the act which the agent is authorized to perform." Restatement (Second) of Agency § 272 cmt. a (1958). The agent's knowledge may be of importance where: "1. an agent makes a contract for the principal or acts in the execution of a contract...4. agent acquires property for the principal." *Id.* In related provisions the Restatement also incorporates the common law doctrine that "The other party to a contract made by an agent on behalf of a disclosed or partially disclosed principal has all the defenses which he would have had against the principal if the principal had made the contract under the same circumstances." *Id.* at § 298. The defenses the third party can invoke under this rule include rescission for the agent's fraud. *See id.* at § 298 cmt. a; § 259 (providing that one who is induced to enter into a contract by reliance on an agent's untrue representations is entitled to rescind the agreement); § 263 ("Unless he has changed his position, a principal whose servant or other agent has fraudulently acquired property for him, holds it subject to the interests of

Here, according to the bankruptcy court's factual findings, at the time Hanover entered the Challenged Trades into Appellants' accounts, the brokers knew that (1) Hanover's posted prices were fraudulently inflated by Hanover's manipulation through the Fake Sales and Fake Buys and other unlawful conduct; (2) there was no market for the House Stocks at the prices at which Hanover "purchased" them from Appellants; (3) Hanover was insolvent; (4) Hanover's proprietary account had no real cash with which to pay for Hanover's "purchase" of Appellants' House Stocks because any "proceeds" posted to the proprietary account derived from fictitious sales booked to create the appearance of a cash balance without expectation of receipt of actual funds from the fraudulent trades; and (5) Hanover had no ability and lacked intention to pay for its purchase of Appellants' House Stocks, and expected that ultimately the obligation to pay would fall upon Adler.

Hanover not only had knowledge of these circumstances, but this very knowledge and the actions it carried out in furtherance of it constituted an affirmative component of its actual intent to defraud Adler and its creditors. In other words, given the state of Hanover's knowledge about its activities and true financial condition, as well as Hanover's representations and omissions to Adler, Hanover was aware that a consequence of its actions would be to defraud Adler. Hanover's purchase of Appellants' House Stocks, which Appellants assert they authorized their brokers to sell, is wrapped into Hanover's frauds and, as more fully discussed below, cannot be separated from that related misconduct. To this extent, the fraudulent acts Hanover committed fell within the scope of its agency power. On this basis, Hanover's knowledge and associated fraudulent intent may be imputed to Appellants for the purposes of supporting the Trustee's rescission or avoidance of the Challenged Trades under common law fraud and illegality principles, as well as under § 548(a)(1)(A) in the event it were held that Appellants' intent is a necessary element of the Trustee's action under that provision.

Appellants rely on *Deyo v. Hudson*, 225 N.Y. 602, 122 N.E. 635 (1919), to challenge the bankruptcy court's ruling concerning the scope of Hanover's agency. They cite the case for the proposition that the rule which imposes liability on an innocent principal for his receipt and retention of the fruits of an agent's fraud "is not unqualified". *Id.* at 639. In Appellants' reading, *Deyo* directly refutes the bankruptcy courts' holding that Appellants' mere retention of the benefits of their trades establishes their liability for Hanover's conduct.[29] *See* Appellants' Brief at 62.

the defrauded person"); *id.* § 63 illus. 5 ("P authorizes A to sell, to local buyers, distant farm land. A represents to one of these buyers, T, that the land has rich sandy loam, that the country is rolling and that oil has been struck within ten miles of it. None of these statements is true. A is authorized to make the first two statements if he reasonably believes them to be true; he is not authorized to make the last statement. If A has no reason to believe them to be true, P is subject to liability for the first two statements but not to the last statement. The transaction is subject to rescission by T if any of the statements are untrue.").

29. In *Deyo*, plaintiffs were law partners who sued defendant stockbrokers for recovery of damages the lawyers alleged having suffered on account of speculative stock trading through defendants by Carver, one of their own attorneys, using their clients' funds. Mitchell, an employee of the brokers, undertook to inform plaintiffs promptly in the event Carver attempted any more trades through defendants' firm. Mitchell withheld from plaintiffs knowledge he had that Carver had

The case is inapposite to the matter at hand, despite the general language from it Appellants rely upon. First, the actual holding of the case turned on Mitchell's lack of both real and apparent authority to give the promise he made to plaintiffs, and thus his inability to bind his employer. Second, the case addressed the brokers' retention of benefits of the alleged fraudulent conduct because plaintiffs were unable to sustain their theory of ratification, which is not at issue here. Third, the court's actual holding was that the proximate cause of the damages plaintiffs claimed was the theft by their own employee rather than the speculative trading executed by the brokerage firm.

■ Fourth, the case does not address the immediate issues raised by this appeal: whether a securities customer, after a fraud is uncovered, can enforce and thus retain the proceeds of a trade the broker fraudulently conducted in part for the customer's benefit, or conversely, whether the defrauded party can rescind the fraudulent transaction. The authorities earlier cited here explicitly refute Appellants' theory. In fact, the same court that decided *Deyo* later reaffirmed the rule that "a contract made on behalf of the principal may be rescinded by the other party if tainted by fraud in its inception, though the principal was himself innocent of any fraud". *Harriss*, 179 N.E. at 479. The *Harriss* court recognized that "[t]he morality of taking advantage afterward of false statements innocently made, by insisting on retaining the advantage of a sale induced thereby, is almost as questionable as of making knowingly false statements to bring about the sale." *Id.; see also Martin v. Gotham National Bank of N.Y.*, 248 N.Y. 313, 162 N.E. 91 (1928).[30]

Appellants also respond that they cannot be held vicariously liable for frauds of their brokers that they did not authorize; that rescission is not contemplated as proper relief to an action under § 548(a)(1)(A); that imputed knowledge does not equate to fraudulent intent; and that to establish fraud under New York law more than knowledge of the falsity is required. *See* Appellants' Brief at 58 (citing *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir.1991)). Further, they contend that the proposition that a principal may not retain the benefits of a fraud derives from the doctrine of ratification. They argue that ratification does not pertain to them because they were not among the class of favored customers for whose benefit Hanover perpetrated fraud, and because Hanover's misrepresentations were not capable of being ratified by Appellants on the ground that Hanover never communicated to Adler that it was acting as Appellants' agents as regards such statements.

Appellants various objections rest on premises which have already been rejected. First, the Trustee did not seek to hold Appellants liable in damages for Hanover's frauds, but only to rescind Appellants'

---

already reopened a trading account with defendants through which he later speculated and lost additional misappropriated funds. The New York Court of Appeals held that the stockbrokers could not be held liable for their agent's fraudulent representations and that their retention of commissions earned on Carver's trading did not constitute ratification of Mitchell's conduct. *See Deyo*, 122 N.E. at 635.

**30.** In *Martin*, defendant bank, because its agents were acting beyond the scope of their authority, was held not liable for damages suffered by plaintiff who was defrauded into lending money to a corporation in which two employees of defendant had an interest and whose debt to the bank was paid by the funds of which plaintiff was defrauded. The bank, however, was required to repay the proceeds it had received and applied to the employees' corporation's debt. *See id.* at 93.

claims as obligations of Adler's and thus bar their enforcement. The bankruptcy court specifically limited its ruling to this basis of relief. *See Decision,* 247 B.R. at 91, 99 n. 64. Second, the imputation to Appellants that is at issue here is not merely Hanover's knowledge of the falsity of its representations but its actual fraudulent intent in connection with transactions of which both Hanover and its brokers and other favored customers, including Appellants, were the intended beneficiaries.

▮ Third, Appellants' objections that in committing acts of fraud against Adler, Hanover did not act within the scope of the authority Appellants conferred were soundly rejected by the bankruptcy court's analysis. In fact, in connection with the Challenged Trades, Hanover acted simultaneously as agent and principal, on behalf of Appellants as authorized agent of the sales of House Stocks and Blue Chip Buys, and as principal for its own account in the purchase of those securities, rather than solely as market-maker dealer.

Fourth, concerning ratification, the Trustee agrees that the principle is not at issue here. *See* Trustee Brief at 52 n.26. While the bankruptcy court cited cases that refer to and discuss ratification, the Decision itself is not premised on the theory that Appellants satisfied the elements of ratification and thus could be held to have affirmed Hanover's fraud. *See Decision,* 247 B.R. at 98–99. Instead, the authorities the bankruptcy court refers to and relies upon are cited for the proposition that even if the Trustee could not maintain an action in damages against Appellants grounded on Hanover's fraud, the Trustee nonetheless is entitled to rescind the Challenged Trades as products of an authorized agent's fraud. *See id.*

#### (iii) *Hanover's Integrated Scheme*

Appellants concede that at the time Hanover executed the Challenged Trades on their behalf "Hanover's brokers were engaged in fraud to benefit themselves, their friends, their families, and certain 'favored' customers." Appellants' Brief at 59. Appellants also insist that, unlike many other Claimants, they did not count among the favored customers because, unlike those customers, as the bankruptcy court determined, Appellants produced evidence establishing that they actually authorized their Hanover brokers to execute the Challenged Trades.

Thus, Appellants ask the Court to draw distinctions from among Hanover's actions during the Final Week's Challenged Trades. In effect, they seek a finding that the purchases and sales Hanover carried out as agent for Appellants during the Final Week were strictly above board and in good faith, thereby disaggregating them from the fraudulent and unlawful activities Hanover's brokers were actively engaged in at that time, in particular during the last moments of the frenzy of fraud they perpetrated on February 24, 1995, when the bulk of the Challenged Trades in question occurred.

As a threshold matter, Appellants' contention must be placed in proper focus. It is essential to recall who Appellants are and the context in which their claims arise. A review of the evidence considered by the bankruptcy court highlights the difficulty inherent in Appellants' efforts to distance their trades from the rest of Hanover's Final Week activities. Appellants comprise eight of the much larger group of Hanover customers who were Claimants in the bankruptcy court proceedings that gave rise to this appeal.

In portraying the full scope of the Hanover's fraudulent scheme and the grounds that prompted the bankruptcy court to uphold the Trustee's disallowances, Judge

Garrity identified several common threads that interweave the various Claimants' transactions.

- None of the Claimants received written confirmations of their February 24 Trades from Adler. With respect to those transactions, Adler affirmatively exercised contractual rights to refuse to proceed with the transactions when it became fully aware on February 23 of the extent of Hanover's financial trouble and deceit. The court also found that those trades never settled because the regulators closed Adler before the trades cleared. To this extent, Claimants in essence endeavored to compel a nonevent existing only in Hanover's fraudulent book entries. *See Decision,* 247 B.R. at 62.

- Some of the Claimants were deemed by Hanover as favored customers selected as beneficiaries of preferential treatment either as relatives or close friends of the Hanover brokers or because the brokers sought to secure their future business. *See id.* at 63, 85.

- None of the Blue Chips Buys Claimants sought the Trustee to deliver were paid for by Hanover; by the proprietary accounts Hanover used to pay for its purchases of Claimant's House Stocks; or by Claimants, none of whom had sufficient funds in their own accounts to pay for the purchases. *See id.* at 106. While in the aggregate the Claimants for whom Hanover acquired Blue Chips held a total of $400,000.00 in their accounts as of February 16, 1995, during the Final Week, Hanover booked into their accounts $18.7 million of Blue Chip purchases, $15.1 million by volume in the brief period Hanover operated on February 24.[31] *See id.* at 72, 106.

- The Hanover brokers sought deliberately to execute the Claimants' transactions in a manner intended to give them preferred SIPA claims in the event of Hanover's inevitable liquidation by systematically selecting for favored treatment, at a time they knew Hanover was insolvent, customers whose exchange of House Stocks for cash or Blue Chips would leave in their accounts less than $100,000.00 in cash and brand name stocks valued up to $500,000.00, which coincided with the limits of SIPA insurance protection. *See id.* at 63, 71, 96.

- Claimants constituted approximately nine percent of the 5,900 Hanover customers holding House Stocks who, by virtue of their being conferred preferential treatment by their Hanover brokers, were able to sell their securities to Hanover during the Final Week, although many more customers were unsuccessful in their efforts to sell. *See id.* at 71.

- All of Hanover's Challenged Trades constituted fraudulent acts actually intended by the Hanover brokers to hinder, delay or defraud Adler or its creditors (*see id.* at 85–89) and designed to confer a substantial preferential benefit only on certain favored customers by giving them preferred SIPA claims and enhanced protection in Hanover's inevitable liquidation. *See id.* at 96.

- Hanover's fraud included manipulation of the price of the House Stocks through Fake Buys and Fake Short Sales calculated to maintain the appearance that the market value of those securities was higher than they were actually worth in an open, unmanipulated market, and therefore to maintain Hanover's accounts, as well

---

31. *See supra* n. 11 for a discrepancy in the bankruptcy court's references to these figures.

as those of their favored customers, at inflated, artificial levels to enhance their value. *See id.* at 96, 104.

- The Hanover brokers who perpetrated the frauds for the benefit of their own accounts and those of their relatives and friends and other favored customers refused to testify about their activities, invoking their Fifth Amendment privilege against self-incrimination. Some of them, including the two brokers who handled Appellants' accounts, pleaded guilty to criminal violations of the securities laws in contention here. *See id.* at 88–89.

- Some Claimants produced no evidence that they authorized the Challenged Trades. *See id.* at 79. Others admitted that they did not authorize the Challenged Sales and/or Blue Chip Buys in advance. *See id.* at 76. While the bankruptcy court ruled that a number of Claimants, including Appellants here, presented enough evidence to satisfy their burden of demonstrating that they authorized the Challenged Trades, the court nonetheless, on other grounds, upheld the Trustee's disallowance of their claims to compel completion of the Blue Chip Buys and delivery of the securities.

The bankruptcy court found that the Claimants did not deny that "when Hanover was manipulating the price of the House Stocks, it realized that it was insolvent, that the Fake Buyers would not realize the cash they appeared to create in Hanover's proprietary account and that without that cash, Hanover could not pay for its 'purchases' of House Stocks from the Claimants." *Decision,* 247 B.R. at 96. Moreover, the court determined that Hanover's brokers did not merely intentionally overprice the House Stocks in order to deceive Adler and its creditors. Rather, they executed and booked into some

Claimants accounts the fictitious trades "to create the appearance that their 'purchases' of the Claimants' House Stocks were bona fide transactions that reflected the true market value of those securities." *Id.* at 97. Absent these calculated devices, the appearance of a market for House Stocks would have crumbled under the pressure of the illegal short selling; Hanover would have been closed much sooner, and its brokers would never have had any ability or occasion for executing and posting into Appellants' accounts the Blue Chip trades Appellants here demand that the Trustee honor.

Assessing the totality of these circumstances, the bankruptcy court concluded that "all those actions were part of an *integrated scheme* which culminated in the execution of the Challenged Trades, but whose end was to vest the Claimants with preferred SIPA claims in the inevitable liquidation proceeding." *Id.* (emphasis added).

The integrated scheme that embraced all of Hanover's transactions during the Final Week, part and parcel of which included the trades Appellants seek to enforce, was systematically unified in method and purpose by the common threads discussed above. The transactions that comprised and fostered Hanover's overall deceitful stratagem embraced, even if only in some incremental degree, those Hanover performed on behalf of Appellants with their admitted approval.

Accordingly, even if Appellants did not know of, intend or authorize foul play on their behalf, at the time Appellants authorized their Challenged Trades, Hanover was already engaged in a continuous scheme that was spun with misconduct purposely directed against Adler and its creditors. Based on the bankruptcy court's findings with regard to (1) Hanover's knowledge concerning its true finan-

cial condition, and (2) the brokers' wrongful motivations, every additional trade Hanover booked for its customers during the Final Week was recorded with full awareness and expectation that the transactions would not be completed. The record also supports a conclusion that the brokers were aware that if those trades were to be honored at all, payment for them would come, not from Hanover's assets, which did not exist for the volume of purchases it undertook, but from Adler and its creditors. Simply put, Hanover's Final Week's Challenged Trades reduce to this: that every transaction Hanover entered for a customer into Adler's books, authorized or not, was predicated for its existence and payment upon an act of deceit that was the practical equivalent of theft from Adler of a significant portion of the purchase price. Absent that form of larceny, none of the claims at issue would have materialized even as Hanover's book-entries. In fact, the benefit of that malfeasance is assumed and built into each of the Challenged Trades. *See* Restatement (Second) of Agency § 263, illus. 1 and 2.

From this perspective, Appellants' authorized trades were not discrete transactions isolated from the rest of Hanover's acts and from whose effects on the market Appellants benefitted only incidentally. Nor was Hanover's fraud merely collateral to the Challenged Trades. Rather, the record is sufficient to sustain a finding that Appellants' transactions became amalgamated into Hanover's fraudulent continuum and necessarily constituted a calculated extension of it. For when Appellants placed their orders to sell their House Stocks, Hanover as their authorized agent extended the misrepresentation to Adler that a market existed for the House Stocks at the posted prices, in this manner not only benefitting Appellants, but furthering Hanover's own interests and those of its other favored customers who stood to gain by a

protraction of the appearance that a real fair market for House Stocks existed.

To this extent, Appellants' purchases and sales were no less tainted by deceit than the rest of Hanover's fraudulent transactions. The prices Hanover charged Appellants for the purchase of their House Stocks were no less manipulated. And the prices Hanover posted in Appellants' accounts could not have been fair and arms length as to Appellants' trades but deceitful as to other customers. Finally, Appellants' trades were just as much instruments intended to extend Hanover's fraud against Adler, and, concomitantly, Adler and its creditors were no less exploited by Hanover's booking Appellants' Challenged Trades in Adler's records, than by the other portions of Hanover's Final Week transactions that Appellants concede were unlawful. *See also Eitel v. Schmidlapp,* 459 F.2d 609, 615 (4th Cir.1972) ("[T]he principal cannot claim the fruits of the agent's acts and still repudiate what the agent knew.... Defendant, by his own admissions, could not have been less interested in [the details of the transaction]. He was interested only in obtaining the profit...and he was perfectly content to leave the details as to how he obtained it to [his agent].").

For these reasons, Appellants cannot sever the portions of their fraud-tainted trades from the balance of Hanover's artifices and endow them with good faith. If the merchandise Hanover had deceitfully pushed upon the market were sour wine, the product as a whole would be no less contaminated because a few good grapes had been pressed in it. In the words of another court encountering an analogous proposition: "The facts are not to be atomized. Where a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications'." *In re Checkmate Stereo and Electronics,*

*Ltd.,* 9 B.R. 585, 612 (Bankr.E.D.N.Y. 1981), *mod. and aff'd,* 21 B.R. 402 (E.D.N.Y.1982) (quoting *Buffum v. Peter Barceloux Co.,* 289 U.S. 227, 232, 53 S.Ct. 539, 77 L.Ed. 1140 (1933)).[32]

Arguments comparable to Appellants' attempt to disaggregate Hanover's fraud, so as to cleanly disentangle their transaction from their broker's integrated misconduct, were also considered and rejected by the Second Circuit in *United States v. Russo,* 74 F.3d 1383 (2d Cir.1996), *cert. denied,* 519 U.S. 927, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996).[33] Defendants there, prosecuted for violations of the Securities Exchange Act, argued that their fraudulent scheme of short sales, which directly involved only blue chip stocks, were not made "in connection with" the broker's separate purchases of house stocks from customers. The Second Circuit rejected this theory. It recognized that defen-

dants' manipulation scheme consisted of several components which they "used in tandem to keep K & C alive". *Id.* at 1383. The Circuit Court, noting that the short sales played an integral role in the scheme, stated:

> While the short sales did not affect the markets for [the house stocks] through actual trading, they enabled K & C to create a false impression of demand for the stock and to shield prices from the realities of the market without the money generated through the Short Sales, the Appellants would not have been able to keep large blocks of [house stocks] off the market or finance the other elements of the kiting scheme, thereby misleading the public as to the value of the [house]stocks.... K & C was the market maker for [the house stocks]— there was no 'open market' on which it could trade except for the one it created,

**32.** In *Buffum,* as part of a concerted effort to defraud creditors and retain the debtor's property within the confines of relatives and friends, the debtor pledged stock certificates in the family corporation as security for indebtedness worth much less than the collateral. The pledge by itself constituted a preference that would have withstood challenge by the bankruptcy trustee because it was made more than four months prior to the petition. Reversing the appellate court's decision against the trustee, the Supreme Court found that the pledge was but a component of a larger fraudulent plan that entailed the distribution of the debtor's assets among family and friends. The court noted: "The unconscionable sale is not to be viewed in isolation, as something disconnected from the pledge,` an accident or afterthought. It was the fruit for which the seed was planted...The [pledgee corporation] set out to do something more than secure the payment of a debt. It became a party to a plan to appropriate a surplus and in combination with its debtor to hold his creditors at bay." *Buffum,* 289 U.S. at 233, 53 S.Ct. 539 (Cardozo, J.).

**33.** In *Russo* defendants were employees of K & C, a securities firm that served as an intro-

ducing broker that underwrote initial public offerings and acted as market maker for the stocks associated with the IPOs. As occurred both here and in *Salmon,* K & C encountered difficulties complying with net capital requirements by reason of downward pressure on the prices of its house stocks and minimal demand for those securities at the prices the firm quoted. Also in apparent confirmation of the seeming constant recurrence of events, K & C, as Hanover did here, endeavored to maintain the appearance that a market existed for the house stock at the firm's stated prices. To this end, K & C devised a scheme to maintain prices artificially high that paralleled that of Hanover, disposing of the securities by entering them into customers' accounts through fictitious purchases.

As a source of cash to pay for the house stocks it was also buying from customers, the firm generated cash credits through short sales of blue chip securities for its own account. In doing so, it took advantage of an accounting error by K & C's clearing broker that made the cash available to K & C through credits in its account without freezing the proceeds to ensure coverage on demanding compliance with margin requirements.

and it could not have continued to make this market without the money generated by the short sales.... K & C could not separate its fraud from its purchase of [house stocks].

*Id.* at 1391.

The point that emerges from these cases is that what matters in response to a claim of innocence is not so much what the claimants actually knew or intended. Rather, it is that, whatever their good faith, insofar as the claimants sought to avail themselves of the benefits of an agent's comprehensive fraudulent scheme, they cannot cleanly extract their own gems out of the mire.

### (iv) *Appellants' Innocence*

Appellants plead innocence as their mantra. Inasmuch as they press the point so intensely, the Court feels obliged to address it with the thorough consideration the matter rightfully merits, for at bottom the argument touches upon philosophical issues that go to the core of our jurisprudence. Appellants' attempt to segregate their trades from the entire context and invoke their innocence must fail under the circumstances presented here. The Court cannot accept the premise of Appellants' supposed disassociation, for the same reasons that impelled Judge Garrity to reject it.

In essence, the theory suggests that amidst the "pandemonium" that prevailed at Hanover during its closing moments on the morning of February 24, 1995 [34] Appellants' brokers had the presence of mind to compartmentalize so as to neatly and clearly differentiate Appellants' trades as distinct transactions, entirely severed from the other purchases and sales they were conducting unlawfully for the purpose of defrauding Adler and SIPC, and in order to shield Appellants' bargains from the taint of the fraud and illegality that characterized and motivated the rest of the brokers' chicanery during those chaotic moments.

Perhaps the most fundamental flaw in Appellants' narrowly focused conceptualization of innocence lies in their overlooking the "integrated scheme" in Hanover's fraud. By their notion, Appellants dealt with Hanover from an insulated distance, as though linearly related to their broker through vertical connections across a void in which Appellants contributed nothing to the events at issue other than authorizing the Challenged Trades, by which fact alone they claim entitlement to the benefits of their bargains. This view of the world reflects a two-dimensional perspective. It takes no account of what role Appellants may have played in narrowing the distance between them and Hanover—through the course of past dealings, through any special relations they may have maintained with their brokers, through the very authorizations they insist they gave Hanover to execute the Challenged Trades. In fact, Appellants' concept ignores that by these and other means they so could have shaped the contours of their relationships and configured associated events as to enable their unscrupulous agents to nourish and advance Hanover's nefarious business to a point that culminated in the incrementally enlarged criminality and frauds em-

---

34. The bankruptcy court cites evidence that on February 24, John Devito, an employee of Adler instructed to go to Hanover's offices to report on what was occurring there, described having witnessed "pandemonium". *See Ensminger II,* 218 B.R. at 21. Devito testified that upon his arrival he encountered "massive chaos", with "people crying, people ripping things down, people walking around with baseball bats", and that when he attempted to convene a meeting with Hanover brokers he was physically attacked by one of Hanover's managers. *See id.;* Trustee's Brief at 11.

bodied in Appellants' portion of the Challenged Trades.

Appellants contend that, aware of bad news regarding Hanover, they repeatedly ordered the sale of their House Stocks, but that their brokers continually put them off by reassurances and false promises, until eventually their persistence paid off—coincidentally during the Final Week and in particular on Hanover's last day in business. This argument overlooks that at that point, as already discussed above, the execution of Appellants' trades became entangled in the extensive fraud Hanover was then perpetrating. Accordingly, that Appellants somehow were included among the select society whose calls to Hanover were answered on February 24, 1995 and who thus were favored with the fruits of Hanover's systematic, fraudulent largesse, may have been no accident. Hanover's brokers knew then that the firm was insolvent and that they intended to defraud Adler and SIPC for the very purpose of bestowing unique value upon themselves and their favored customers, including Appellants, that would place their claims at a distinct advantage over those of many thousands of other Hanover customers not so chosen to receive the brokers' deceitful beneficence.

The view of the world Appellants' theory espouses, this Court believes, is not sustained by reality. Nor does it accord with the geometry of the law or the symmetries of life. In fact, Appellants' relationships to Hanover and Adler evidenced in these proceedings cannot be conceived as discrete perpendicular lines implicating only Appellants' singular claims and unitary interests. By its very terms, a bankruptcy is akin to a zero-sum game. Typically, the numerous claims against the debtor far exceed the value of the estate. Few creditors are able to receive the entire value of their claims. Accordingly, the more any one claimant recovers, the less will be left for others. Any claim paid at or near full worth necessarily diminishes the size of the debtor's estate, and thus comes at the expense of all other creditors. *See Young v. Higbee*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945).

For these reasons the underlying philosophy of the Bankruptcy Code and SIPA establishes certain equitable principles and priorities designed to maximize assets available for ratable distribution to all creditors similarly situated. *See Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348, 352 (N.D.Texas 1996) (citing *Higbee*, 324 U.S. at 210 n. 8, 65 S.Ct. 594). To this end, the rules seek to prevent unjust enrichment and to avoid placing some claims unfairly ahead of others by distinguishing transactions truly entered in good faith and for value from those somehow induced and tainted by preference, illegality or fraud. *See id.; see also Investors Ctr.*, 129 B.R. at 353 ("Repeatedly this Court has been forced to tell claimants that the fund created for the protection of customers of honest, but insolvent, brokers gives them no protection when the insolvent broker has been guilty of dishonesty, breach of contract or fraud.").

There is an alternate way to regard events here at issue that better reflects the overall statutory framework of the Bankruptcy Code and SIPA. Taking all other relevant interests into account, Appellants' claims must be considered not in the isolation of Appellants' linear ties to Hanover, but in the light of Hanover's actions and Adler's consequent bankruptcy as well. From the perspective of these broader interrelations, the pertinent connections and effects that should be reckoned here spread not just vertically to reach Appellants' claims, but horizontally to touch the legitimate interests and expectations of the thousands of other credi-

tors of Adler. The larger universe would expand to consider the bankruptcy's impacts on Adler customers situated at a far more arm's-length distance from the events in question: those who maintained no accounts at Hanover but who nonetheless were affected by Hanover's fraud that precipitated Adler's collapse [35]; those who did not engage unethical agents, and cannot seek to avail themselves of advantages and bargains created for them by fraudulent misdeeds; those whose relations to Hanover did not qualify them to rank among the select few chosen to gain from the Hanover brokers' preferences and whose bona fides are thus not propped up by reliance upon benefits bestowed by the unlawful means of agents. In sum, from this broader outlook, in a world of original sin, Appellants' invocation of innocence is a relative thing and their claims for relief must be assessed in these relative terms.

In this view of things, Hanover's calculated fraud cannot be contained, as Appellants' hypothesis would have it, only within Hanover, as though spending its force in a void, and never implicating some of its intended beneficiaries just beyond Hanover's borders. Put another way, Appellants' transactions and relations with Hanover cannot be perceived as islands entire unto themselves, somehow uninvolved, and somehow unengulfed by the ocean of corruption that surrounded Hanover's whole fraudulent course of dealings on behalf of and profiting Appellants and other select customers during Hanover's final hours.

2. *Avoidance Pursuant to 11 U.S.C. § 548(a)(1)(B)*

As an additional ground for avoiding the Challenged Trades, the Trustee asserted a constructive fraud claim under § 548(a)(1)(B).[36] The Trustee sought to demonstrate that: (1) Adler received less than a reasonably equivalent value in exchange for the obligations it purportedly incurred or the transfers it made in connection with the Challenged Trades and that (2) at the time such obligation or transfer occurred, Adler was either insolvent or was engaged or about to engage in a business or transaction for which its remaining property constituted unreasonably small capital. *See* 11 U.S.C. § 548(a)(1)(B).

Unlike the requirements of § 548(a)(1)(A), the criteria applicable to § 548(a)(1)(B) are objective. For the Trustee to prevail, no element of intent or state of mind on the part of Hanover is required to be imputed to Adler or to Appellants. To this extent, the relevant inquiry and the bankruptcy court's determinations under both elements rest on factual findings. On this appeal, these ques-

---

**35.** Adler served as clearing firm for 42 introducing broker-dealers, including Hanover. At the time of its closing it had approximately 66,000 active customers, of which Hanover accounted for 15,500. *See Decision*, 247 B.R. at 65.

**36.** Section 548(a)(1)(B) provides:
The Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily...(B)(i) received less than a reasonably equivalent value in exchange for such trans-

fer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a)(1)(B)

tions of fact are reviewable for clear error. *See* Fed. R. Bankr.P. 8013; *Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504.

The bankruptcy court found that the Trustee had sufficiently established both requirements of § 548(a)(1)(B) and thus was entitled to avoid the Challenged Trades on this independent basis. Appellants take issue with the bankruptcy court's factual findings with regard to both elements of the § 548(a)(1)(B) determination. They also contend that the bankruptcy court erred by (i) failing to address their defense under § 548(c) that they gave Adler value in good faith in connection with the Challenged Trades and (ii) not giving adequate consideration to Appellants' defense that the Challenged Trades constituted settlement payments or margin payments protected by § 546(e) of the Bankruptcy Code from the Trustee's avoidance power under § 548(a)(1)(B). The Court will consider these arguments in turn.

### a. *Reasonably Equivalent Value*

Appellants assert various ways by which Adler received reasonably equivalent value for the cash credits Hanover entered into their accounts in connection with the Challenged Sales, triggering Adler's obligation to pay for the purchases in the event Hanover failed to do so. They contend that the bankruptcy court erred in not considering all of the circumstances affecting the value Adler received in exchange for clearing and settling Appellants' Sales and Blue Chip Buys. *See* Appellants' Brief at 79–82. First, Appellants argue that Adler's ability to use the House Stocks it held to effect a buy-in of the Illegal Short Sales represented value to Adler in that Adler possessed, in a cornered market, the potential to realize millions of dollars of value embedded in the pent-up demand for House Stocks created by the Illegal Short Selling. Under

Appellants theory, Adler could have issued a buy-in notice and forced the Short Sellers to deliver all the House Stocks they sold short, and thereafter, because the sellers had nowhere else to go but Adler, could have raised the price. *See id.* at 77, 79–80. Appellants contend that in these circumstances the House Stocks "had actual, realizable cash value, at minimum, reasonably equivalent to the price paid". *Id.* at 80.

Appellants also maintain that in connection with the Blue Chip transactions Adler received further value in the forms of (1) the cash in Appellants' accounts; (2) the House Stocks and their proceeds, which constituted security for Hanover's obligation to pay for the Challenged Sales; (3) Appellants' enforceable obligation to pay for the Blue Chips; and (4) a lien on any Blue Chips Adler acquired for them that would secure Appellants' obligation to pay the purchase price. *See id.* at 82.

On the extensive factual record before it, including a trial on the merits of the various issues Appellants' raise, and weighing the reports and testimony of the parties' respective experts, the bankruptcy court rejected Appellants' arguments. The court found that, contrary to Appellants' assertions, Adler did not intend to effect a buy-in of the Illegal Short Sales of House Stocks. *See Decision,* 247 B.R. at 106. Moreover, the court ruled that Adler's intent and ability to carry out such a buy-in, as well as the prices the Trustee actually obtained in buy-in the Trustee conducted in late March 1995, were irrelevant to the question of the value Adler received from Appellants weeks earlier in connection with the Challenged Trades. *See id.* at 107. The court concluded that the only value Adler actually received in connection with the Challenged Trades was the House Stocks that Hanover's book entries trans-

ferred from Appellants' accounts to Hanover's proprietary account.

### (i) Date of Valuation

In assessing the value of those securities, the bankruptcy court rejected the Claimants' argument that the manipulated House Stock prices which prevailed during the Final Week represented the proper measure for determining reasonably equivalent value. Instead, the court accepted the Trustee's argument that because of Hanover's manipulation of House Stock prices prior to and during the Final Week, the most appropriate market prices to be applied to appraise the House Stocks were those that would have prevailed as of February 16, 1995 absent Hanover's fraud.[37] Noting that once Hanover was out of business, and thus unable to manipulate the market, House Stocks prices dropped sharply by 75%, the court adopted House Stock prices recorded on February 27, 1995 as the most accurate reflection of the House Stocks' fair market worth as of February 16 for § 548(a)(1)(B) purposes. See id. at 110. Applying those prices, the court found that Adler did not receive reasonably equivalent value in connection with the Challenged Trades.

For the purposes of § 548(a)(1)(B), the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). However, § 548(a)(1)(B) contains a critical qualification. The value that is exchanged and received by the debtor must be "reasonably equivalent." 11 U.S.C. § 548(a)(1)(B). This concept has been equated to something akin to fair

market value. See BFP v. Resolution Trust Corp., 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); see also Barber v. Golden Seed Co., Inc. 129 F.3d 382, 387 (7th Cir.1997) ("[T]he standard for '[r]easonable equivalence should depend on all the facts of each case,' an important element of which is fair market value.") (citations omitted); Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.L., Inc.(In re R.M.L., Inc.), 92 F.3d 139, 149 (3d Cir.1996) (" 'The touchstone is whether the transaction conferred realizable commercial value on the debtor'.") (citations omitted); Davis v. Suderov (In re Davis), 169 B.R. 285, 299 (E.D.N.Y.1994) ("Absent unusual circumstances, [fair market value] will typically be the controlling consideration.") (citations omitted).

 Applying this standard, this Court sees no clear error in the bankruptcy court's factual findings and concurs in its judgment. The Court notes at the outset that generally whether a transfer is for "reasonably equivalent value" is largely a question of fact, as to which considerable latitude must be allowed to the bankruptcy court as the trier of the facts. Moreover, the determination of reasonably equivalent value depends on all the circumstances surrounding the transaction. See 5 Collier ¶ 548.05[1][b], at 548–35.

 None of the forms of value Appellants argue Adler received, singly or combined, rises to a level that may be deemed "reasonably equivalent" commercial value. First, the statute requires that the debtor must have "received" the value in question "in exchange" for the transfer or obligation at stake. An unperformed promise to pay or to deliver securities in the future, after the debtor has completed

---

**37.** That date corresponds to the point in time when, according to the bankruptcy court, Hanover experienced a net capital deficiency that would have warranted its being closed by the regulators. See Decision, 247 B.R. at 112.

the transfer or incurred the obligation, cannot satisfy the concept of a fair exchange. The requirement that the debtor must have "received" the value in question expresses a temporal condition demanding an element of contemporaneity in the determination of whether something close to the reasonable equivalence has been exchanged. Full performance on the debtor's part in return for an executory promise to perform on the other party falls short of the requisite standard of equivalent worth at the time of the transaction. Under § 548(d)(2)(A), the term "value" would exclude future considerations, at least to the extent they remain unperformed. *See Bailey v. Metzger, Shadyac & Schwarz (In re Butcher)*, 72 B.R. 447 (Bankr.E.D.Tenn.1987); 5 *Collier* ¶ 548.07[2][a], at 548–63; ¶ 548.05[1][b], at 548–39 ("The language section 548(d)(2)(A), seeming to contemplate only a present advance, or transfer of property as security for, or the discharge of, an antecedent debt, generally leaves no room for a mere executory promise to constitute value.").

### (ii) *The Potential Buy–In Value*

For the same reasons, this Court finds no clear error in the bankruptcy court's decision not to credit Appellants' theory claiming intrinsic value embedded in the buy-in Adler allegedly had the potential to realize. The pertinent inquiry regarding reasonably equivalent value requires a determination not only as to the sufficiency of the value given, but also as to whether the value was received in exchange for the transfer in question. The notion of a fairly contemporaneous exchange of value suggests some element of consciousness or recognition among the parties concerning the particular interest in property at issue and the value being traded. The bankruptcy court rejected Appellants' allegations that Adler intended to conduct a buy-in.

This court finds no sustainable evidence on the record to suggest that at the time of the transfer or obligation in connection with the Challenged Trades, Adler or the Appellants or even Hanover contemplated that the reasonably equivalent consideration they understood they were trading in exchange for the House Stocks was Adler's claimed ability to pursue the Short Sellers in a buy-in. Appellants' theory that Adler was in a position to realize value locked in the House Stocks is besides the point in a determination as to whether that supposed value reflects the actual consideration Appellants or Hanover had in mind giving, or that Adler understood it was gaining and actually received, in exchange for the transfer of securities or cash associated with the Challenged Trades.

Moreover, to the extent Appellants claim that what they, or Hanover as their agent, gave Adler as value in the exchange for Adler's obligation to deliver the Blue Chips was the worth Adler could have obtained from the House Stocks by capitalizing on its ability to effectuate a buy-in of the Illegal Short Sales, Appellants' argument implicitly acknowledges that the value Appellants claim they gave was not then actual or current. Rather, it depended on a contingency: Adler's ability at a future point to secure the full value contained in the exchange, so as to render it reasonably equivalent to what the House Stocks purportedly were worth in perhaps the only real market existing for them. Consequently, in order for Adler to receive the alleged true value, it had to undertake, at some risk, a buy-in whose viability or net yield could not be projected with any degree of certainty at the time of the exchange. To this extent, the hypothetical buy-in represented a proposition speculative at best, trading a hope of recovery in

exchange for a current and quantifiable obligation on Adler's part to deliver particular Blue Chip securities.

In any event, insofar as Appellants argue that Adler contemplated such a buy-in, the bankruptcy court ruled otherwise as a factual matter. Appellants contest Judge Garrity's determination. This conclusion rests on issues of fact made by the bankruptcy court after a full examination of the record and following a trial. This Court, having examined that record, holds that Judge Garrity's determination is supported by substantial evidence and finds no clear grounds for a reversal of the bankruptcy court's judgment in this regard.

With regard to the cash Appellants claim they held in their accounts that could be applied to the purchase of the Blue Chips, the bankruptcy court found that none of the Claimants' accounts had funds sufficient to pay for the Blue Chips. According to the court, the Claimants who purchased Blue Chips maintained, in the aggregate, less than $400,000.00 in their accounts as of February 16, 1995, as against a total of between $13.3 million and $18.5 in Blue Chip Buys booked into their accounts during the Final Week. *See Decision,* 247 B.R. at 72, 107.

Pertaining specifically to Appellants in this proceeding, the Trustee estimates that altogether the customers had approximately $38,000.00 in their accounts during that period and with this amount purportedly purchased more than $3 million in Blue Chips. *See* Trustee's Brief at 67.[38] There were also no actual "proceeds" of the Challenged Sales in Appellants' accounts be-

cause Hanover never paid for those trades. In fact, the bankruptcy court specifically found that Hanover was neither able to nor intended to pay for them. *See Decision,* 247 B.R. at 96, 104.

Appellants' remaining arguments fair no better under close scrutiny. As earlier stated, Appellants' purported promise or obligation to pay for the Blue Chips, even if enforceable, does not equate to "reasonably equivalent" value measured as of the time of the exchange. Their lien hypothesis is unavailing because, as the bankruptcy court noted, it assumes the Blue Chips were delivered. *See Decision,* 247 B.R. at 107. The Trustee's records, however, contained no evidence that the Blue Chips were ever received by Adler's estate. *See id.* (citing *Ensminger I,* 218 B.R. at 27).

Finally, Appellants contend that the supposed buy-in could have garnered a substantial windfall for Adler reflecting House Stock prices, at a minimum, comparable to those Hanover posted during the Final Week. This Court is satisfied that the bankruptcy court dealt convincingly with the issue. The methodology the bankruptcy court employed, which assumed the House Stocks' market prices as of February 27, 1995 is not unreasonable, particularly given the empirical evidence that the value of those securities plummeted by 75% on the day following Hanover's closing and the cessation of the price manipulation that had previously sustained the artificial values.[39] According to Judge Garrity,

---

38. This figure represents a computation made at a time when Appellants comprised nine Hanover customers. Since then, former Appellant Michael Polselli settled his claim and withdrew from this appeal. *See supra* n. 2. It is not certain whether Polselli's withdrawal would affect the Trustee's calculation of Ap-

pellants' aggregate cash position during Final Week.

39. The Trustee asserts that in the five years that have elapsed since Hanover's closing, the House Stocks never recovered value to prices anywhere near those posted during the Final Week. *See* Trustee's Brief at 61. One-and-

While we can attribute some of that decline to the fact that Hanover was no longer acting as a market maker for the [House] [S]tock[s]... we find that it was largely attributable to the fact that Hanover was no longer creating an illusion of demand.

*Id.,* 247 B.R. at 110. Similar precipitous drops in the value of house stocks were recorded in other cases where the primary market-maker, which had engaged in fraudulent trades to maintain the appearance of a market at inflated prices for house stocks, was forced to close down. *See Russo,* 74 F.3d at 1389; *Salmon I,* at 5.

Nor does the Court find persuasive Appellants' insistence that the value the Trustee obtained from the buy-in the Trustee conducted on March 20 and 29, 1995, which garnered the Adler estate $17 million, is a better indicator of what the House Stocks were worth on February 16, 1995. *See* Appellants' Brief at 23–24; Appellants' Reply at 32. Whatever may have been the House stock prices in late March 1995, the only value that is relevant for the purposes of § 548(a)(1)(B) is that of the prevailing prices recorded at the time the Challenged Trades were booked. *See Cooper v. Ashley Comm., Inc. (In re Morris Communications NC, Inc.),* 914 F.2d 458, 466 (4th Cir.1990); 5 *Collier* ¶ 548.05[1][b], at 548–38 ("Neither subsequent depreciation nor appreciation in the value of the consideration affects the question of whether reasonably equivalent value was given."). The bankruptcy court was not bound by the prices Hanover posted as a measure of fair value in light of the overwhelming evidence that those prices were manipulated and Hanover's inability to find a market. *See Salmon I,* at 20.

b. *Adler's Insolvency*

▇ The bankruptcy court also found that the Trustee had met his burden of establishing the second element required for avoidance of a debtor's transfer or obligation under § 548(a)(1)(B)— that at the time of the Challenged Trades Adler was insolvent or operating with unreasonably small capital. *See* 11 U.S.C. § 548(a)(1)(B). The Bankruptcy Code provides that a debtor is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A).

In determining "fair valuation" of Adler's worth, the bankruptcy court applied a "deathbed" valuation rather than the standard of a going concern. *See Decision,* 247 B.R. at 111 (citing *In re Taxman Clothing Co.,* 905 F.2d 166, 170 (7th Cir.1990)) ("going concern value is not the proper standard if the business is 'on its deathbed'") (citation omitted); *Langham, Langston & Burnett v. Blanchard,* 246 F.2d 529, 532 (5th Cir.1957). The "deathbed" indicators the bankruptcy court found relevant included "ongoing fraud, struggling to stay in business before fraud is discovered, fraud used in an attempt to alleviate cash flow problems and an inability to reorganize post-bankruptcy." *Decision,* 247 B.R. at 111.

The bankruptcy court also relied on the evidence presented at trial by the testimony of the Trustee's two experts, who agreed that both Hanover and Adler were insolvent as of February 16, 1995. The court's determination of Adler's insolvency as of February 16 was premised on an appraisal of the fair market value Hanover's inventory of House Stocks which the

---

one-half years after Hanover's close, every one of the House Stocks was trading at less than 25% of the February 27, 1995 prices, or

about one-sixteenth of the Challenged Sales prices. *See id.* (citing Trustee's Ex. 72.)

court concluded was far less than its worth at Hanover's quoted prices. To this end, the court again assumed that the most accurate reflection of House Stocks' real value was that in a market unaffected by Hanover's manipulation. Accordingly, the court adopted the assumption of the House Stocks' February 27, 1995 prices that it had earlier employed in connection with determining the element of reasonably equivalent value. *See id.* at 113.

Ascribing a value of $10.3 million to the House Stocks in Hanover's proprietary account at February 27 prices, the court concluded that on February 16, 1995 Hanover had negative net worth of $16.9 million and Adler nearly $6 million. *See id.* at 113–14. The court noted that the Claimants' expert disagreed with the use of the February 27, 1995 market prices for valuating the House Stocks in computing Hanover's solvency, but otherwise did not object in any meaningful way to the methodology used by the Trustee's experts. *See id.* at 111–12.

Appellants' sole challenge to the bankruptcy court's ruling is that it depended entirely on employing the February 27, 1995 prices as representing fair value of Hanover's House Stocks on February 16. *See* Appellants' Brief at 82–83. Appellants contend that the court's methodology ignores the real cash value of the House Stocks to Hanover and Adler through the prospect of buy-ins of the Illegal Short Sales. *See id.* This Court has already concluded that the bankruptcy court did not clearly err in assuming that the February 27, 1995 market prices fairly stated the House Stocks' real value on February 16, 1995. On this basis, the Court upholds Judge Garrity's determination that, for the purposes of the Trustee's avoidance of the Challenged Trades pursuant to § 548(a)(1)(B), Adler was insolvent on February 16. The bankruptcy court's rea-

soning and methodology accords with the approach followed by the court in *Salmon I* under somewhat comparable facts in sustaining an avoidance under § 548(a)(1)(B). *See Salmon I*, at 17–24.

### 3. *Defense of Value Given Pursuant to 11 U.S.C. § 548(c)*

Appellants argue that the bankruptcy court failed to address the defense they asserted under § 548(c) of the Bankruptcy Code. That provision states that a transferee

> that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). Appellants contend that they acted in good faith and gave value in the form of the House Stocks in exchange for the cash and securities Adler credited to their accounts at Hanover's posted prices, and that they thus are entitled to retain those interests and enforce Adler's obligation to complete the Challenged Trades to the extent of the value given. *See* Appellants' Brief at 68–69. With regard to the Blue Chip Buys, Appellants argue that Adler received (1) the House Stocks and their proceeds and (2) Appellants' obligations to pay the purchase price.

Appellants maintain that the bankruptcy court erred by not preserving purported value that Appellants gave which they claim at least equaled or exceeded the value of the transfers the Trustee seeks to avoid and by ignoring Appellants' rights to pay for the Blue Chip Buys in the event their House Stocks Challenged Sales were avoided. *See id.* at 69.

Appellants' § 548(c) arguments rest on essentially the same legal and factual

grounds they offer to support their §§ 548(a)(1)(A) and 548(a)(1)(B) claims: their good faith, and the value they purportedly gave in exchange for the Challenged Trades. The asserted value included Appellants' House Stocks and proceeds in their accounts reflected at the prices at which Hanover purchased their House Stocks, the potential value to Adler of a buy-in and Appellants' obligation to pay the purchase price of the Blue Chips. Each of these issues was effectively subsumed in the bankruptcy court's analysis under §§ 548(a)(1)(A) and 548(a)(1)(B) discussed above.

Because the factual and legal predicates upon which the bankruptcy court's determinations under § 548(a)(1)(A) and § 548(a)(1)(B) effectively foreclose application of § 548(c) elements that depend on similar findings, Appellants suffered no prejudice by the bankruptcy court's failure to respond to their § 548(c) argument.

As a threshold matter, by its very terms § 548(c) provides that, in order to invoke this defense, the transferee must satisfy three standards: take (1) for value *and* (2) in good faith, and (3) claim the applicable right to the interest only to the extent the transferee gave value to the debtor in exchange. A finding against the transferee on any of these elements would bar application of § 548(c). *See, e.g.,* 5 *Collier* ¶ 548.07[2][a], at 548–62 ("Awareness of fraudulent purpose of a transaction is obviously inconsistent with good faith.") Here, the bankruptcy court's findings with regard to the Trustee's applications for avoidance of the Challenged Trades under

§ 548(a)(1)(B), which this Court affirmed above, sufficiently treat the question of value Appellants gave, while the Court's conclusions relating to the Trustee's common law claims discussed below, similarly dispose of Appellants' good faith argument. For these reasons, this Court finds no basis for Appellants' § 548(c) defense.

4. *Defense of Settlement Payments or Margin Payments Pursuant to § 546(e)*

As an additional challenge to the Trustee's avoidance application under § 548(a)(1)(B) and other applicable law, Appellants assert the protection afforded to settlement payments and margin payments under the "stockholder defense" of § 546(e).[40] That provision carves out an exemption for certain transfers from the application of § 548(a)(1)(B) and other avoidance provisions of the Bankruptcy Code. *See* 11 U.S.C. § 546(e). The defense applies if the transfer qualifies as (1) a margin payment or a settlement payment (2) made by or to any of the specifically identified securities trade entities. *See id.; Munford v. Valuation Research Corp. (Matter of Munford, Inc.),* 98 F.3d 604, 610 (11th Cir.1996), *cert. denied,* 522 U.S. 1068, 118 S.Ct. 738, 739, 139 L.Ed.2d 675 (1998); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230, 1236–37 (10th Cir.1991), *cert. denied,* 505 U.S. 1213, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992) (herein *"Kaiser II"*); *Zahn v. Yucaipa Capital Fund,* 218 B.R. 656, 675 (D.R.I.1998).

The Bankruptcy Code defines a "settlement payment" as "a preliminary settle-

---

**40.** 11 U.S.C. § 546(e) provides: "Notwithstanding sections 544, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title."

ment payment, a partial settlement payment, an interim settlement payment; a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). "Margin payment" is defined as a

> payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency.

11 U.S.C. § 741(5). If a transfer qualifies as either a settlement payment or a margin payment as defined, the bankruptcy trustee is not empowered to avoid the transaction except as an actual fraudulent conveyance under § 548(a)(1)(A). *See* 11 U.S.C. §§ 546(e), 741(5).

### a. *The Parties' Arguments*

Appellants, citing the plain language of the statute, argue that their portions of the Challenged Trades constituted both settlement payments and margin payments. In support, they review the movement of cash and securities of the settlement process of their transactions, as reflected in Adler's records, and point out that Appellants' House Stocks were on deposit with Hanover at the time they placed the order to sell. In furtherance of those instructions, Adler debited the House Stocks out of Appellants' accounts and into Hanover's Proprietary Account, simultaneously debiting cash out of Hanover's Proprietary Account and into Appellants' accounts. *See* Appellants' Brief at 73; *Decision*, 247 B.R. at 71. Regarding the Blue Chips, Adler

debited cash representing the purchase price from Appellants' accounts, and credited the Blue Chips to those accounts. *See Decision*, 247 B.R. at 71. Appellants conclude that these debits and credits constitute the book-entry transfer of securities that, as regard the House Stock Sales, is complete as of trade date, eliminating the customers' stock position. *See* Appellants' Brief at 73–74 (citing *Bell & Beckwith*, 821 F.2d at 340).

In support of their margin payment argument, Appellants assert that the House Stocks and their proceeds secured payment to Adler, a participant in the NSCC, a securities clearing agency. *See id.* The Blue Chip Buys were reported to the NSCC, which generated contract sheets identifying the transactions and Adler held the House Stocks or their cash proceeds as security for the Appellants' obligation to pay for the Blue Chip Buys. *See id.*

Appellants also argue that the Bankruptcy Code's definition of "transfers" does not limit the term to an actual conveyance of ownership of property that remains incomplete until settlement date. Rather, they maintain that § 101(54) would encompass as transfers the debits and credits in Appellants' and Hanover's accounts because these entries record conveyances of "an interest in property".[41] *See* Appellants' Reply at 21. Thus, Appellants argue that even if the book-entry debits and credits in their accounts and Hanover's books created only Adler's obligation to deliver cash and securities to Appellants, these transactions nonetheless constitute transfers of an interest in property. *See* Appellants' Reply at 22 (citing

---

**41.** Bankruptcy Code § 101(54), upon which Appellants rely, defines "transfer" as

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or

with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

11 U.S.C. § 101(54).

*Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); S.Rep. No. 95–989, at 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813;[42] 5 *Collier* ¶ 548.02[1][a].

The Trustee counters that the "stockbroker defense" applies, if at all, only to the grounds under § 548(a)(1)(B) and New York fraudulent conveyance law upon which the bankruptcy court's judgment rests. He asserts, however, that § 546(e) does not apply at all to this case. First, the Trustee argues that even applying the plain language of § 546(e), the statute does not protect the trades Appellants seek to enforce. The Trustee posits that § 546(e), by its terms, shelters from the Trustee's avoidance powers only a "transfer" that constitutes a margin or settlement payment made before the commencement of the case. *See* Trustee's Brief at 73.

By this theory, what the Trustee seeks to avoid here are not "transfers" Adler made, but "obligations" Appellants claim Adler incurred during the Final Week. Arguing that the Bankruptcy Code's avoidance provisions treat the making of transfers and the incurrence of obligations as distinct concepts, the Trustee focuses on the language of § 548, which authorizes avoidance of "any transfer of an interest, or any obligation incurred". 11 U.S.C. § 548(a). Based on this provision, the Trustee reasons that § 546(e) applies only to a "transfer" made, and not to an obligation incurred by the debtor. Trustee's

Brief at 74. The Trustee thus concludes that § 546(e) protects only the *actual* movement of securities and cash and that the evidence here establishes that no cash or securities actually changed hands before settlement was complete.

Second, the Trustee maintains that application of § 546(e) under Appellants' reading, would "substantially impede the fair and effective operation of SIPA." *Id.* at 75 (citing *SIPC v. Charisma Sec. Corp.*, 506 F.2d 1191, 1195 (2d Cir.1974)).[43] This follows, the Trustee argues, by reason of Hanover's admitted frauds, which, if not imputed to Adler, would defeat avoidance under § 548(a)(1)(A) and thus effectively countenance enforcement of transactions calculated to defraud SIPC.

Third, the Trustee contends that § 546(e) has no application in the absence of bona fide securities trading and that there were no such transactions here because no actual exchange of any consideration occurred, and hence no real transaction against which to apply settlement payments. Finally, the Trustee holds that applying § 546(e) as construed by Appellants to enforce their trades would conflict with the policy underlying the statute and defeat its purpose. Specifically, he argues that the statute protects securities transactions only insofar as executed in the ordinary course of business and that § 546(e) was not intended to protect trades that occur outside the ordinary

**42.** The legislative history Appellants quote states:

> A transfer is a disposition of an interest in property. The definition is as broad as possible. Many of the potentially limiting words in current law are deleted, and the language is simplified. Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property.

*Id.*

**43.** The Bankruptcy Code applies to SIPA liquidations only to the extent consistent with SIPA. Section 78fff(b) of SIPA provides that:

> To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with [various provisions of the Bankruptcy Code, including Chapter 5].

15 U.S.C. § 78fff(b).

course of business, such as those motivated by demonstrable manipulation and other fraud. Under the Trustee's theory, since the Challenged Trades cleared only through Adler, cancelling the transactions would not occasion adverse effects on other entities in the securities clearing network. In other words, the affected industry would not be threatened with the spread to other brokerage houses of the chain reaction of potential insolvencies that § 546(e) was designed to avert.

### b. *The Bankruptcy Court's Rulings*

The bankruptcy court ruled that the definitions of "settlement payment" and "margin payment" contained in § 741 of the Code apply here because § 546(e) incorporates them by reference. *See Decision*, 247 B.R. at 104. While acknowledging that many courts define "settlement payment" broadly to include any transfer made toward the completion of settlement regardless of the date in the process when such transfer occurs, the court rejected Appellants' arguments.

The court agreed that the Trustee had established that "Hanover hatched a plan to create fraudulent SIPA claims, not bargained-for exchanges of cash and securities." *Id.* Sustaining this finding, the court cited evidence demonstrating that (1) Hanover's House Stocks "buys" during the Final Week were false; (2) Hanover dictated which of its customers could "sell" securities; and (3) the Challenged Sales could not have occurred without the Fake Buys, since Hanover would not have had any "cash" with which to "pay" over to the Claimants the proceeds of the sales and the Blue Chips. On this basis, the court reiterated that "[Hanover's] brokers engaged in criminal and other wrongful acts in booking the Challenged Trades, and they did so to enhance the SIPC claims of the Claimants, not to have the trades performed." *Id.*

The bankruptcy court disagreed with the Trustee's argument that SIPA effectively nullifies § 546(e). The court also declined to resolve the parties' dispute over the construction of the terms "settlement payment" and "margin payment", holding that regardless of how broadly the terms were defined, § 546(e) does not protect the Challenged Trades from the Trustee's avoidance under § 548(a)(1)(B). As grounds for this conclusion, the court stated that "[t]he Challenged Trades are the result of Hanover's massive fraud, not ordinary course transfers, and the statute simply does not insulate transactions like these from attack under § 548(a)(1)(B) of the Bankruptcy Code." *Id.* at 105 (citing *Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir.1990)); *In re Integra Realty Resources*, 198 B.R. 352, 360 (Bankr.D.Colo. 1996). The Court further reasoned that any other result is contrary to the goals of § 546(e) because it would undermine rather than promote investor confidence by endorsing a scheme to defraud SIPC. *See id.*

### c. *Applicability of the Defense*

 As a point of departure, in any matter involving statutory construction, judicial inquiry begins with the text of the statute. The court must first examine whether the plain language is unambiguous, and there end the search if on its face the wording is clear enough to leave no room for doubt or further interpretation. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1,6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) ("[W]hen the statute's language is plain, 'the sole function of the courts'—at least where the disposition required by the text is not absurd—is to enforce it according to its terms") (quoting *United States v. Ron*

*Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)) (internal quotations omitted); *Connecticut Nat'l Bank v. Germain* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("When the words of a statute are unambiguous, then, this first cannon is also the last: 'judicial inquiry is complete.'") (citations omitted).

### (i) *Settlement Payments*

A number of courts which have examined the meaning and legislative history of § 546(e) have concluded that the definition of settlement payment "defies plain meaning; to the contrary...it is circular and cryptic." *Zahn*, 218 B.R. at 675; *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l)*, 195 B.R. 971, 983 (Bankr.D.Mass. 1996) (the statutory definition of the term "is as opaque as it is circular"); *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 663 (N.D.Ill.1991). As one court put it, § 546(e) "'essentially' provides that a settlement payment is a settlement payment...." *Zahn*, 218 B.R. at 675.

By way of guidance in ascertaining the meaning of "settlement payment," as the term relates to both § 546(e) and companion provisions in § 546(f),[44] Congress made clear that the provisions are to be defined with reference to the common understanding, practice and usage in the securities industry. First, § 546(e) specifies that the qualifying transfers consist of payments made "by or to" various participants in the trading of securities, specifically a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency. *See* 11 U.S.C. § 546(e). Second, Section 741(8) itemizes several particular forms of settlement payments included in the definition. *See* 11 U.S.C. § 741(8). *See Kaiser II*, 952 F.2d at 1237; *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman Asset Management Corp.)*, 878 F.2d 742, 751 (3d Cir.1989). Further reflecting actual industry practice and definitional understanding, the Bankruptcy Code expressly extends its reach to cover several particular kinds of financial transactions which rely upon the concept of settlement payments.[45] *See Kaiser II*, 952 F.2d at 1239 n. 9

In ordinary language, "payment" refers to the "act of paying" or to the thing being paid. *Marriam–Websters Collegiate Dictionary* 853 (10th ed.1998). "To pay" is defined as "1a: to make due return to for services rendered or property delivered .... [2b]: to discharge indebtedness for: settle .... [2c]: to make a disposal or transfer...." *Id.* The term "settlement" as commonly used in connection with purchases and sales in the securities trade refers to acts that occur at different stages of the process towards completion of the securities transaction. *See Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir.1990) (herein "*Kaiser I*"). In *Kaiser I* the Tenth Circuit cites approvingly several industry sources that define the term in words that share a common element: the payments are made in contemplation of the completion of a securities trade.[46] *See id.*

---

**44.** Section 546(f) pertains specifically to settlement payments made in connection with repurchase agreements. *See* 11 U.S.C. § 546(f).

**45.** These transactions include: "securities contracts", *see* U.S.C. § 741(7); "repurchase agreements", *see* 11 U.S.C. § 101(47); "commodity contracts", *see* 11 U.S.C. § 761(4); "forward contracts", *see* 11 U.S.C. § 101(25); *see also Kaiser II*, 952 F.2d at 1239, n. 9.

**46.** *See, e.g.*, A. Pessin & J. Ross, Words of Wall Street: 2000 Investment Terms Defined 227 (1983); *accord* D. Brownstone & I. Franck, The VNR Investor's Dictionary 279

The first aspect of the process, known as "street-side settlement", involves the relationship and associated actions between brokers and clearing agencies during the clearance and settlement of the trade. *See Kaiser II*, 952 F.2d at 1237.[47] In this context, brokers transmit the purchases and sales to the clearing entity, which on the date of the trade makes credit and debit entries in the accounts of its member brokers and institutions, and records and computes the obligations it has incurred for payment on the settlement date, which typically occurs within five days of trade date. *See id.* At this stage, "settlement payments" are regarded "payments made in discharge of a party's settlement obligations." *Id.* (*citing* Division of Market Regulation, Securities and Exchange Commission, *The October 1987 Market Break* at 10–5 (1988)); *see also* Oesterle, *Comment on the Harris Paper*, 74 Cornell L.Rev. 943, 944 (1989) ("Settlement payments refer to the final payment of funds between the clearinghouse [members] for trade[s] registered to a specific point in time.").

In another phase, settlement occurs between the broker and the customer. "Customer-side settlement" has been defined as " '[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale.' " *Kaiser II*, 952 F.2d at 1238 (quoting New York Stock Exchange, *Language of Investing Glossary* 30 (1981)).

In several cases which have considered the issue, the Bankruptcy Code's definition of settlement payments has been characterized as extremely broad. The cases have extended or adapted the term to embrace various forms of payment that further the settlement process in different types of securities transactions. *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505 (3d Cir.1999) (payment for shares during a leveraged buyout); *cert. denied*, 528 U.S. 1021, 120 S.Ct. 531, 145 L.Ed.2d 411 *Hamilton Taft & Co. v. Howard, Weil, Labouisse, Freidrichs Inc.*, 114 F.3d 991 (9th Cir.1997) (reverse repurchase agreement between stockbroker and debtor); *Jonas v. Resolution Trust Corp. (In re Comark)*, 971 F.2d 322, 325–26 (9th Cir.1992) (debtor's return to another party, upon cancellation of the

---

(1981) ("finishing up of a transaction or group of transactions"); Group of Thirty, Clearance and Settlement Systems in the World's Securities Markets 86 (1989) ("[t]he completion of a transaction wherein securities and corresponding funds are delivered and credited to the appropriate accounts"); New York Stock Exchange, Language of Investing Glossary 30 (1981) ("[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives the broker the proceeds of a sale"); D. Scott, Wall Street Words 320 (1988) ("[t]ransfer of the security (for the seller) or cash (for the buyer) in order to complete a security transaction").

47. This system depends on two corresponding sets of guarantees of performance made by all the parties in the chain affirming that they

will honor their obligations despite a default by another party in the system. The brokers guarantee to perform if their customers fail to do so, and the clearing agency guarantees to perform if the clearing members do not. *See Kaiser II*, 952 F.2d at 1238 n. 4. These guarantees allow the parties to trade freely without concern over events occurring between trade date and settlement date. *See Zahn*, 218 B.R. at 675–76. *Wieboldt*, 131 B.R. at 664 (citing Neil M. Garfinkel, Note, *No way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO*, 1991 Colum. Bus. L.Rev. 51, 61–63); *Bankruptcy of Commodity and Securities Brokers, 1981: Hearings Before the Subcomm. on Mono-policies and Commercial Law of the House Comm. on the Judiciary* 97th Cong. 301 (1981) (statement of Jack Nelson, President, National Securities Clearing Corporation).

transaction, of government securities serving as additional margin in a repurchase agreement); *Kaiser II*, 952 F.2d at 1235(payments to shareholders for their stock in connection with a leveraged buyout); *Bevill*, 878 F.2d at 743 (transfers of federal government securities in connection with repurchase agreements by participant securities dealer to purchasers qualify as settlement payments under § 546(f)); *but see Wieboldt*, 131 B.R. at 664–65 (return of certain transfers made by debtor in a leveraged buyout held not settlement payments); *see also Healthco Int'l*, 195 B.R. at 982.

In giving "settlement payments" an expansive reading, the courts in these cases recognize that the securities industry encompasses a wide range and variety of transactions, representing investments of staggering proportions and entailing corresponding national economic implications.[48] These interests demand stability and certainty in settled transactions, and legal definitions adaptable to the usage, understanding and realities of the market. *See Integra Realty*, 198 B.R. at 357 n. 1. To promote these aims, Congress adopted § 546(e) as an exception to the Trustee's avoidance powers for transactions that are not actually fraudulent as defined in § 548(a)(1)(A). The statute recognizes that if the pre-bankruptcy transactions of a securities broker-debtor could be readily reversed, confidence in the chain of guarantees upon which the functioning of the system depends would be undermined and the entire market could be threatened by

serial bankruptcies. *See Zahn*, 218 B.R. at 676; *Wieboldt*, 131 B.R. at 664.

The legislative history of § 546(e) indicates that the provision was intended "to minimize the displacement caused in the commodities and securities markets in the event [of] a major bankruptcy affecting those industries." H. Rep. No. 97–420, at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583. More specifically, Congress sought to prevent the "ripple effect" created by "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected industry". *Id.; see also Bevill*, 878 F.2d at 747.

The intent to reach broadly to encompass all aspects of securities industry practices is manifested in the language of the statute. The definition of settlement payment in Section 741(8) specifically mentions different forms of payments, whether "preliminary", "partial", "interim", "on account", "final", "*or any other similar payment commonly used in the securities trade.*" 11 U.S.C. § 741(8) (emphasis added); *see Kaiser II*, 952 F.2d at 1237 ("The clear aim of the definition is to encompass all 'settlement payments' commonly used in the securities trade.") (citing *Kaiser I*, 913 F.2d at 848). The Third Circuit reflected this flexibility in *Bevill*, where it observed that a broad statutory definition is consistent with Congress' intent that "settlement payment"

> may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and that it includes transfers which are *normally re-*

---

48. *See, e.g., Bevill*, 878 F.2d at 745, noting that the estimate daily volume of repurchase agreements transactions in 1983 amounted to several hundred billion dollars; during one week in 1988 it was approximately $600 billion. The record volume of stock exchange and over-the-counter trades during the week following the market crash of 1987 was esti-

mated at $200 billion. The court also observed that the repurchase agreements market is used by the Federal reserve System to help execute monetary policy, that the investments serve to finance the national debt at the lowest possible cost, and that they are also attractive to private businesses and state and local governments. *See id.*

*garded as part of the settlement process,* whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process *for the particular type of transaction at hand.*

*Bevill,* 878 F.2d at 752 (emphasis added).

Appellants, citing these authorities, fault the bankruptcy court's "elevation of policy over the application of § 546(e)", and contend that the court's approach violates the plain meaning of the rule. They insist that "it was the bankruptcy court's responsibility to apply § 546(e) as written". Appellants' Brief at 74.

This Court agrees with the bankruptcy court and the Trustee that § 546(e) does not apply here to rescue Appellants' Challenged Trades, and concludes that Judge Garrity, in rejecting Appellants' § 546(e) defense, was not wrong to look not solely to the text but to the policy and overall scheme underlying the statute.

 Though the courts agree that the § 546(e) definition of "settlement payment" is to be read broadly, the term "is not boundless." *In re Kaiser Merger Litigation,* 168 B.R. 991, 1001 (D.Colo.1994); *see also Integra Realty,* 198 B.R. at 358. And while it is axiomatic that where the legislative scheme is coherent and consistent the court need not inquire beyond the text of the statute, in cases where the plain language, even if literally applicable, would yield absurd results at odds with the statutory design, courts may look beyond the printed word to the law as a whole and its purposes and policy, so as to determine what particular legislative intent may apply. *See Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (" 'in expounding a statute, we [are] not... guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' ") (citing *Pilot Life Ins.*

*Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)).

This principle expresses an obvious corollary to the paramount canon of statutory interpretation. If the plain language of the text is the point of departure, another bedrock premise equally guides our path to statutory meaning. It is that the courts must bear in mind that in exercising its powers to write the laws, Congress's declared purpose is legislation, not lexicography; that the essence lawmakers infuse into statutes to serve as building blocks is not disembodied words but organic substance imbued with meaning and charged to an end. As one of our eminent jurists reminds us "statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir. 1945),(L.Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

 Thus, in prospecting profoundly into words in search of the sense of particular legislation, the most bountiful ground is bound to occur at the juncture where plain language and the lawmakers' intent converge to manifest policy and foster stated aims. For this task to be most authoritative and fruitful at any point of genuine uncertainty, the inquiry cannot end in text, but in context. It must take account of the whole and not surrender purpose to literalness. *See Shell Oil Co. v. Iowa Dep't of Revenue,* 488 U.S. 19, 25, 109 S.Ct. 278, 102 L.Ed.2d 186 (1988) ("[T]he meaning of words depends on their context."); *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) ("[S]tatutory language must always be read in its proper context."). As the Supreme Court has stated in connection with the Bankruptcy Code, "[s]tatutory construction, however, is a holistic endeav-

or. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme...." *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc.,Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

The dispute now before the Court entails a tension not uncommon between literal language and the whole design of the Bankruptcy Code, as well as between competing objectives of the statute. In § 546(e), Congress recognized that the unwinding of settled securities transactions could create an environment hostile to capital formation, engendering diminished investor confidence, as well as increased costs and volatility of transactions in capital markets. To that end, strong policy reasons favor a statutory reading of settlement payments that protects participants in the securities markets and promotes finality of securities transactions, as a counterbalance to safeguarding the interests of creditors. *See Integra Realty,* 198 B.R. at 357 n. 1 (quoting from portions of a brief the SEC submitted in *Kaiser I* ).

At the same time, the spirit that infuses the whole of SIPA and the Bankruptcy Code is Congress's determination, reflected in a trustee's avoidance powers under § 548 as well as SIPC Rule 300.503, that "a few individuals should not be allowed to benefit from transfers by an insolvent entity at the expense of the many. Rather, Congress intended equal shares of the bankruptcy estate for creditors of equal rank." *Jewel Recovery,* 196 B.R.

348, 352 (N.D.Tex.1996) (citing *Young v. Higbee Co.,* 324 U.S. 204, 210 n. 8, 65 S.Ct. 594, 89 L.Ed. 890 (1945)).

Faced with the clash of interests inherent in these provisions, courts which have had occasion to interpret and apply § 546(e) have identified a number of considerations which may prove helpful and persuasive in deciding which Congressional intent should prevail, and which other vital legislative policy must yield. These factors may be instructive in determining whether the transfers at issue here qualify as "settlement payments" entitled to the protection of § 546(e).

■■■■ The courts' considerations include whether: (1) the transactions have long settled by means of actual transfers of consideration, so that subsequent reversal of the trade may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market (*see Kaiser II,* 952 F.2d at 1240–41; *Integra Realty,* 198 B.R. at 356–57); (2) consideration was paid out in exchange for the securities or property interest as part of settlement of the transaction (*see Kaiser I,* 913 F.2d at 850; *Integra Realty,* 198 B.R. at 360 [49]); (3) the transfer of cash or securities effected contemplates consummation of a securities transaction (*see Resorts Int'l,* 181 F.3d at 515 [50]; *Comark,* 971 F.2d at 326; *Kaiser I,* 913 F.2d at 849); (4) the transfers were made to financial intermediaries involved in the national clearance and settlement

**49.** The court in *Integra Realty* quotes from the Final Report of the Securities and Exchange Commission on the Practice of Recording the Ownership of Securities in the records of the Issuer in other than the Name of the Beneficial Owner of Such Securities, pursuant to Section 12(m) of the Securities Exchange Act of 1934 at 9, n.1 (December 3, 1976), which states that "clearance and settlement of secu-

rities encompasses the process by which parties to a transaction exchange money and securities." *See id.* at 360 n. 4.

**50.** The *Resorts Int'l* court states that in the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction. *See id.*

system (*see Kaiser I*, 913 F.2d at 849;[51] *Wieboldt*, 131 B.R. at 664–65); (5) the transaction implicated participants in the system of intermediaries and guarantees which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guarantees in the chain were invoked (*see Zahn*, 218 B.R. at 676; *Jewel Recovery*, 196 B.R. at 352; *Healthco Int'l*, 195 B.R. at 983; *Wieboldt*, 131 B.R. at 665–65).

Taking account of the language of § 546(e) in the light of these considerations, this Court affirms the bankruptcy court's determination that § 546(e) does not apply to protect the Challenged Trades from the Trustee's avoidance power under § 548(a)(1)(B). The Court concludes that (1) the transfers Appellants rely upon to enforce their Challenged Trades do not satisfy the criteria defining "margin payments" or "settlement payments" and (2) the application of § 546(e) to the circumstances present in this case would be inconsistent with the overall scheme of the Bankruptcy Code and would substantially impede the fair and effective operation of SIPA. *See Charisma Sec.*, 506 F.2d at 1195.

As an initial matter, the Court does not need to reach the parties' dispute as to whether, as the Trustee holds, § 546(e)'s reference to "transfer" encompasses only actual movements of cash and securities and not incurrence of obligations, or whether, as Appellants' contend, the definition of "transfer" contained in § 101(54) is broad enough to encompass the various phases of the clearance and settlement process of securities transactions through which property or "an interest in property" passes that do not necessarily entail actual conveyance of cash or securities. *See* 11 U.S.C. § 101(54).[52] Regardless of how broadly or narrowly the term is defined, this Court is persuaded that the transfers which Appellants seek to enforce against Adler either did not constitute qualifying "payments" or did not contemplate consummation of a bona fide securities "settlement" in the relevant sense of these words.

The bankruptcy court found that none of the Appellants had sufficient funds at Adler to pay for the Blue Chips. Thus, with the exception of whatever value may be ascribed to the proceeds from the sale of Appellants' House Stocks, the only other transfer or payment Appellants count on to complete their transactions are the "purchase" payments Hanover, by means of automatic entries on Adler's books, credited to its customers' accounts and simultaneously debited from its proprietary account. The bankruptcy court, however, characterized Appellants' House

---

**51.** *But see Munford v. Valuation Research Corp.*, 98 F.3d 604, 610 (11th Cir.1996) (holding § 546(e) not applicable to payments by a financial institution to shareholders in an LBO because the bank served only as an intermediary or conduit and never acquired a beneficial interest in either the funds or the shares); *cf. Resorts Int'l*, 181 F.3d at 516–17 (taking issue with *Munford's* standard that the transferee of the payment must acquire a beneficial interest in the securities or funds).

**52.** The Court notes that as regards one issue that may bear upon this argument the circuit courts have expressed disagreement. One view holds that a transfer may include clearing through parties who serve only as intermediaries or conduits and do not acquire a beneficial interest in the property involved in the transaction, and that such transfers constitute settlement payments protected by § 546(e). *See e.g. Kaiser II*, 952 F.2d at 1236 (payments to intermediary brokers as part of a leveraged buyout). Another circuit took a contrary position. *See Munford*, 98 F.3d at 610.

Stocks as "practically worthless" (*Decision*, 247 B.R. at 106) and found these securities constituted but a fraction of the purchase price of the Blue Chips. To create a semblance on paper that its proprietary account was replenished with cash sufficient to pay for its House Stocks purchases, Hanover executed fake purchases of House Stocks as well as fake Short Sales of Blue Chips. However, because of Hanover's insolvency at all times during the Final Week and its inability and lack of intent to pay for those acquisitions, its reason for proceeding with these transactions, as the bankruptcy court determined, was to defraud Adler and its creditors.

Accordingly, the "payments" Hanover, acting as Appellants' agents, entered into Appellants' accounts and obligated Adler to deliver upon were not posted as elements of trades that contemplated a settlement of the transactions in the ordinary course of business. Rather, they were actually integral components of Hanover's criminal conduct and other wrongful acts committed to "enhance the SIPC claims of the Claimants, not to have the trades performed." *Decision*, 247 B.R. at 104. To this extent, these portions of phantom fraudulent payments Appellants seek to apply to their purchase of Blue Chips could not be considered as contemplating a normal "completion of a securities transaction" as commonly understood in the securities industry. *Kaiser I*, 913 F.2d at 849; *see also Comark*, 971 F.2d at 325; *Bevill*, 878 F.2d at 752. While the statutory definition of settlement payment may be obscure and elusive, one clear policy purpose Congress reflected was to "protect ordinary course of business transfers related to the purchase or sale of securities." *Healthco Int'l*, 195 B.R. at 983 (citing H.R.Rep. No. 595, at 392 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6348).

To the degree the definition of "settlement payments" Congress drafted to govern application of § 546(e) employs as a reference point transfers in the ordinary course of business "normally regarded [in the securities trade] as part of the settlement process" for the particular transaction (*see Bevill*, 878 F.2d at 752), the form of "payments" so steeped in fraud that Appellants here rely upon can hardly be deemed so "normally regarded". *Id.; see also Healthco Int'l*, 195 B.R. at 983. An inherent aspect of these payments encompassed, as elements of Hanover's "integrated scheme", transfers specifically designed to undermine the very statutory design Congress enacted to protect the securities industry.

Appellants argue that their transactions satisfy the definition of "settlement payments" because "Adler delivered the cash to the Appellants by debiting it out of Hanover's account and into theirs." Appellants' Reply at 24 (citing *Decision*, 247 B.R. at 82). Appellants overlook, however, whatever "cash" Adler "delivered" to Appellants it transferred only because Hanover made fraudulent entries into its customers' accounts that included Hanover's manipulated prices, and that Adler could not debit any "cash" out of Hanover's account because Hanover, then insolvent, had no "cash" it could deliver. Thus, Hanover knew that any "cash" it booked into its customers' accounts as part of the Challenged Trades' settlement had to derive, if at all, by way of its fraud upon Adler and SIPC. Consequently, "payments" for the trades Hanover mechanically posted as transfers by Adler for the benefit of selected customers could no more be classified as "normal" in securities trades than rubber checks could be commonly regarded as acceptable means of payment in the banking industry.

Second, for the same reasons, the payments Hanover booked into Appellants' accounts at Adler did not constitute transfers paid out as consideration in a bona fide exchange for the House Stocks it purported to buy from Appellants, or for the Blue Chips it supposedly purchased on their behalf. In fact, Hanover had insufficient assets to exchange during the Final Week. Looking at the transaction as a whole, there is no evidence, as the bankruptcy court found, that what Hanover, acting as Appellants' agent, contemplated would proceed to settlement as to each trade was a bona fide, bargained-for exchange or negotiated contract rather than a consummated fraud against Adler and its creditors.

Hanover's various schemes, which encompassed multiple deceptions and manipulations designed to defraud Adler, could not be considered part of an arms-length "exchange" of consideration. Were the "payments" in question to be recognized as sufficient for Appellants to enforce the Challenged Trades, the bulk of the value Adler would exchange for actual cash or Blue Chip securities it would be obligated to transfer to Appellants' accounts would be the "cash" Hanover credited to its own proprietary account. These credits represented customer purchases of House Stocks that were fabricated and booked at Hanover's manipulated prices. *See Integra Realty*, 198 B.R. at 360 (examining a unilateral transfer of securities to shareholders, the court observed: "There was not really an exchange, and certainly, no consideration was given by the recipients for the exchange. The Court is not inclined to treat any delivery of stock to complete a distribution as a settlement payment.").

Third, because the "payments" Appellants rely upon to validate their Blue Chips purchases primarily represent Hanover's phony book entries into Adler's books, there were no actually completed transfers of cash and securities. The Blue Chips were never delivered, and the trades involving them never settled. For these reasons, avoiding the Challenged Trades would not entail unwinding trades settled long ago that might create a threat of disruption to the affected market. *See Kaiser I*, 952 F.2d at 1240–41. Similarly, the Court finds no evidence on the record indicating that any effects of reversing the Challenged Trades would spill over beyond Adler into the securities industry to threaten the "ripple effect" on other brokers and participants in the system that concerned Congress when it enacted § 546(e). *See Bevill, Bresler*, 878 F.2d at 747; *Integra Realty*, 198 B.R. at 360; *Jewel Recovery*, 196 B.R. at 352.

Insofar as Appellants contend they made qualifying settlement payments that were "partial" or "on account" as represented by the House Stocks legitimately in their accounts, the argument seeks to divorce aspects of Appellants' trades from Hanover's integral deceitful design that included manipulated prices sustained by fictitious transactions. The Court rejected this argument above. In response to Appellants' disclaimer that Hanover did not act as its authorized agent in connection with these transactions, the bankruptcy court determined otherwise in a conclusion this Court has endorsed. *See* discussion *supra* Part III.C.1.

Finally, this Court concurs with the policy concerns Judge Garrity articulated. Although no other brokers beyond Adler may be directly affected by the Challenged Trades, protecting the claims of a few customers at the expense of the many other creditors under the circumstances surrounding this case would not inspire stability and confidence in the capital markets. It would give a blessing to an intro-

ducing broker's massive, integrated scheme specifically intended to defraud its clearing house and SIPC and to benefit selected customers. The effect of enforcing these involuntary transfers against the debtor, for the benefit of some of those customers, would be to diminish the assets available for equitable distribution to all other similarly situated creditors. *See Jewel Recovery,* 196 B.R. at 352.

### (ii) *Margin Payments*

This Court concludes that essentially the same reasoning that would preclude the application of § 546(e) to protect the transfers in question as "settlement payments" would equally bar use of the statute to exempt the same fraud-tainted transfers as "margin payments." Like "settlement payments", the Bankruptcy Code defines "margin payments" by reference to what is commonly regarded as such transfers in the securities trade, including a general catchall to embrace a payment "that secures an obligation of a participant in a securities clearing agency." 11 U.S.C. § 741(5).[53]

Appellants contend that their House Stocks and their cash proceeds "secured payment to Adler", a securities clearing agency, and that Adler similarly held this property "as security for the Appellants' obligation to pay for the Blue Chip Buys." Appellants' Brief at 74. However, the participant in a securities clearing agency referred to in § 741(5) is Adler, as clearing house, not Appellants as customers. Thus, the "obligation" that § 741(5) defines as being secured by a margin payment must be that "of" Adler to perform in a manner that implicates its participation in a clear-

ing agency, rather than that of Appellants as customers to pay Adler.

In this case, the obligations Adler incurred to perform the Challenged Trades on behalf of Appellants were those created by Hanover's book entries of debits and credits for securities purchases at manipulated prices it quoted and in amounts Hanover knew it could not pay and thus also knew Adler would be obligated to pay. Although the bankruptcy court found that Adler regularly monitored Hanover's accounts, it also noted that Adler did not have the ability to do so on a real-time basis. *See Decision,* 247 B.R. at 90, 121. Thus, Adler was not in a position under the circumstances to determine immediately the adequacy or reality of the assets available in its Hanover-related accounts as margin to secure Adler's obligation to the clearing agency, thereby placing Adler and the system at risk of loss. As a consequence, under Appellants' theory of margin payments, Adler's determinations regarding transfers to secure its obligations to the clearing agency would be made not by Adler, but by Hanover's unilateral fraudulent entries on Adler's books. By these means, Adler in effect would be obligated to become a participant and to aid in perpetrating a fraud upon itself devised by its introducing broker.

The Court concludes that, under the circumstances established by the evidence the bankruptcy court cited in this case, Appellants' argument must fail. To classify the transfers Appellants characterize as "margin payments," thus qualifying for the protection of § 546(e) and entitling Appellants to enforce the Challenged Trades against Adler, would run counter to the

---

**53.** Section 741(5)'s complete definition of "margin payment" states:

[P]ayment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, ini-

tial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency. *Id.*

common understanding of margin payments in the ordinary course of the securities trade and conflict with essential purposes of the Bankruptcy Code and SIPA.

### (iii) *The Holistic Statutory Framework*

It is true, as Appellants stress, that as regards margin or settlement payments, § 546(e) specifically preserves the bankruptcy trustee's power to avoid transactions as fraudulent conveyances only to the extent the claim is brought pursuant to § 548(a)(1)(A), which by its terms applies only to transfers by the debtor with actual intent to defraud creditors. From § 546(e)'s recognition of this exception, Appellants deduce that the trustee's remedy must be exclusive, and that under SIPA once a claim for cash or securities satisfies the literal requirements of SIPC Rules 300.501 or 502, the transaction must be honored. *See* Appellants' Brief at 70, 77; Appellants' Reply at 25, 29.

Under this theory, § 546(e) would insulate from avoidance by the trustee, under any other applicable law incorporated by § 544(b) [54], any property transfers in connection with execution of a securities trade. In other words, if the transaction does not qualify as a fraudulent conveyance by a debtor, the trustee is barred from challenging its validity or enforceability under any other theory, even if the transaction is otherwise permeated with fraud that is not directly attributable to the debtor or to the claimant.

The conclusion Appellants draw does not follow. It rests on a flawed syllogism that omits due recognition of a vital link in the statutory design, and represents an untenably constraining interpretation of the overall framework reflected in the interconnections among the Bankruptcy Code, SIPA and the SIPC Rules. First, the Bankruptcy Code applies to SIPA liquidations only to the extent it is consistent with SIPA. *See* 15 U.S.C. § 78fff(b).

Second, Appellants' argument invokes Rules 300.501 and 502, while essentially overlooking or discounting the effect of Rule 300.503. The latter provision states unequivocally that nothing in the Series 500 Rules shall be construed to limit the trustee's rights in a SIPA proceeding to avoid any securities transaction as "fraudulent, preferential, *or otherwise voidable* under applicable law." 17 C.F.R. § 300.503 (emphasis added). This Rule, juxtaposed following Rules 501 and 502, must be viewed as serving a purpose of limitation, as a qualifying proviso, and not an appendage or nugatory afterthought.

Rule 503's reference to "under applicable law" indicates that the avoidance power reserved extends beyond SIPA and the Bankruptcy Code, and thus could incorporate relevant fraud avoidance actions recognized by other federal and state laws. *See Ensminger I,* 218 B.R. at 702 (reference to "other applicable law" in § 544(b) incorporates "any applicable law, including, *but not limited to,* SIPA, the Bankruptcy Code, and New York's Debtor and Creditor Law") (emphasis added). Moreover, the language "fraudulent *or* otherwise voidable", framed as it is in the alternative, clearly signifies an intent to encompass avoidance actions predicated upon legal theories grounded not solely on fraudulent conveyances by a

---

**54.** Section 544(b) authorizes the trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b); *see also* 15 U.S.C. § 78fff(b), which makes chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11 applicable to SIPA proceedings.

debtor but extending as well to principles rendering the transactions "otherwise voidable", as, for example, under common law rules regarding rescission or unenforceability of contracts entered into in violation of statutes.

Accordingly, where, as in the instant case, the requirements of § 548(a)(1)(A) may not be satisfied—because the debtor itself may have made no intentionally fraudulent transfer, but nonetheless was itself manifestly the victim of deliberate deceit in connection with the particular transaction—nothing in the language, legislative history or statutory intent of § 546(e) may reasonably be construed to countenance the use of the stockholder defense as Appellants propose. The effect of this theory would be to apply the statute, not as a shield to protect truly bona fide trades of parties uninvolved in any misconduct, but as a device employed by the perpetrator, and/or its principals or beneficiaries, to affirm and enforce a fraud the existence of which depends, as an integral component of the scheme, upon payments that are sought to be immunized as "settlement" or "margin" payments. Courts confronted with claims to extend the application of § 546(e) so as to give effect to fraudulent schemes have rejected the effort. *See Wider v. Wootton,* 907 F.2d 570, 573 (5th cir.1990) (asserting that the court "will not implicitly authorize fraudulent business practices through an unjustified extension of the stockholder defense").

### D. *AVOIDANCE OF TRANSFERS PURSUANT TO § 544(b) AND NEW YORK DEBTOR AND CREDIT LAW*

Section 544(b) of the Bankruptcy Code empowers the trustee to "avoid any transfer of interests of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowed] unsecured claim" against the debtor. 11 U.S.C. § 544(b). "Applicable law" for these purposes in the instant case would include the New York Debtor and Creditor Law, the relevant portions of which are contained in §§ 270–81. *See* N.Y. Debt. & Cred. Law §§ 270–81 (McKinney 1990). The statute contains avoidance provisions comparable to those the Bankruptcy Code authorizes, enabling creditors to avoid transfers that are actually fraudulent (*see id.,* § 276) or constructively fraudulent. *See id.,* §§ 273–74; *see also In re Harvard Knitwear, Inc.,* 193 B.R. 389, 392 (Bankr.E.D.N.Y.1996).

The bankruptcy court noted that New York's Debtor and Creditor Law and § 548 of the Bankruptcy Code "devolve from the same source, are founded on the same principles and are designed to effectuate the same purposes." *Decision,* 247 B.R. at 116 (*citing* the Statute of Elizabeth, 13 Eliz., ch. 5 (1571); 5 *Collier,* ¶¶ 548.01[2], at 548–8, 548.LH[2] at p. 548–89). Accordingly, the court held that the same intent imputation doctrine it had employed in connection with its determination of the Trustee's § 548(a)(1)(A) avoidance claim applied under New York law as well, and that on the same basis that the Trustee could avoid the Challenged Trades under § 548(a)(1)(A) he is also entitled to judgment pursuant to §§ 273–74 of the New York Debtor and Creditor Law. *See id.*

For the reasons described above, to the degree that the New York Debtor and Creditor Law's avoidance provisions are coextensive with and grounded on the same substantive principles and purposes as § 548, this Court concludes that the Trustee may avoid the Challenged Trades as constructively fraudulent under §§ 273–74, but not as actually fraudulent

under § 276 of the New York Debtor and Creditor Law.

In part, the bankruptcy court found support for the Trustee's position in *Stochastic Decisions, Inc., v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993). This Court does not read in *Stochastic* the extension of the intent imputation doctrine that would be necessary in this case to find actual fraudulent intent on Adler's part. That case, which primarily involved an action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, did not deal with the issue at hand in any meaningful way.

The very brief mention in *Stochastic* of the New York Debtor and Creditor Law as construed by the New York Court of Appeals that is cited and relied upon by the bankruptcy court referred to "a *creditor's remedy for money damages* against parties who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance." *Id.* (emphasis added). This Court does not read this language to clarify the specific issue relating to the scope of intent imputation under the domination or control doctrine that the Court found insufficiently settled in connection with § 548(a)(1)(A). *See* discussion, *supra.* Part III.C.1.b.

## E. *RESCISSION OF CONTRACTS UNDER NON–BANKRUPTCY LAWS*

The bankruptcy court upheld the Trustee's determinations to rescind the Challenged Trades as fraudulent transfers under New York common law and as illegal contracts under federal and state securities laws. This Court affirms the bankruptcy court's rulings on these grounds.

### 1. *Common Law Fraud*

Under New York law, an action for common law fraud requires a plaintiff to establish, by clear and convincing evidence, each of the following elements: that the defendant (1) made a material, false statement; (2) knowing that the representation was false; (3) acting with intent to defraud; and that plaintiff (4) reasonably relied on the false representation; and (5) suffered damage proximately caused by the defendant's actions. *See Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir.1994); *Vermeer Owners, Inc. v. Guterman*, 78 N.Y.2d 1114, 578 N.Y.S.2d 128, 585 N.E.2d 377, 378 (1991). The remedies available in an action challenging a contract procured by fraud or false representation include rescission and cancellation. *See Davis v. William Rosenzweig Realty Operating Co.*, 192 N.Y. 128, 84 N.E. 943, 944 (1908); *Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 611 N.Y.S.2d 533, 534 (1st Dept.1994).

#### a. *The Hanover's Misrepresentations*

The bankruptcy court found that, through its direct computer links with Adler, Hanover made the following representations to Adler: (a) customers were really purchasing and intended to pay for $45.1 million in House Stocks; (b) Hanover was going to pay for the $22 million in securities that remained in its proprietary accounts; (c) the prices for the Fake Buys represented the true market price real customers were willing to pay for the House Stocks; and (d) there were assets available from Hanover's customers to pay for the Fake Buys and Fake Short Sales that Hanover booked in the Final Week. *See Decision*, 247 B.R. at 120–21.

As the bankruptcy court had determined in connection with its analysis of the Trustee's claims under § 548, Hanover knew at

the time it made these representations that they were false and that Hanover uttered them to deceive Adler into clearing the Challenged Trades. *See id.* The court also found that Adler reasonably relied on Hanover's misrepresentations and was damaged as a consequence by incurring obligations to deliver cash and Blue Chips in exchange for the House Stocks Claimants sold to Hanover. *See id.* at 125. Finally, the court found that in making these representations Hanover acted as Claimants' agent. *See id.* at 121 n. 95.

Appellants do not dispute that Hanover explicitly or implicitly made the representations the bankruptcy court found to be fraudulent. *See* Appellants' Brief at 84. They take issue only with the court's conclusion that Hanover acted as their agent in making those representations and with the court's treatment of the reliance issue. They contend that the court did not determine that Adler relied on the Hanover's false statements and that in fact the trial record established conclusively that Adler did not rely on Hanover's ability to pay for its purchases of House Stocks, or on the legitimacy of the Fake Buys and Fake Short Sales. *See id.*

b. *The Bankruptcy Court's Rulings and Factual Basis*

In assessing the reasonable reliance elements, the bankruptcy court reviewed the trial record at length and reported and relied upon the following factual findings:

- While Adler supervised the trading accounts of Hanover and other corresponding brokers on a daily basis, it could not do so on a real-time basis because trades were not reflected in Adler's books and records until the morning after the trades were made. *See Decision,* 247 B.R. at 121.

- For approximately two weeks before the Hanover closed, Adler was providing regular information to NASD and the NYSE about Hanover's financial condition and trading in House Stocks. *See id.* A team of NYSE and NASD regulators appeared daily on Adler's premises to monitor trading by Adler and Hanover and to ensure that they were in capital compliance. *See id.*

- Adler was aware, based on customer complaints during the period from early December 1994 to late January 1995, that Hanover was being accused of improprieties and that it was the subject of an SEC investigation for securities fraud. *See id.* at 121–22.

- Until the day Hanover closed, the evidence that the NASD had received indicated to the NASD that the Hanover was in capital compliance; in fact, the NASD reported to NYSE on February 23, 1995, the day before Hanover closed, that the firm was in capital compliance. *See id.*

- Adler had reason to be believe that in late January 1995, Hanover was or would soon be out of capital, and for that reason demanded a $10 million capital infusion from Hanover. *See id.*

- There was no evidence to suggest that Adler knew that Hanover was in fact out of capital during the Final Week. *See id..*

- Shortly before Adler closed on February 26, 1995, Adler's shareholders infused $1 million in capital into Adler in an effort to protect it from a net capital deficiency caused by Hanover's failure, evidencing that Adler had no concept of the breadth of Hanover's or of Adler's financial condition. *See id.*

- Adler personnel, in deposition testimony, flatly denied knowledge of Hanover's fraudulent scheme. *See id.*

- Although Adler could have terminated its computer link with Hanover at any time, the evidence does not reflect that Adler should have done so based upon the knowledge that Adler possessed. *See id.* at 122.
- Despite Adler's efforts, Hanover successfully concealed the nature and extent of its fraudulent scheme from Adler and the regulators. *See id.* at 124.

On these facts based on trial testimony and other evidence on the record, the bankruptcy court concluded that, whatever knowledge Adler had of Hanover's trading irregularities or financial condition, "Adler had no inkling of the true extent of Hanover's troubles or that it was engaging in fraudulent trading in an effort to stay in business." *Id.* at 123. The court thus specifically found that "Adler reasonably relied on Hanover's false representations." *Id.* at 124.

Appellants' challenge of the bankruptcy court's findings and conclusions contends that (1) the court did not find by clear and convincing evidence that Hanover's false representations constituted a substantial factor in Hanover's decision to clear and settle Appellants' trades; (2) Adler not only did not rely on Hanover's misrepresentations, it knew them to be false and consciously chose to continue to clear and settle trades for Hanover, such knowledge precluding a determination of reliance; (3) Adler knew Hanover could not pay for its purchases of House Stocks; (4) Adler knew Hanover's Fake Buys and Fake Short Sales were not authorized; (5) even if Adler did believe and rely on Hanover's false representations, its reliance was not justified because the truth was staring Adler in the face and Adler chose to look the other way; and (6) because Adler guaranteed Hanover's trades on behalf of Appellants, the Trustee cannot rescind them on the basis of Hanover's frauds.

These arguments essentially represent a frontal attack on the bankruptcy court's factual findings, challenging the judge's assessment of trial testimony and other evidence of record. In each case, Appellants read the same record and reach different factual conclusions from it.

On this appeal the applicable standard of review is clear error, even if at trial on the merits a heightened standard, such as clear and convincing evidence, may have applied. *See United States v. Costello,* 275 F.2d 355, 357 (2d Cir.1960). Whatever the standard, the reviewing court is obligated to give the trial court due deference and cannot reverse where it finds that the trial court, reviewing conflicting versions of evidence, decides to credit that offered by the party it determines to be more credible or convincing. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504 ( "[W]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous."); *EEOC v. Local 638,* 81 F.3d 1162, 1174 (2d Cir.1996).

The Court has reviewed the record and Judge Garrity's exhaustive analysis of the evidence. On this basis, this Court upholds the bankruptcy court's findings as "plausible in light of the record in its entirety." *Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504. The Court is not persuaded that Appellants have established clear error in the bankruptcy court's review of the record or in its factual findings. Many of these determinations necessarily rest on the trial court's assessments of credibility of given witnesses, what material to credit and how much weight to assign to particular testimony or documents.[55]

---

**55.** In reviewing the dispute over whether Adler had guaranteed Hanover's trades, for example, the court, referring to evidence offered by Appellants' expert, observes that

Appellants' quarrels with regard to these issues rest substantially on matters of judgment, on their being unable to come to terms with factual determinations the trial judge reached that differ from their own subjective reading of the evidence. At best, Appellants what assert is that there is another permissible reading of the record. To this extent, this Court remains unconvinced by Appellants' claims of error. The Court also finds the bankruptcy court's conclusions of law consistent with applicable rules and precedent.

#### c. *Appellants' Responsibility*

First, with regard to Appellants' responsibility for Hanover's representations acting as Appellants' agent, the relevant factual issues and legal principles were already considered above in the discussion of the question as it relates to application of the Bankruptcy Code's fraudulent conveyance provisions. *See* Section ___, *supra.* The Court incorporates and reiterates its conclusion upholding the bankruptcy court's corresponding determination that in making the representations here at issue Hanover acted as Appellants' authorized agent.

#### d. *Reasonable Reliance*

Next, the Court addresses the common law issue in dispute. The standard of reasonable reliance and due diligence applied under New York Law is articulated in *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980). In fraud actions, a plaintiff need not establish due diligence except in cases "in which plaintiff was on guard or practically faced with the facts." *Id.; see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542

(2d Cir.), *cert. denied*, 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997); *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 18, 23–25 (2d cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

Reliance is a distinct element of fraud. *See* Restatement (Second) Torts § 537 (1977); *see also id.,* § 546 ("Reliance is to fraud what proximate cause is to negligence; that is to say, fraud and injury must bear the relation of cause and effect"). A plaintiff asserting fraud may rely on a representation without undertaking to investigate if the representation related to matters uniquely within the defendant's knowledge and plaintiff has no independent means available to ascertain the truth. *See Lazard Freres*, 108 F.3d at 1542 (If plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into a transaction by misrepresentations."); Restatement (Second) of Torts § 540 ("The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.") *see also Mallis*, 615 F.2d at 80–81. While reliance must be justifiable, mere negligent failure to investigate adequately is insufficient to bar a claim of fraud. *See Albert v. Title Guar. & Trust Co.*, 277 N.Y. 421, 14 N.E.2d 625 (1938) ("It is no excuse for a culpable misrepresentation that means of proving it were at hand.").

Applying these standards here, the bankruptcy court, following its lengthy

---

"[w]e are unpersuaded by Lowry's report and the testimony he gave during the trial on this issue." *Decision,* 247 B.R. at 119. Instead, the court credits the testimony of the Trust-

ee's expert: "We find Mr. Press' testimony to be more persuasive and in keeping with the plain language of the Clearing Agreement." *Id.*

recitation of the relevant evidence, specifically concluded that "Adler reasonably relied on Hanover's false representations. It was damaged as a consequence. . . ." *Decision,* 247 B.R. at 124. These findings explicitly express the three necessary factual elements pertaining to reliance: (1) establishment of the presence of reliance; (2) demonstration that the reliance was reasonable; and (3) the cause and effect relation between reliance and the injury alleged. The court's determination that Adler was "damaged *as a consequence*" of Hanover's fraud, immediately following its finding of reasonable reliance, cannot be fairly read as other than a reflection of the causal relation— "consequence"— between the reliance and the injury— the effect— Adler suffered on account of it.

The evidentiary record sufficiently sustains the bankruptcy court's finding, made after trial and an exhaustive review of the facts, that Adler's knowledge "does not even remotely approach what is tantamount to complicity in Hanover's fraudulent scheme, or even acquiescence in Hanover's actions as a calculated risk with a profit motive." *Decision,* 247 B.R. at 122–23. This conclusion is supported by the deposition testimony of Edward Cohan, Adler's Chairman and Chief Executive Officer, who testified that it was not until the evening of February 23, 1995 that he came to believe Hanover was engaged in illegal conduct through bribery of Short Sellers, actions he immediately reported to the NYSE. *See id.* at 122 (citing Cohan Dep. Tr. 62:18; 166:12–15; 182:4–183:9; 185:21–187:4; 206:8–207–8). William Giordano, Adler's second in command confirmed Cohan's statements concerning Adler's knowledge of Hanover's conduct. *See id.* (citing W. Giordano Dep. Tr. 10:16–18; 16:7–11; 34:17–35). To the same effect, the Trustee's expert testified at trial that Hanover's fraud and true financial condi-

tion were not apparent to Adler. *See id.* at 124.

By contrast, Appellants quote various statements from the record purportedly contradicting or casting doubt on the testimony the bankruptcy court relied upon, and demonstrating the extent of what Adler knew or should have known about Hanover's financial troubles and illegal activities. *See* Appellants' Brief at 87–99. This Court offers three responses to Appellants' contention. First, to the degree Appellants' case rests upon possible doubts reflected in the testimony of witnesses, or on conflicting interpretations of the record, the trier of fact is in the best position to assess the probity of witnesses and to assign their statements and related proof appropriate relevance, credibility and weight. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504. Upon review of such conflicts, this Court must accord due deference to the trial court's findings of fact and to its resolution of conflicting testimony. It bears noting on this point that as regards the standard of review of the bankruptcy court's factual findings, the Bankruptcy Rules do not distinguish between oral and documentary evidence. *See* Fed. R. Bankr.P. 8013. Taking account of these considerations, the Court finds sufficient evidence to support the bankruptcy court's findings and is not persuaded that Judge Garrity's factual determinations on the various points Appellants contest are clearly erroneous.

Second, there is a significant difference, as the bankruptcy court acknowledged, between, on the one hand, Adler's state of knowledge and reasonable suspicions about Hanover's financial difficulties and irregularities, and, on the other, both Adler's total appreciation of the full breadth of Hanover's massive frauds and other criminal conduct, as well as its conscious and affirmative complicity in those

unlawful actions. This distinction express-es the substantive contrast, which amounts to more than just a matter of degree, in dividing mere negligence from reckless-ness or actual intentional misconduct. *See, e.g., Daniels v. Williams*, 474 U.S. 327, 334, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Third, Appellants' theory is tantamount to an accusation that Adler, in pursuit of its own profit motive, knowingly or reck-lessly, aided Hanover's frauds or deliber-ately chose to look the other way. *See* Appellants' Brief at 86. This argument poses a dilemma which should give Appel-lants grounds for pause, as it does to the Court. For, were the Court to adopt the predicate of Appellants' claim, the implica-tions to their case would be severe. In essence, Appellants urge the Court to ac-cept that Adler, with full knowledge and in conscious or reckless disregard of the facts and for its own gain, chose to facilitate Hanover's fraud. Were the Court to so determine, it could hold that Adler's con-duct was sufficiently conscious or reckless that Adler could be deemed to have pos-sessed the actual intent to defraud its creditors. In that event, Adler's transfers of property in connection with the Chal-lenged Trades would satisfy the elements for avoidance of fraudulent conveyances pursuant to § 548(a)(1)(A) of the Bank-ruptcy Code and its companion state law provision, New York Debtor and Creditor Law § 276. *See Personnel Adm'r of Mas-sachusetts v. Feeney*, 442 U.S. 256, 278, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (express-ing "the presumption, common to the crim-inal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions").

On the facts of this case, there would then be no need to engage the issue of ascribing Hanover's fraudulent intent to Adler. Hence, the Trustee would be enti-tled to relief under § 548(a)(1)(A). *See*

*Salmon I*, at 13–14. Had the bankruptcy court viewed the evidence of Adler's knowledge and complicity to be as clear and convincing as Appellants assert it is, the court could have concluded that Adler itself possessed the requisite intent to de-fraud its creditors. It then would not have found it necessary to reach that result obliquely, without clear and controlling au-thority, by extending the domination or control doctrine to the facts of this case.

Recognizing this conceptual quandary, and the contradiction in Appellants' posi-tion, the bankruptcy court nonetheless ap-plied the imputed intent rule because it was persuaded that the record did not adequately support a finding of Adler's sufficient knowledge and involvement in Hanover's fraud. *See Decision*, 247 B.R. at 94. Accordingly, in accepting Appel-lants' argument here, the Court would be compelled to reverse the conclusion it reached above that the conditions for avoidance pursuant to § 548(a)(1)(A) are not satisfied in this case because the ele-ment of the debtor's intent to defraud could not be established by imputing Han-over's misconduct through the domination or control rule.

### e. *Adler's Claimed Guarantee*

The Court also finds no basis for revers-ing the bankruptcy court's ruling rejecting Appellants' argument that the Trustee's claim for rescission of the Challenged Trades based on Hanover's fraud cannot prevail, and that the transactions are en-forceable despite Hanover's fraud, on the ground that Adler had guaranteed all of Hanover's trades. In support of that as-sertion, Appellants relied upon the testi-mony of their expert and other witnesses, as well as on judicial admissions the Trust-ee purportedly made in allegations con-tained in the complaint that initiated this case and in related documents. *See* Appel-

lants' Brief at 99–104. The bankruptcy court found that the evidence to which Appellants refer did not establish the existence of a guarantee by Adler of all of Hanover's proprietary trades. Rather, the Trustee acknowledged, and the court held, that such a guarantee existed only as to Hanover's trades with the Street. *See Decision*, 247 B.R. at 119–20.

Under New York law, a special promise to answer for the debt, default or financial obligations of another person must be in writing. *See* N.Y. Gen. Oblig. Law § 5–701 (McKinney 1989); *Martin Roofing, Inc. v. Goldstein*, 60 N.Y.2d 262, 469 N.Y.S.2d 595, 457 N.E.2d 700 (1983); *Griffin v. Bookman*, 39 N.Y.2d 57, 382 N.Y.S.2d 733, 346 N.E.2d 534 (1976). While Appellants strenuously argue at length to establish the existence of the supposed guarantee through the testimony of numerous witnesses, some of them unrelated to Adler, they cite no document written and executed in accordance with the requirements of the law that confirms the reality and terms of the claimed guarantee as it pertains to Hanover's proprietary trades of House Stocks. Insofar as Appellants sought to locate the guarantee in the Clearing Agreement, Customer Agreement and Alder's confirmations, the bankruptcy court found no evidence of such a guarantee there. *See Decision*, 247 B.R. at 119. Neither has this Court's review of those documents produced the supposed guarantee.

Appellants' expert at trial claimed that the source of the guarantee was paragraph 3(a) of the Clearing Agreement, though conceding that the provision makes no reference to the term "guarantee". *See id.* Moreover, the irrevocable guarantee Appellants invoke is contradicted by paragraph 3(b) of the Clearing Agreement, which expressly grants Adler the right to cancel any transaction introduced by Hanover "for any reason". Clearing Agreement, ¶ 3(b). Moreover, paragraph 13 of the Clearing Agreement states that Adler "shall have no liability to any Introduced Accounts for any loss suffered by them." *Id.*, ¶ 13(b).

Appellants' search for the putative guarantee in industry practice is equally unavailing. The bankruptcy court found unpersuasive Appellants' expert's trial testimony that it was "customary" for clearing firms to back the obligations of introducing firms to customers in the event the latter failed to pay on settlement. *See Decision*, 247 B.R. at 119. The court noted that the expert failed to specify the nature, terms or instances of the existence or enforcement of this "customary obligation". *See id.* On the other hand, the Trustee's expert testified to the contrary, stating that "he has spoken to the major clearing firms in this country and was explicitly advised that they 'do not guarantee [such] trades'." *Id.* The bankruptcy court concluded that this testimony was more persuasive and more consistent with the plain language of the Clearing Agreement. *See id.*

The issue of the existence of a guarantee and the scope of a guarantor's obligations pursuant to such a claimed agreement is a question of law determined by applicable principles of contract and suretyship law. *See Martin Roofing*, 457 N.E.2d at 701. The testimony of expert witnesses, or even parties, however clear or cogent, cannot give rise to an agreement not manifest in any writing, or that relevant documents expressly deny. This Court finds no basis for overturning the bankruptcy court's findings and conclusions on this issue.

## F. *RESCISSION OF TRADES AS ILLEGAL CONTRACTS*

### 1. *Illegality Under Securities Laws*

The bankruptcy court, applying the common law doctrine concerning the unen-

forceability of illegal contracts, granted the Trustee's application to rescind the Challenged Trades on the grounds that the transactions violated the criminal provisions of three securities statutes: § 10(b) of the Securities Exchange Act of 1934 (the "SEC Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; the illegality provisions of SIPA, 15 U.S.C. § 78jjj(c); and New York's Martin Act, N.Y. Gen. Bus. L. § 352(1) (McKinney 1996) (the "Martin Act"). Each of these statutes declares unlawful the use of any device, scheme or artifice to defraud any person in connection with securities transactions subject to the statutes. *See id.*[56]

Appellants do not dispute that in booking the Challenged Trades their Hanover brokers engaged in criminal conduct that contravened these statutes. Rather, they contend that Appellants personally did not violate any law and that the illegality of contract principle is an extraordinary equitable remedy not available to the Trustee to invoke against Appellants. *See* Appellants' Brief at 104. In particular, Appellants take issue with the bankruptcy court's application of § 29(b) of the SEC Act,[57] which Appellants contend permits rescission of illegal contracts only against direct violators with actual knowledge, and not against innocent parties.

Appellants raise no specific issue as to the application of the criminal provisions of SIPA or the Martin Act. Instead they argue that, assuming their relevance, public policy and equitable considerations weigh in favor of enabling Appellants to enforce the Challenged Trades. *See id.* at 107. In essence, they maintain that the Trustee possesses other remedies he has already pursued against Hanover and the Illegal Short Sellers to vindicate the wrongs committed here, and therefore no equitable policy or statutory purpose would be served by permitting the Trustee to apply the illegality principle against innocent customers. This Court finds no merit in Appellants' arguments. Nor does it see sufficient legal basis to disturb the bankruptcy court's reasoning and conclusions relating to this issue.

 Under both federal and New York law, illegal contracts are unenforceable. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77–78, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982); *Benjamin v. Koeppel*, 85 N.Y.2d 549, 626 N.Y.S.2d 982, 650 N.E.2d 829, 830 (1995). The New York general rule is articulated in *Benjamin:*

---

**56.** In relevant part, SIPA's criminal penalty provision applies in particular to any person who, directly or indirectly, in connection with or in contemplation of any liquidation or direct payment procedure -

> (C) fraudulently or with intent to defeat this chapter— (i) conceals or transfers any property belonging to the estate of the debtor... (iv) receives any material amount of property from a debtor...

15 U.S.C. § 78jjj(c).

**57.** Under § 29(b) of the 1934 Act:

> Every contract made in violation of any provision of this Act or of any rule or regulation thereunder, and every contract ...

heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this Act or any rule or regulation thereunder, shall be void (1) as regards to the rights of any person, who in violation of such provision, rule or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards to the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation.

15 U.S.C. § 78cc(b).

Illegal contracts are, as a general rule, unenforceable. However, the violation of a statute that is merely malum prohibitum will not necessarily render a contract illegal and unenforceable. If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy . . . the right to recover will not be denied.

626 N.Y.S.2d 982, 650 N.E.2d at 830 (internal quotation marks and citations omitted).

Appellants' reliance on general expressions of public policy and the purposes of the securities laws minimizes the severity of the extensive and deliberate fraud their brokers committed while acting within the scope of their agency. Appellants seek to enforce the benefits of their agents' wrongful acts, while ignoring the effects of those offenses on some of the central purposes of the securities laws. The misconduct here was no "merely malum prohibitum", but an uncontested, massive onslaught on the law, contravening three pertinent federal and state securities statutes, that comprises conduct wrong in itself. *See Palazzetti Import/Export, Inc. v. Morson,* No. 98 Civ.0722, 1999 WL 420403, *2 (S.D.N.Y. June 23, 1999). The statutory framework of these laws encompasses criminal prohibitions intended to punish and discourage precisely the wrongs Hanover's brokers committed. Rewarding parties who seek to avail themselves of the fruits of their agents' fraud would serve to advance no stated public policy expressed or implied in these statutes or articulated by any tenet of common sense.

### 2. *Exceptions for Innocent Parties*

The securities laws undeniably and for sound reason do provide exceptions to protect the legitimate trades and expectations of truly innocent parties. In claiming the mantle of innocence, however, Appellants' argument is premised on a point the bankruptcy court rejected: that in executing the Challenged Trades Hanover did not act as Appellants' authorized agent, in that connection making the fraudulent misrepresentations which in part constituted Hanover's criminal violations of § 10(b), SIPA and the Martin Act. This Court, in sustaining the bankruptcy court's conclusion, rejected Appellants' premise as well. *See* discussion *supra* Part III.C.1.c.

Appellants' reliance on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), for the proposition that they cannot be held responsible for Hanover's SEC Act violations is misplaced. *Central Bank* dealt with whether Rule 10b–5 liability extended separately to parties who aid and abet violations of the securities laws based on their own conduct that did not manifest the requisite fraudulent intent to break the law. The case did not expressly deal with the scope of liability by principals for securities violations committed by their broker-agents through actions taken within the scope of their authority.

The latter question has arisen in several cases in this District and has engendered disagreement among the courts. Some have held that an agency theory of liability remains available in Rule 10b–5 cases after *Central Bank. See Vento & Co. of New York, LLC v. Metromedia Fiber Network, Inc.,* No. 97 Civ.7751, 1999 WL 147732, *12 (S.D.N.Y. Mar.18, 1999) ("[I]f *Central Bank* had precluded the liability of a principal for the misconduct of its agent, that decision would have prevented any liability by corporations or partnerships under Rule 10b–5 since such legal entities can only act through their natural agents.

There is no indication that the Supreme Court intended such a drastic restriction on the possible defendants in securities fraud lawsuits."); *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 407 (S.D.N.Y.1998); *In re ICN/Viratek Sec. Litig.*, No. 87 Civ. 4296, 1996 WL 164732, *6 (S.D.N.Y. Apr.9, 1996); *Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788, 1995 WL 261518, *17 (S.D.N.Y. May 3, 1995).

Other courts have determined that after *Central Bank*, Rule 10–5 claims based on agency liability are no longer sustainable. *See Converse, Inc. v. Norwood Venture Corp.*, No. 96 Civ. 3745, 1997 WL 742534, *3 (S.D.N.Y. Dec.1, 1997); *ESI Montgomery County, Inc. v. Montenay Int'l Corp.*, No. 94 Civ. 0119, 1996 WL 22979, *3 (S.D.N.Y. Jan. 23, 1996).

 This Court finds that the better argument is made by the courts which have held that *Central Bank* does not bar application of agency principles to support liability in securities fraud cases. Judge Koeltl's reasoning in *Vento* is persuasive. *See Vento*, 1999 WL 147732, at *12. There the Court observed that in *Central Bank* the Supreme Court was concerned primarily with "broadening the range of unlawful conduct beyond that specifically prescribed by the [Exchange] Act." *Id.* (quoting *American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1430 (3rd Cir.1994)).

In *Winback*, the Third Circuit, noting that courts imposing liability on agency theories do not expand the scope of affirmative conduct proscribed by the relevant statute, held that *Central Bank's* discussion of aiding and abetting liability "should not be transplanted into the more settled realm of agency law." 42 F.3d at 1430–31. The court further added: "The principal is held liable not because it committed some wrongdoing outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its status merits responsibility for the tortuous actions of its agents." *Id.; see also Seolas v. Bilzerian*, 951 F.Supp. 978, 983 (D.Utah 1997).

The same agency law principles vitiate Appellants' claim as "innocent parties" entitled to the protection accorded by SEC Act § 29(b) to non-violators without actual knowledge that the making or enforcement of the contract was in violation of the SEC Act. The plain language of that provision casts doubt on Appellants' invocation of its safeguards. The contracts the Trustee in these proceedings seeks to rescind as illegal are the Challenged Trades Hanover executed on Appellants' behalf in accordance with the terms of the Clearing Agreement and the Customer Agreements. Appellants spent considerable energies arguing earlier in this appeal that they were parties to these very contracts, that their contracts became irrevocable on the trade date and that Appellants are entitled to enforce them. Hanover's knowledge of the illegal means it employed as Appellants' agent to execute the Challenged Trades may be imputed to Appellants. *See* discussion *supra* Part III.C.1.c.(ii).

The Court has considered Appellants' citation of *Occidental Life Ins. Co. of N.C. v. Pat Ryan & Assocs., Inc.*, 496 F.2d 1255, 1265–66 (4th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974) to support their assertion of rights under § 29(b). The Court considers the case, which deals with election of remedies, inapposite to the issues here on appeal. *See id.* at 1265–66 (stating that § 29(b) is "more properly viewed as an adjunct to the other remedies provided by the [SEC Act] and ... should be read as complementing those remedies available to the injured party and not as being antagonistic"). Rather, the case reinforces the common law rule the bankruptcy court proper-

ly applied here, that illegal contracts are voidable at the election of the victim. *See Kidder Peabody & Co. v. Unigestion Int'l., Ltd.,* 903 F.Supp. 479, 498 (S.D.N.Y.1995) ("contracts to purchase securities were induced through fraud in violation of the anti-fraud provisions of the Exchange Act, thus rendering those contracts 'unlawful contracts' under § 29.").

### IV. *CONCLUSION AND ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the Court's May 3, 2001 Order in this matter be amended as set forth herein; and it is further

**ORDERED** that the judgment of the bankruptcy court in this matter is affirmed, except insofar as the bankruptcy court purports to approve the Trustee's avoidance of the Challenged Trades pursuant to § 548(a)(1)(A) of the Bankruptcy Code and § 276 of the New York Debtor and Creditor Law; and it is finally

**ORDERED** that the Clerk of the Court close this case.

**SO ORDERED.**